1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

```
------------------------------:
                              :
UNITED STATES OF AMERICA      :
                              :
                              :
     -vs-                     :   Case No. 1:17-cr-204
                              :
                              :
ROSEMBERG M. MAJANO           :
      and                     :
JOSE A. ORELLANA MONTALVO,    :
             Defendants.      :
                              :
------------------------------:
```

PARTIAL TRANSCRIPT
(Defendant Orellana Montalvo's Testimony)

November 29, 2017

Before:   Liam O'Grady, USDC Judge

And a Jury

APPEARANCES:

Thomas W. Traxler and Dennis Fitzpatrick,
Counsel for the United States

Dwight E. Crawley, Counsel for Defendant Majano

Gregory B. English, Counsel for Defendant Orellana Montalvo

Defendants, R.M. Majano and J.A. Orellana Montalvo, in person

INDEX

WITNESS                              EXAMINATION        PAGE


  JOSE A. ORELLANA MONTALVO

                                     DIRECT               7
                                     CROSS               26
                                     REDIRECT            62

3

1              NOTE:  A portion of the case is heard on November 29,

2     2017 in the absence of the jury as follows:

3     JURY OUT

4              THE COURT:  All right, ladies and gentlemen, please

5     have a seat.

6              Mr. Majano, you have a right to testify in the case,

7     and an absolute right not to testify if you do not wish to.

8     And I want you to speak with your counsel now about your rights

9     and your decision.  All right?

10              MR. ENGLISH:  Your Honor, may I step out?

11              THE COURT:  Yes, please, go ahead.

12              NOTE:  Mr. English leaves the courtroom.

13              THE COURT:  So take a moment with Mr. Crawley, Mr.

14     Majano.

15              NOTE:  A discussion is had between defendant Majano

16     and his counsel.

17              MR. CRAWLEY:  At the appropriate time he's -- I don't

18     know if you want to wait for Mr. English to return.

19              THE COURT:  I don't think we need to wait for Mr.

20     English.

21              MR. CRAWLEY:  Thank you, Your Honor.

22              THE COURT:  Mr. Majano, have you had an opportunity

23     to discuss with your counsel, Mr. Crawley, whether you'll

24     testify or not?

25              DEFENDANT MAJANO:  (Through Interpreter) Yes, I did

4

1    speak.

2          THE COURT:  All right.  So you understand you have

3    the right to testify in your case if you wish.  If you do so,

4    you will be subject to cross-examination by Government

5    attorneys.

6          If you decide you do not wish to testify, you have

7    the right to remain silent.  And the fact that you have not

8    testified in the case cannot be used against you as evidence of

9    your guilt.

10         Do you understand that?

11         DEFENDANT MAJANO:  (Through Interpreter) Yes.

12         THE COURT:  All right.  You have had sufficient

13   opportunity to speak to Mr. Crawley about the decision?

14         DEFENDANT MAJANO:  (Through Interpreter) Yes.

15         THE COURT:  All right.  And are you going to testify

16   or not in the case?

17         DEFENDANT MAJANO:  (Through Interpreter) I will not

18   testify.

19         THE COURT:  All right.  Mr. Crawley, do you think you

20   have had sufficient time to speak with Mr. Majano about

21   testifying or not, sir?

22         MR. CRAWLEY:  Yes, Your Honor.  In fact, I met with

23   him many times at the Alexandria Jail.

24         THE COURT:  All right.  Okay.  Then Mr. Majano will

25   not testify.

5

1              Do you have any other witnesses that you will call?

2              MR. CRAWLEY:  No, Your Honor, not on behalf of Mr.

3    Majano.

4              THE COURT:  All right.  Then we will wait for Mr.

5    English then.  And I will ask you whether you have any

6    witnesses you want wanted to call and just tell the jury at

7    that time.

8              NOTE:  Mr. English returns to the courtroom.

9              THE COURT:  All right, Mr. English, Mr. Majano has

10   indicated he is not going to testify.  And Mr. Crawley has no

11   other witnesses that he is going to call.

12             Have you had the opportunity to speak to Mr. Orellana

13   Montalvo about testifying?

14             MR. ENGLISH:  Yes, sir, Your Honor, I have explained

15   his options.  And he elects to testify.

16             THE COURT:  So he understands that he may rely on the

17   right to remain silent and not testify, and that no inference

18   of his guilt can be made because he has not testified?  And on

19   the other hand, if he does testify, he is subject to

20   cross-examination under our rules of evidence; is that correct?

21             MR. ENGLISH:  Yes, sir, Your Honor.  If the Court

22   would like to inquire, he would be happy to answer any of your

23   questions.

24             THE COURT:  Mr. Orellana, have you had an opportunity

25   to speak with your counsel about testifying, sir?

6

1            DEFENDANT ORELLANA MONTALVO:  Yes, Your Honor.

2            THE COURT:  And after discussing it fully with him,

3   you decided to waive your right to remain silent and testify in

4   your defense?

5            DEFENDANT ORELLANA MONTALVO:  Yes, Your Honor.

6            THE COURT:  Okay.  All right.  Have a seat.

7            MR. ENGLISH:  Mr. Crawley will rest before I start my

8   case?

9            THE COURT:  Yes, sir.

10           MR. ENGLISH:  Thank you, Your Honor.

11           THE COURT:  All right.  Let's get our jury back in,

12   Joe.

13           NOTE:  At this point the jury returns to the

14   courtroom; whereupon the case continues as follows:

15   JURY IN

16           THE COURT:  All right, please be seated.

17           Mr. Crawley, did you wish to present any evidence in

18   your case, sir?

19           MR. CRAWLEY:  No, sir, Your Honor.

20           THE COURT:  All right.  Then, Mr. English.

21           MR. ENGLISH:  Thank you, Your Honor.  Your Honor, at

22   this time I would like to call my client, Alex Orellana, to the

23   stand.

24           THE COURT:  All right, please come forward and be

25   sworn, sir.

J.A. Orellana Montalvo - Direct

7

1          NOTE:  Defendant Orellana Montalvo is sworn.

2          THE COURT:  Please go ahead whenever you are ready.

3          MR. ENGLISH:  Thank you, Your Honor.

4          JOSE A. ORELLANA MONTALVO, the defendant herein,

5  called in his own behalf, first being duly sworn, testifies and

6  states:

7      DIRECT EXAMINATION

8  BY MR. ENGLISH:

9  Q.   Sir, would you please state your full name, spelling each

10  portion of it so Mr. Linnell can take it down.

11  A.   Yes.  It's Jose Alejandro Orellana Montalvo.  J-o-s-e

12  A-l-e-j-a-n-d-r-o O-r-e-l-l-a-n-a M-o-n-t-a-l-v-o.

13  Q.   And for the record, are you the defendant in this case?

14  A.   Yes, I am.

15  Q.   Now, what should we call you?

16  A.   You can call me Jose or Alex.

17  Q.   Which do you prefer?

18  A.   Alex.

19  Q.   Well, Alex it will be.  Regarding -- is it fair to say you

20  prefer to be called Alex Orellana?

21  A.   Yes, I do.

22  Q.   Why is that?

23  A.   You know, I've been here for a very long time and I've

24  always got grief for my actual real name, Jose, so I have gone

25  to the more Americanized, which Alejandro in English is

J.A. Orellana Montalvo - Direct

8

1    Alexander.  So I go by Alex.  And my last name Orellana from my

2    real father's last name.

3    Q.   How old are you?

4    A.   I am 25 years of age.

5    Q.   Are you a U.S. citizen?

6    A.   Yes, I am.

7    Q.   Where were you born?

8    A.   I was in San Salvador, El Salvador.

9    Q.   How long have you been in the United States?

10   A.   I have been in the United States for about 18 years.

11   Q.   Who do you live with here?

12   A.   I live with my girlfriend, I have a child, and her father,

13   and my stepdaughter.

14   Q.   And how much education have you had in the United States?

15   A.   I went to elementary school, I went to middle school.  I

16   dropped out of high school because of my learning disability.

17   I had a hard time reading and writing.  So I went to a military

18   school call Commonwealth Challenge of Virginia, I graduated

19   from there.  And when I went to do my GED, unfortunately, I did

20   fail my GED due to my disability of learning with my writing

21   and my reading.

22   Q.   How long was this military school?

23   A.   It was approximately six months.

24   Q.   And where was it located?

25   A.   It was located in Virginia Beach, Norfolk.

J.A. Orellana Montalvo - Direct

9

1    Q.    Did you live there when you were going to school?

2    A.    Yes, I did live there.  I was only allowed to visit my

3    house two times out of the entire time I was there, but that

4    was only of my good behavior.  If I did not behave well, I was

5    not allowed to go back home.

6    Q.    What learning disabilities do you have?

7    A.    I am having problems reading and writing.  Also

8    mathematics.  I don't know why, it just never stuck.

9    Q.    Now, what is your current occupation?

10   A.    I work at a Marriott Hotel.  I do night auditing, also as

11   front desk agent.

12   Q.    Now, when was your last visit to El Salvador?

13   A.    My last visit was July 17 through the 25th, if I'm not

14   mistaken.

15   Q.    Now, why did you go there?

16   A.    I had -- before I went, I was actually into a very bad

17   argument with my fiancée -- or my girlfriend, sorry.  We had

18   arguing -- argument about our financial issues.

19         My son also suffers from spina bifida, which is a

20   really bad case of spinal cord.  He had just recently came out

21   of surgery.  And due to his disabilities, I was -- couldn't

22   find work because of his physical therapy that he had to go.  I

23   got into a really bad argument with her.  I called my father, I

24   told him what was going on, I was depressed, I didn't know what

25   to do.

1        My father offered and he said, you know, let me see

2  if I can find a cheap plane ticket, you know, come over here

3  where I'm at, I'm doing some renovations --

4        MR. FITZPATRICK:  Objection, to the hearsay.

5        MR. ENGLISH:  Your Honor, it's not offered --

6        THE COURT:  Overruled.  I will allow it.

7  A.   My father told me to come help him do some renovations for

8  the house that he is selling over there.  He called me back, he

9  said, look, I found a ticket, just come over, you know, just

10 relieve some stress.

11       So I proceeded and I went to El Salvador to help my

12 father renovate his home.

13 BY MR. ENGLISH: (Continuing)

14 Q.   What did you do while you were there?

15 A.   Helped my father do paintings, we painted the walls.  A

16 little bit of electrical work, I wasn't really too familiar

17 with it, but mostly just painting.

18 Q.   Did you meet anyone there who is of significance in this

19 case?

20 A.   Yes.

21 Q.   Who was that?

22 A.   I met a person named Kevin Joel Lainez Lopez.

23       MR. FITZPATRICK:  Your Honor, I object to the form of

24 a question.  It assumes facts not in evidence.  Significance to

25 the case.

J.A. Orellana Montalvo - Direct

11

1    MR. ENGLISH:  Your Honor, if may have a moment, I can

2    connect it.

3    THE COURT:  Go ahead.  Overruled.

4    BY MR. ENGLISH: (Continuing)

5    Q.   And after you came home, did you hear from this Kevin

6    again?

7    A.   Yes, I did.

8    Q.   And how did that happen?

9    A.   The morning of August 10 when all this occurred, I

10   received a small phone call from Mr. Kevin.  He called me --

11   THE COURT:  Let me interrupt you for just a moment.

12   I think certain witnesses that testified for the Government

13   that are subject to recall have come into the courtroom, not

14   understanding -- Agent Honicker, was he subject to recall?

15   MR. FITZPATRICK:  No.

16   THE COURT:  Oh, not subject to recall.

17   MR. FITZPATRICK:  Agent Honicker is free to go or

18   stay.

19   THE COURT:  All right.  My mistake.  Thank you.

20   Okay, go ahead.

21   BY MR. ENGLISH: (Continuing)

22   Q.   Please continue.

23   A.   So that morning I received a small call from Mr. Kevin.

24   He had asked me as a favor if there was any way possible that I

25   go to the airport and pick up an individual --

12

1          MR. FITZPATRICK:  I apologize, Your Honor.

2   Objection.  May we approach?

3          THE COURT:  Yes.

4          NOTE:  A side-bar discussion is had between the Court

5   and counsel out of the hearing of the jury as follows:

6   AT SIDE BAR

7          THE COURT:  This is all hearsay.  I mean, I allowed

8   the question about the father because I knew he could testify

9   about what he did.  How are you getting this in?

10         MR. ENGLISH:  Your Honor, under if FRE 801(d)(2)(E),

11  a co-conspirator statement, this Kevin is the person who asked

12  him to go to the airport who had constant contact with him, who

13  was the puppet master who told him what to do, and is obviously

14  the person who dispatched the co-defendant.  That is a

15  reasonable inference to make from this.

16         He is prepared to give his full name, his address,

17  his phone number, and describe everything he did.  He will

18  explain how he met the person, and why he trusted the person,

19  and why he did what he did.

20         So he is the person -- we have had the texts.  We

21  have had the phone records showing the telephone calls back and

22  forth between him and this person in El Salvador.  He is going

23  to identify who the person is and say what was said during

24  those telephone conversations.

25         MR. FITZPATRICK:  Your Honor, first of all, it has to

J.A. Orellana Montalvo - Direct

13

1    be a co-conspirator statement in furtherance of the conspiracy.

2    I don't see that.

3           Even so, it has to have some indicia of reliability.

4    There is no way in the world to test the reliability of this

5    statement.  It is wholly inconsistent with the rest of the

6    evidence.  And he is not going to be able to put on any other

7    testimony to support the reliability.

8           So the prejudicial effect of these statements

9    outweigh any relevant value, and I don't see any relevance.

10          THE COURT:  Mr. Crawley wants I think to interject as

11    well.

12          MR. CRAWLEY:  I guess the concern I am going to have,

13    Your Honor, is if he going to testify that my client knows this

14    person -- because the inference he just made was that he is

15    going to identify this person as the person who communicated

16    with my client.

17          MR. ENGLISH:  No, sir, Your Honor.  My client will

18    testify he doesn't know the co-defendant and had never seen him

19    before August 10.  But there has been a lot of testimony about

20    someone in El Salvador from a number there who is telling the

21    co-defendant what to do.

22          My client is going to explain what he was told to do.

23    Clearly some conspiracy exists to get the cocaine into the

24    country.  My client was told to pick the person up in the

25    airport.

J.A. Orellana Montalvo - Direct

14

1        My whole defense is he was sent to pick up someone

2    without knowing what it was.  He is going to identify who the

3    person is and tell us move by move what the person told him to

4    do.  And also to establish why he trusted the person.

5        If I can make a proffer what he will say, it is that

6    his father was friends with someone who ran a hardware store.

7    And for years he had bought supplies from him to renovate his

8    house that he had there.  They went to a party for a girl who

9    had turned 15, which is a big deal in Hispanic culture, he met

10   the person's nephew, who was this Kevin who was there, and they

11   exchanged phone numbers.

12       So when Kevin called him and asked him to pick up

13   somebody from the airport, and he told him he would give him

14   $100 to pay him to do it, and would pay $50 for his expenses,

15   he had no reason to mistrust what was being said there.

16       He will further testify that when he was at the

17   airport, he got a call from his father's telephone that was

18   used by this Kevin, who checked on how he was doing.

19       His father will testify that when they were there and

20   they went to the party and they met the people, on August 10,

21   he was invited by the hardware store owner, Kevin's uncle, to

22   go to a cabana at a beach.  And while he was there, Kevin's

23   phone did not work, so he used his phone, that is one of the

24   calls we have which is identified, the name is Poppa, the

25   person used that phone to call my client to tell him what to

J.A. Orellana Montalvo - Direct

15

1    do.

2          So the Government has put in all this evidence of all

3    these calls and they say it is proof of the conspiracy.  And we

4    are entitled to show what happened, and my client was involved

5    to the point where was being manipulated by someone to go

6    around -- even assuming -- you know, he says, it's true, he had

7    no knowledge they were drugs -- some puppet master was telling

8    him where to go.

9          And we want to show who the person is.  We will give

10   the Government the full identity of the person.  We will give

11   the name, address and phone number.  And without this

12   testimony, we have no defense.

13         MR. FITZPATRICK:  Your Honor, may I respond?

14         THE COURT:  Yes.

15         MR. FITZPATRICK:  That theory completely falls apart

16   by the evidence in the case, and that's why it should be

17   excluded.

18         At 6:40 there is a WhatsApp message from the

19   defendant to his dad, Pops.  And he says, call me.

20         And 6:54 he receives a call.  He then at 7:10 he gets

21   another WhatsApp message that says, okay, I told him to go to

22   the Marriott.  Right.

23         So his client is calling his dad, said, call me.  He

24   texted him.

25         This theory that his dad gave the phone to someone

J.A. Orellana Montalvo - Direct

16

1    else doesn't make any sense.

2              MR. ENGLISH:  Your Honor, I respectfully submit, that

3    is something they can cross-examine him on, and the jury can

4    decide.  We would have the two witnesses, my client and his

5    father, who will testify to that.  And they can attack it

6    however they want.

7              But it is our theory of defense, and we are entitled

8    to put on the evidence, however thin the Government may think

9    it is.

10             THE COURT:  How is it admissible?

11             MR. ENGLISH:  That's what I am trying to --

12             THE COURT:  It is not in furtherance of a conspiracy.

13   You are denying that a conspiracy existed.  How is this --

14             MR. ENGLISH:  There was a conspiracy between the

15   person in El Salvador and the people on the other end who want

16   to get the drugs.  And asking my client to pick up the person

17   and move him, it shows the conversation is in furtherance, even

18   if my client is not a member of the conspiracy, he is being

19   used by the conspiracy to move the person with the drugs to

20   where he is supposed to be.

21             So the statements that they make to him to use him

22   are admissible under 801(d)(2)(E).  The same way if someone

23   went to an airport to buy a ticket in furtherance of a

24   conspiracy to go -- what they say, to buy the ticket, would be

25   admissible, to a ticket agent, it's in furtherance of the

1    conspiracy even though the ticket agent is not part of the

2    conspiracy, what they said.

3          MR. FITZPATRICK:  That last example though, that

4    wouldn't be true.  We would not be able to get the statements

5    of the ticket agent in through 801(d)(2)(E).

6          MR. ENGLISH:  Not the statement of the agent, but

7    what the person said to the ticket agent.

8          THE COURT:  Mr. Crawley.

9          MR. CRAWLEY:  I would, and I have never done this, I

10   would join the federal government in objecting to this notion

11   that he is a co-conspirator because there is nothing that he

12   has presented to us that would support that this person Kevin

13   is a co-conspirator or even exists.

14         So every case I have had with the Government in which

15   there is a co-conspirator, even if he was an unindicted person,

16   we knew at least that this person existed.  This is just

17   something out of the air.

18         THE COURT:  This is totally inadmissible.  It doesn't

19   come in under 801.  The objection is sustained.

20         MR. ENGLISH:  Your Honor --

21         THE COURT:  What do you have left that you think you

22   can put on without this story?

23         MR. ENGLISH:  Your Honor, without him saying someone

24   asked him to go pick someone up and that he did not know the

25   person, why he went to the airport, I have no defense.

J.A. Orellana Montalvo - Direct

18

1          They have put in all the circumstantial evidence to

2   show he has gotten phone calls from El Salvador and that he was

3   at the airport.

4               THE COURT:  Right.

5               MR. ENGLISH:  We are entitled to explain why he's

6   there.

7               THE COURT:  He can say, I was asked to come pick

8   somebody up at the airport, not for the truth of it, but to

9   explain why he went to the airport that day.  And beyond that,

10  I don't see how you could get any of this in.  It's just not

11  co-conspirator statements.  I mean, it is not a proper

12  exception.  It's all hearsay.

13              So you put your defense together the way -- you look

14  at the evidence, do what you can to put a defense together, but

15  this one isn't going to fly, it is not admissible.

16              I don't know what else to tell you.  Your exception

17  is noted, of course.

18              MR. ENGLISH:  Yes, sir.

19              THE COURT:  I think he can explain, I went to the

20  airport that day to pick up a passenger that I had been asked

21  to pick up.  I was told I was going to make $150.  And I think

22  you're stuck with that.

23              MR. ENGLISH:  Yes, sir.

24              THE COURT:  All right.

25              NOTE:  The side-bar discussion is concluded;

J.A. Orellana Montalvo - Direct

19

1   whereupon the case continues before the jury as follows:

2   BEFORE THE JURY

3            MR. ENGLISH:  May I, Your Honor?

4            THE COURT:  Mr. English, go ahead.

5   BY MR. ENGLISH: (Continuing)

6   Q.   As a result of this telephone call, what did you do?

7   A.   Pretty much I went to the airport to pick up the

8   individual.  At that point I did not know what he looked like

9   or who he was.  I still don't even know who he is.

10           When I went to the airport, I pulled up, I parked.  I

11  went to the waiting area.  I stood there and I waited for like

12  an hour.  After an hour, you know, I got the phone number of

13  the individual.  I tried calling it.  It would not even ring.

14           Finally I got ahold of him, asked him where he was.

15  He didn't specifically tell me where he was.  I told him I will

16  be downstairs.

17           So I went and I moved to the downstairs area.  I sat

18  there and I started waiting.  Smoked a cigarette.

19           After that, as you see, the pictures that they

20  showed, I was actually looking at the lot number.  Not once was

21  I aware that was a detective.  I mean --

22  Q.   Hold on.  Let me ask you, did you know the name of the

23  person you were supposed to meet at the airport?

24  A.   The name of the person?

25  Q.   Yes.

J.A. Orellana Montalvo - Direct

20

1   A.   No.

2   Q.   How did you know who you were looking for?

3   A.   Just by a picture.

4   Q.   Where did you get the picture?

5   A.   I got it through a text message.

6   Q.   From whom?

7   A.   From Mr. Kevin.

8   Q.   Now, so what did you do at the airport?

9   A.   I sat and I waited to see if maybe somebody came out of

10  the International gate.  And I just waited.

11  Q.   And did you eventually go somewhere else?

12  A.   Yeah.  Well, I mean, after awhile waiting, I really got

13  frustrated.  Like I was like just done, I didn't want to wait

14  anymore.

15          So I was like, really, it was like, okay, well, you

16  know, I'm leaving.  Like this is really wasting my entire

17  afternoon.  I was literally on the beltway making my home, I

18  received a call from Mr. Kevin once again.  He insisted that

19  the person had moved to an area where Pollo Campero was.

20          I went around the area.  He did not tell me that the

21  person was inside of the Pollo Campero.  He just said he was

22  around that area.

23          So I went to that area, I drove around.  I got

24  there -- actually, I went into a place called Pho 75, and I

25  actually ate at the Pho 75 because I was actually starving, I

J.A. Orellana Montalvo - Direct

21

1    hadn't eaten all day.  I sat down, I ate some Pho.

2              At that moment I actually spilled something on my

3    shirt, it was water that I spilled on my shirt.  I went back to

4    my car after I was done eating and I changed my shirt.  We had

5    recently came back from like a beach trip, and I found a black

6    Lacoste polo shirt in back seat.  So I took the red shirt off,

7    I put the black one on, and I grabbed the shirt and I put in

8    the glove compartment of my car.

9    Q.   Did Kevin tell you what he would give you to go pick this

10   person up?

11   A.   Yes.  It was $100 for myself.  And also, he would give me

12   $50 for gas, parking, and any type of tolls that I will

13   encounter going towards Dulles.

14   Q.   And he didn't tell you who you were picking up?

15   A.   No, he didn't tell me the name, I did not know the

16   person's name, I've never met him in my life.  All he sent was

17   a picture of the guy.

18   Q.   And did there come a time you got a telephone call from

19   your dad's phone number?

20   A.   Yes, I did actually.  And to my surprise, it wasn't my

21   dad, it was actually Mr. Kevin who called me from my father's

22   phone.

23   Q.   Now, at the time you were arrested by the police, did you

24   have cash on you?

25   A.   Yes, I did.

J.A. Orellana Montalvo - Direct

22

1   Q.   How much?

2   A.   I had $900.  $900.

3   Q.   And where did that money come from?

4   A.   That money came from -- I had a Honda Civic, a 1992, EG

5   four door, that I had recently sold so I can come up with money

6   to pay my rent.

7   Q.   And did you know there was a digital scale in the vehicle

8   you were driving?

9   A.   No, I was not aware of any digital scale being in the car.

10  The car doesn't even belong to me.  Like the car belonged to my

11  parents.

12          And I wasn't even supposed to have the car that day.

13  The only reason why I had the car was because I was supposed to

14  get a tire change for my mother.  And, I mean, I just took it

15  because I'm expecting somebody to come from the airport with

16  luggage.  So I wasn't going to take a smaller vehicle expecting

17  somebody coming from the airport with a bunch of bags.  That's

18  what you expect.

19  Q.   Now, had you ever seen the gentleman sitting here, your

20  co-defendant, before August 10?

21  A.   Absolutely not.  I've never seen him or met him in my

22  life.

23  Q.   What's the closest you came to him that you're aware of on

24  August 10?

25  A.   I'm sorry, say that one more time.

J.A. Orellana Montalvo - Direct

23

1    Q.    What's the closest you came to him that you are aware of

2    on August 10?

3    A.    When I pulled over to the bus station, honestly, when I

4    finally recognized him, like I finally looked at him, and he

5    was the only person there with like a bag.  And I was just

6    like, okay, maybe that's the guy.  But at that same -- go

7    ahead.

8    Q.    And did you talk to him some during that day?

9    A.    No.

10   Q.    Did you have a telephone?

11   A.    I did have a telephone call, but I never talked to him

12   face-to-face.  We never exchanged --

13   Q.    Did you speak to him over the phone?

14   A.    Yes.

15   Q.    And in what language?

16   A.    Spanish.

17   Q.    So did he ever get into your vehicle?

18   A.    Absolutely not.

19   Q.    Well, what was your purpose in meeting him?

20   A.    I was just supposed to pick him up.  I was told he had a

21   very bad English -- not English, Spanish.  He didn't know how

22   to speak English.  He had a language barrier.  All I was

23   supposed to do was just go check him into a hotel and get him a

24   Friends and Family discount that I'm offered because my brother

25   is actually a manager at Marriott.

J.A. Orellana Montalvo - Direct

24

1          So I was supposed to just give him like a discount,

2    check him in, and then leave.

3    Q.   Did he ever get into your vehicle?

4    A.   No.

5    Q.   Why not?

6    A.   As soon as I went to pull up to pick him up, I noticed I

7    had a message from the WhatsApp app.  I looked at the app, I

8    opened the message real quick.  I glanced down, and it said --

9    the message:  Marriott, make sure he doesn't have a tail.

10          And that automatically was just like what, like there

11   is something wrong.  And not only just that, like I questioned

12   Mr. Kevin when I received a call from him earlier.  I was like,

13   you know, what's going on?  You guys have me going up and down

14   like -- it's just like it's fishy, you know.

15          So when I pulled up, I read that message, and I

16   looked at the guy, and I was just like, this is bad news.  So I

17   left.  And I never let him in my car.

18   Q.   How long after that were you arrested?

19   A.   I didn't even get to the next light.  I noticed there was

20   police behind me, and I pulled over right away.

21   Q.   Did you know that the person you were supposed to pick up

22   was carrying drugs?

23   A.   Absolutely not.  I mean, when you're picking up somebody

24   from the airport, the least thing you would think that they are

25   bringing is drugs for the simple fact that they are being

J.A. Orellana Montalvo - Direct

25

1    searched, there is, you know, x-ray machines they have to go

2    through, dogs they have to go through.  I would never expect

3    somebody coming out of the airport full of especially that

4    amount of drugs.

5    Q.   Did you conspire with anyone in this case?

6    A.   Absolutely not.

7              MR. FITZPATRICK:  Objection, Your Honor, ultimate

8    issue.

9              THE COURT:  Overruled.

10   BY MR. ENGLISH: (Continuing)

11   Q.   Now, when this person Kevin called you and asked you to do

12   something, why did you trust him enough to do it?

13   A.   I mean, I had met him in El Salvador.  He had --

14             THE COURT:  The objection was sustained to this

15   testimony.  And so move on.

16             MR. ENGLISH:  Your Honor, in that case, I have no

17   further questions.

18             THE COURT:  Okay.  All right.  Cross-examination.

19             MR. FITZPATRICK:  I'm happy to defer to Mr. Crawley

20   first if he wants to do that.

21             THE COURT:  Oh, I'm sorry.

22             MR. CRAWLEY:  I have nothing to add.

23             THE COURT:  All right.  Thank you.

24             MR. FITZPATRICK:  Thank you, Your Honor.

25             THE COURT:  So that last answer is stricken.  You're

26

1    not to consider it.  All right.

2        CROSS-EXAMINATION

3    BY MR. FITZPATRICK:

4    Q.   In your testimony to your lawyer you stated that the first

5    time you recognized the defendant was when you pulled up next

6    to the bus stop and you saw him; is that correct?

7    A.   That was first actual face-to-face contact with him.

8    Q.   First face-to-face.  And that was your sworn testimony

9    under oath about ten minutes ago, correct?

10   A.   Yes.

11   Q.   If we could put up Exhibit 52-1, please.  Publish it.  It

12   has been previously admitted.

13           THE COURT:  Joe, I think he is going to --

14           MR. FITZPATRICK:  I'm sorry, Mr. Ruelas, we will use

15   the screen.  We can publish it, Ms. Morrell.  52-1.

16           51, I am sorry.

17   BY MR. FITZPATRICK: (Continuing)

18   Q.   Do you recognize this photograph?

19   A.   Yes.

20   Q.   And this is you walking directly past Mr. Majano, correct?

21   A.   Yes.

22   Q.   And Mr. Majano is a distinctive looking man, correct?

23   A.   I mean, his face was literally glued to his phone and I

24   wasn't paying --

25   Q.   His face is glued to his phone?

27

1  A.    As you can see, he's looking at his phone.

2  Q.    He's looking at his phone.  He has a shaved head?

3  A.    Yeah.

4  Q.    He is thick in stature?

5  A.    You would say, yes.

6  Q.    Can you show the pictures that were sent to Mr. Majano's

7  phone around 12:41, Exhibits 95 and 96.

8          MR. ENGLISH:  Objection, Your Honor, this is an

9  enlarged photograph.  It's not the same photograph my client

10  saw on the phone.

11  A.    Well, there is --

12          THE COURT:  Stop.  The objection is overruled.  You

13  may redirect on that point, Mr. English.

14          Listen to the question and answer the question.

15          THE WITNESS:  Yes, sir.

16  BY MR. FITZPATRICK:  (Continuing)

17  Q.    This is the same picture that was on your iPhone, correct?

18  A.    Yes.

19  Q.    When you receive a picture on your iPhone, you can tap on

20  the picture, it can expand and occupy the entire screen; is

21  that correct?

22  A.    That's correct.

23  Q.    All right.  Can we go to the next picture, please.

24          You also received this picture at 12:41 from -- you

25  call him Mr. Kevin.  Unfortunately, your father calls him

J.A. Orellana Montalvo - Cross

28

1    Kamalion.  Do you remember that?

2    A.   There was actually no name on my phone.

3    Q.   Okay.  And when people -- and you were using WhatsApp,

4    correct?

5    A.   That is correct.

6    Q.   That's correct.  And you have heard testimony in this case

7    about WhatsApp, haven't you?

8    A.   Yes.

9    Q.   That's an end-to-end encryption device, right?

10   A.   You can say that.

11   Q.   And you can definitely say that.  And both parties have to

12   agree to go into the chat, correct?

13   A.   That is correct.

14   Q.   That is correct.  Because both parties have to know what

15   the encryption codes are, correct?

16   A.   It's like a text message app.  You don't necessarily --

17   Q.   It's a text message app.  Answer my question.  You have to

18   know the code to type into it so you can access the message,

19   correct?

20   A.   No.

21   Q.   It's an end-to-end -- what does encryption mean?

22   A.   You would say it's an end-to-end, but that application is

23   mostly used for texting.

24   Q.   It's secure?

25   A.   And the phone, you add the phone number, and then you send

J.A. Orellana Montalvo - Cross

29

1    a message like you would in any other phone.  It's not like you

2    will have to enter a special code in order to get in contact

3    with that person.

4    Q.   Right.  And when you engage in an encrypted chat, those

5    are secured exchanges where the parties have to agree with each

6    other to speak securely, correct?

7    A.   I wasn't aware that it was a secure encrypted.  El

8    Salvador mostly uses those because in El Salvador you actually

9    have to have minutes or purchase cards.  So what most people do

10   is they usually just text through WiFi because, I mean, nobody

11   over there has --

12   Q.   We're talking about WhatsApp here.

13   A.   I understand that.  But I'm just trying to let you know

14   that most people in El Salvador don't have the money to be

15   going back and forth buying cards, which is credits, to talk

16   through text.  So they usually just use WhatsApp because it's a

17   free app that you use to communicate with somebody through

18   WiFi.

19   Q.   It's free, and it's a secure app and you have to agree to

20   chat with the person under WhatsApp, correct?

21   A.   You don't have to agree.  You just enter their phone

22   number, and then you just say -- you just send them a message

23   and then they receive it.  It's not like a special code you

24   receive.

25   Q.   Let's put up 52.1 again please.  51, I am sorry.  51.

J.A. Orellana Montalvo - Cross

30

1         So that person that you saw in the pictures on your

2    iPhone, expanded on your screen, shaved head, broad shoulders,

3    you walk within two feet of him -- you're telling this Court

4    and this jury that you didn't recognize him here inside Pollo

5    Campero?  The first time you recognized him was out on Elden

6    Street?

7    A.   I did not -- I did not see him.  I wasn't really paying

8    attention to my surroundings.  I was just mostly just trying to

9    get to the bathroom, I had to pee really bad.

10         I was just trying to go to the bathroom.  I wasn't

11   paying attention to my surroundings.

12         Another thing is that I did have my prescribed

13   glasses that day, which are the ones that I have today.  I did

14   not -- was not wearing my prescription glasses that day.

15   Q.   All right.  And you testified in response to counsel that

16   the person you were picking up had difficulty with the English

17   language; is that right?

18   A.   Yes.  Well, I was under the impression that he had no --

19         THE COURT:  Listen to the question and answer the

20   question that you are asked, please, sir.

21   Q.   You are bilingual, correct?

22   A.   Yes.

23   Q.   You speak English and Spanish fluently?

24   A.   That is correct.

25   Q.   Okay.  And you testified that you've had a job as a night

J.A. Orellana Montalvo - Cross

31

1    auditor; is that correct?

2    A.   Actually, I just recently received that job.  Prior to

3    that I was not working due to my son's disability, which he had

4    to be -- I had to take him to physical therapy almost every

5    single day.

6              THE COURT:  Listen to the question.

7              THE WITNESS:  I'm sorry.

8              THE COURT:  And answer the question that you are

9    asked.  Okay?

10             THE WITNESS: Yes, sir.  I'm sorry.

11             THE COURT:  And it should be -- most of these are

12   yes/no questions.

13             THE WITNESS:  Okay.  I'm sorry.

14             THE COURT:  And then if Mr. English wants to ask you

15   further about some of these issues, he can get up on redirect

16   and ask you to give a little more information.

17             But right now, listen to the question and answer the

18   question.

19             THE WITNESS:  Sorry.  I have never done this before.

20             THE COURT:  Please continue.

21             MR. FITZPATRICK:  Thank you very much, Your Honor.

22   BY MR. FITZPATRICK: (Continuing)

23   Q.   How long have you been working as a night auditor?

24   A.   Less than a month.

25   Q.   Okay.  And you've received training in that?

J.A. Orellana Montalvo - Cross

32

1   A.   Yes, I have.

2   Q.   And they have put you out on the floor and you're working

3   as a night auditor?

4   A.   I also do day and night auditor as well.

5   Q.   And the night auditor position is what, 11 p.m. to 7 a.m.?

6   A.   Exactly.

7   Q.   All right.  And as a night auditor, your job is to

8   reconcile the books for the hotel for that day; is that

9   correct?

10  A.   I don't understand what that word "reconcile" means.

11  Q.   You do the receipts for, the daily receipts for the hotel?

12  A.   I mostly just check people in if they come.  And whenever

13  they need to buy like sodas or anything, there is like a market

14  right next to the cashier.  I do that.  And I just count the

15  drawer, make sure it is at $400.

16  Q.   Exactly.  So you reconcile the drawer and you make sure

17  that the books are correct?

18  A.   Yes.

19  Q.   All right.  That involves a little bit of math, right?

20  A.   I have a calculator.  It's really not that hard.  And we

21  still have a system that at the end of the day --

22  Q.   I don't think I have a question in front of you.

23  A.   Oh, I am sorry.

24  Q.   Do I?

25  A.   No, sir.

J.A. Orellana Montalvo - Cross

33

1    Q.    Okay.  I want to show you -- let's take the Government's

2    Exhibit 43, please.

3            No, excuse me, 36, it's the red shirt.  It's a

4    physical object, physical item.  You can pull that out.

5            You recognize that, right?

6    A.    Yes.  This is my Armani Exchange shirt.

7    Q.    Oh, it's an Armani Exchange shirt?

8    A.    Yes, that's what it is.

9    Q.    Can you hold it up, please, for the jury.  That's the

10   front of it, right?  You can stand up.

11   A.    Oh, I am sorry.

12   Q.    Show it to the jury, please.  There are no stains on the

13   front of that shirt, right?

14   A.    No, sir.  Actually --

15   Q.    You can turn it around.  Turn the shirt around.  No stains

16   on the back of shirt, right?

17   A.    No.

18   Q.    All right, you can sit down.  You testified earlier that

19   you spilled some water, right?

20   A.    Yes.

21   Q.    This was when you were at Pho 75?

22   A.    Yes.

23   Q.    All right.  Now, you testified that you ate at Pho 75.

24   That must have been at what, approximately 6 o'clock?

25   A.    I don't recall the time.  I'm sorry.

J.A. Orellana Montalvo - Cross

34

1    Q.    You don't remember that?

2    A.    I don't remember the exact time.

3    Q.    I am not asking for an exact time.  Give me an approximate

4    time.

5    A.    I would be incorrect if I just give you a random time.

6    Q.    Why would you be incorrect?

7    A.    It was later, it was later that afternoon, I was around

8    the area around the time.  I mean, you can say around 6, but I

9    can't say it was at exactly 6:43 or 6:45 because that would not

10   be correct.

11   Q.    Okay.  Then you recall going into the Pollo Campero,

12   correct?

13   A.    Yes.

14   Q.    And you ordered food there as well?

15   A.    Yes.

16   Q.    Okay.  And did you order food in the Pollo Campero because

17   of what?  What was your reason?

18   A.    I actually got Camperitos, which is like little chicken

19   nuggets, I was actually going to bring over to my son, with

20   french fries.  And the soda was for myself.

21   Q.    You live in Woodbridge?

22   A.    Yes.

23   Q.    That's about an hour at a minimum from Dulles Airport?

24   A.    Yes.

25   Q.    All right.  Isn't it true, sir, that you went into Pollo

J.A. Orellana Montalvo - Cross

35

1    Campero because you are performing countersurveillance, you saw

2    Mr. Majano in there, and you were gauging the situation; isn't

3    that true?

4    A.    No.

5    Q.    And isn't it true that you ordered food so you wouldn't

6    make -- you wouldn't draw attention to yourself, you wouldn't

7    look conspicuous; isn't it true?

8    A.    No.

9    Q.    It's still your testimony today in front of this jury that

10   you went in at 7:30 to Pollo Campero to buy chicken nuggets and

11   french fries for your son, is that your testimony?

12   A.    Yes.

13   Q.    All right.  Thank you.  If we can turn to Government's

14   Exhibit -- let's go to 93, please.  The transcript.

15         Oh, 123, my apologies.  Let's go to 123.

16         You heard the call earlier that we played that had

17   yourself on the call, do you remember that?

18   A.    Yes.

19   Q.    There is no doubt in the world that that's you, right?

20   A.    That is correct.

21   Q.    You're not going to say that is somebody else?

22   A.    Absolutely not, that's me.

23   Q.    Okay.  And you are speaking with -- was that your

24   girlfriend?

25   A.    Yes, sir.

J.A. Orellana Montalvo - Cross

36

1    Q.   Okay.  If we can turn to, let's turn to page 1.  Do we

2    have that up there.

3             Do you see page 1 up there?

4    A.   Yes, I do.

5    Q.   And you begin the phone call and you're speaking in

6    English, correct?

7    A.   Yes.

8    Q.   And you've already testified that you are bilingual, your

9    girlfriend is bilingual; is that correct?

10   A.   That's correct.

11   Q.   You're having a pleasant exchange in English; is that

12   correct?

13   A.   Yes.

14   Q.   And then turn to page 2 please, Ms. Morrell.  Line 20.

15            You switch over to Spanish; isn't that correct?

16   A.   Yes.

17   Q.   And you switch into -- immediately switch into the Spanish

18   language when you want to talk about a sensitive, discreet

19   matter; isn't that right?

20   A.   No.  I usually just like to switch my languages with her.

21   Q.   Okay.  But at this very moment you said, in Spanish:  Did

22   you block my telephone.

23            Is that correct?

24   A.   That is correct.

25   Q.   And then you had a long conversation about accessing your

J.A. Orellana Montalvo - Cross

37

1    telephone; isn't that correct?

2    A.    That is correct.

3    Q.    And it's correct that you were having your girlfriend log

4    into the iPhone Web site to access your phone in order for your

5    girlfriend to erase it, correct?

6    A.    Erase, yeah.

7    Q.    You were going to erase the contents of your phone; isn't

8    that correct?

9    A.    Not all the contents.  It was more personal matters with

10   me and her, private pictures that I had, which I told the

11   detective that I had in my possession of my phone when they

12   started going through my phone as I was being arrested.

13   Q.    You never mentioned in this phone call private pictures

14   between you and your girl friend?  The first time you've said

15   that is today; isn't that true?

16   A.    Yes.

17   Q.    Okay.  So you never said that on this call, correct?

18   A.    No.

19   Q.    In fact, you said, erase all?

20   A.    Yes.

21   Q.    You wanted the entire phone erased, right?  And you were

22   making this call after you had been arrested and charged in the

23   federal court and arraigned; is that correct?

24           So you knew you were under a federal charge when you

25   asked your girlfriend to erase the contents of your phone; is

J.A. Orellana Montalvo - Cross

38

1   that correct?

2   A.   That's correct.

3   Q.   And isn't it true, Mr. Orellana, that you knew that you

4   had a number of phone calls with co-conspirators on your phone

5   and you had a number of WhatsApp messages on your phone, and

6   you had the photographs of him on your phone; isn't that

7   correct?

8   A.   That is correct.

9   Q.   And yet you still -- and that's when you asked your

10  girlfriend to erase your phone, correct?

11  A.   Correct.

12  Q.   All right.  If we can go to page 5, please.  At the top of

13  page 5, line 73 and 74.  You and your girlfriend are speaking

14  in English, correct?

15  A.   Yes.

16  Q.   And you said:  You know, I slept, I slept for a little bit

17  yesterday.

18          That's what you said in English, right?

19  A.   Correct.

20  Q.   And then your girlfriend responds, she begins:  Yeah,

21  that's not -- and then goes into the Spanish.  And that's where

22  she said:  Yeah, that's not, that's not the code.  That's like

23  I told you.

24          And then again you start talking about wiping this

25  phone in Spanish rather than English, correct?

J.A. Orellana Montalvo - Cross

39

1   A.   Correct.

2   Q.   Now, the reason why you were doing that, you were under

3   the impression that the Government would not be able to

4   understand your Spanish calls, correct?

5   A.   No.

6   Q.   Didn't you have an understanding that it was a more secure

7   way for you to communicate with your girlfriend in the Spanish

8   language rather than the English language?

9   A.   Either way I knew it was going to get translated if it was

10  brought up to court.  I mean, the beginning of the phone calls

11  it says, this phone call is being monitored and recorded.

12  Q.   All right.

13  A.   I am pretty sure you guys can get an interpreter.

14  Q.   Okay.  If we can turn to page 6, please.  Finally, on line

15  97, you put -- you recalled the name of your pass code, which

16  is name of your child and 0223.  And you communicated that to

17  your girlfriend, correct?

18  A.   Correct.

19  Q.   She said:  It worked, it worked.

20       Correct?

21  A.   Yes.

22  Q.   All right.  And then you asked:  It worked?

23       You asked her back?  You wanted to confirm that,

24  correct?

25  A.   Correct.

40

1   Q.   Because you were really concerned to get into that phone,

2   aren't you?

3   A.   I mean, I can't really do much, I'm in jail at this point.

4   Q.   You can't wipe it yourself?  Right?  You can't do it

5   yourself, so you need someone else to help you, right?

6   A.   Yes, you can say that.

7   Q.   Well, you can't say that -- it can also be true, right?

8   A.   True what, I'm sorry?

9   Q.   It's true that you couldn't wipe the phone yourself, you

10  needed someone else to do it for you?  That's a true statement,

11  correct?

12  A.   I mean, yes, but at the same time the police officers

13  already had my phone.  And when they were going through my

14  phone, I told them they didn't have a warrant to go through my

15  known, and they all laughed at me and told me that they did not

16  need a warrant to go through my phone, that they could get the

17  warrant from the judge later.

18  Q.   Okay.  And that's why two days later you were asking your

19  girlfriend --

20  A.   I was upset.

21  Q.   Let me ask my question.  That's why you were asking your

22  girlfriend two days later to wipe your phone, correct?

23  A.   Yes.  I was upset.

24  Q.   Now, we're hearing -- you don't make excuses for your

25  conduct, do you?

J.A. Orellana Montalvo - Cross

41

1    A.    I don't understand your question.

2    Q.    Do you know what an excuse is?

3    A.    Yes.

4    Q.    Okay.  Do you make excuses for your conduct?

5    A.    No.

6    Q.    Okay.  Because we have heard quite a few excuses so far.

7    I just want to make sure we were on the same page.

8              MR. ENGLISH:  Objection, Your Honor, that's not a

9    question.

10             THE COURT:  Sustained.

11             MR. FITZPATRICK:  Thank you, Your Honor.

12   BY MR. FITZPATRICK: (Continuing)

13   Q.   Now, after she said it worked, you queried her:  It

14   worked?

15             And then she responded:  Yes, okay, but I don't know

16   how the hell to erase that shit.

17             And then you responded:  Put it to erase if you can,

18   or within the day today for it to close and erase all the,

19   everything.

20             Right, you said that?  Line 101.

21   A.    Yes.

22   Q.   Okay.  So you want her -- you're not going to deny that

23   you want her to erase everything on that phone, correct?

24   A.    Not everything, no.

25   Q.   Mr. Orellana, you just said it there.  You just said

J.A. Orellana Montalvo - Cross

42

1    that's what you said.  On August 12 you told her:  For it to

2    close and release all the, erase everything.

3              Correct?

4    A.   Correct.

5    Q.   All right.  Turning to page 7, which is the continuation

6    of entry 109.  Well, beginning -- I am sorry.  Let's begin on

7    the bottom of page 6, please.

8              You said -- this is you speaking once again in

9    Spanish:  It should say so there.  It must say so there.  Put

10   it in lost mode, or I don't know what the F, pause.  Or it says

11   there, erase all.

12             Right?  So again, a second time, you're telling her

13   to erase all, correct?

14   A.   Correct.

15   Q.   All right.  Let's turn to page 11, please.

16             In line 196, this is your girlfriend speaking.  And

17   once again you're speaking in English; is that correct?

18   A.   Yes.

19   Q.   And you're speaking about social things, about partying

20   and things of that nature; is that correct?

21   A.   It was actually my girlfriend's mother's birthday that

22   weekend.

23   Q.   So, fine, you're talking about -- in English about your

24   girlfriend's mother's birthday; is that correct?

25   A.   I guess, yes.

J.A. Orellana Montalvo - Cross

43

1    Q.    Well, that's what you just said?

2    A.    I mean, I'm just letting you know that that's what was

3    going on that weekend.

4    Q.    Okay.  And you're speaking in English?

5    A.    Yes, sir.

6    Q.    Okay.  And then in 197 you break in in Spanish -- and this

7    is continuous.  We heard this recording earlier, do you

8    remember that?

9    A.    Yes.

10   Q.    So you go right from that English dialog into Spanish, and

11   you say:  Does my say off line.

12         Do you remember that?

13   A.    Correct, yes.

14   Q.    And your girlfriend responds:  Yeah, they haven't turned

15   it on.

16         But you asked the question:  No, but did they get it?

17         Do you remember that?

18   A.    Yes.

19   Q.    Okay.  And your girlfriend sent you some messages,

20   correct?

21   A.    Correct.

22   Q.    And then you're having her check on the messages, correct?

23   A.    No.  I am guessing she had sent me some messages later

24   that day, and she said that they never got received because on

25   the iPhone it says Delivered or it just stays like blank.

J.A. Orellana Montalvo - Cross

44

1    Q.   Right.  And she said:  They still say that they haven't

2    arrived, the messages that I sent to you.  So they haven't

3    opened it yet, they haven't --

4            And you get frustrated at you point and you say:

5    Well, I don't know.  That isn't worth shit to me.

6            Correct?

7    A.   Where does it exactly say that?

8    Q.   On page 12, I'm sorry, page 12, line 205, 204 and 205.

9    A.   I was like, yeah, I don't know, I don't care.  That's what

10   it says in Spanish:  Bueno, yo no sé, vale verga.

11           I don't care.

12   Q.   So let's talk, let's move to page 13, please.  And if we

13   have line 223.  Once again, you and your girlfriend are

14   speaking in English, correct?

15   A.   Correct.

16   Q.   And again, more about social activities, you are talking

17   about, you know, drinking and the problems with drinking and

18   all that.  That's the context of line 223, correct?

19   A.   I'm very overprotective of my girlfriend, so at that time

20   I was --

21   Q.   I just asked you a simple question.

22   A.   Yes, correct.

23   Q.   Is what you're talking about?

24   A.   Correct, correct, correct.

25   Q.   Is that in English?

J.A. Orellana Montalvo - Cross

45

1    A.   Yes, correct.

2    Q.   I know you want to talk about what you want to talk about,

3    but please answer my questions.

4    A.   I am so sorry about that.  You're right.

5    Q.   Okay.  And immediately after that you then once again turn

6    into speaking with Spanish; is that correct?

7    A.   Yes.

8    Q.   And you ask her, out of context, you say:  What time did

9    he go pick it up.

10            Do you remember that?

11   A.   Yes.

12   Q.   You said that?  And your girlfriend says:  Huh?

13            Do you remember that?

14   A.   Yes.

15   Q.   And you say:  Did he go pick up the pencils?

16   A.   Yes.

17   Q.   Okay.  And then your girlfriend said:  Yes.

18            And you say:  And everything?

19            Do you remember that?

20   A.   Yes.

21   Q.   Okay.  And your girlfriend says:  I gave them to -- yes.

22   He, came to pick them all up.

23   A.   Yeah.

24   Q.   Came to pick all of those pencils up, didn't he?

25   A.   Yes.  I can --

46

1    Q.    Maybe about 1,000 pencils?

2    A.    No.  Actually --

3    Q.    How many pencils were there?

4    A.    Three.

5    Q.    Oh, three pencils?

6    A.    Yes.

7    Q.    So you're asking if someone has come to pick up three

8    pencils?

9    A.    Can I say something, Your Honor?

10           THE COURT:  Just listen to the question.

11           THE WITNESS:  All right, sir.

12   BY MR. FITZPATRICK: (Continuing)

13   Q.   No, it's your testimony -- I'm sorry, Your Honor.

14           THE COURT:  Stop.  So you listen to the question, you

15   answer the question.  And if you can answer it yes or no,

16   answer it yes or no.  And if you can't answer it yes or no,

17   say, I can't answer that yes or no.

18           THE WITNESS:  Okay.

19           THE COURT:  As I said, Mr. English, if he wants to

20   follow up with you, we will give you that option.

21           THE WITNESS:  Okay, gotcha.  Okay.  I'm sorry.

22           MR. FITZPATRICK:  Thank you very much, Your Honor.  I

23   apologize for --

24           THE COURT:  Next question.

25   BY MR. FITZPATRICK: (Continuing)

J.A. Orellana Montalvo - Cross

47

1    Q.   So it's your testimony today that you were querying her,

2    questioning her about if someone came to pick up three pencils,

3    correct?

4    A.   Correct.

5    Q.   This is a pen, but three of these in pencil form.  Okay.

6            MR. ENGLISH:  Objection, Your Honor, that wasn't a

7    question.

8            THE COURT:  Sustained.  Let's ask questions, please.

9            MR. FITZPATRICK:  Thank you.

10   BY MR. FITZPATRICK: (Continuing)

11   Q.   And your girlfriend responded:  Yes, yes, he came to pick

12   them all up.

13           He came to pick all of those three pencils up, right?

14   Them all up?

15   A.   Yes.

16   Q.   Okay.  And you said:  Okay.

17           So you understood what she meant, correct?

18   A.   Correct.

19   Q.   All right.  Then:  And your -- and do you have it there?

20           And your, unintelligible, do you have it there?

21           Another question.  And your girlfriend responds

22   because show knows what you're talking about, she says:  I

23   already took everything out.  I took out everything except my

24   weapon.

25           And her weapon is her gun, right?

J.A. Orellana Montalvo - Cross

48

1    A.    Yes.

2    Q.    Okay.  So she removed the gun from the three pencils

3    before the guys came to pick up the pencils, is that your

4    testimony?

5          You gave the okay -- well, I'm sorry, I'm

6    interrupting you.  Please.

7    A.    No, by all means, go ahead.  What were you saying?

8    Q.    No, you can answer my question.

9    A.    I don't understand your question at this point.

10   Q.    Okay.  So you understood that your girlfriend said in

11   response your question, I'm keeping my gun?

12         But according to your testimony, I gave them the

13   three pencils?  That's your understanding of what happened

14   there?

15   A.    I don't recall.

16   Q.    You don't recall.  Okay.  And then the call ends; is that

17   correct?

18   A.    Yes.

19   Q.    Where are those pencils today, Mr. Orellana?

20   A.    I don't recall.

21   Q.    You don't know where the pencils are?

22   A.    Correct.

23   Q.    Okay.  Let's take a look at Government's Exhibit 93, the

24   WhatsApp.  Put Exhibit 93 up, please.  If we can go to

25   page 1218, please.

J.A. Orellana Montalvo - Cross

49

1        And at the top it's you communicating -- your

2    nickname is Ace; is that correct.

3    A.   That's just the name on the WhatsApp app, yes, correct.

4    Q.   That's the name you use on the WhatsApp application?

5    A.   Correct.

6    Q.   Okay.  It's not a assigned to you.  It's the one you

7    choose?

8    A.   Yes, sir.

9    Q.   And that's because when you're speaking to other people

10   privately, they know who they're speaking with, correct?

11   A.   Yes.

12   Q.   All right.  And you send a message to Pops that says:

13   Call me.

14            Is that correct?

15   A.   Correct.

16   Q.   And on that day, you had well over -- there were well over

17   40 contacts with Pops on your phone; is that correct?

18   A.   Correct.

19   Q.   Let me go back for just a moment.  We were speaking of

20   your shirt earlier.  Now, we have already demonstrated to the

21   jury that there are no stains on your shirt, correct?

22   A.   Correct.

23   Q.   And it was your testimony to the agents when they

24   discovered your shirt in the glove box, that you changed your

25   shirt because you had -- you had spilled something on it,

J.A. Orellana Montalvo - Cross

50

1    correct?

2    A.    Correct.

3    Q.    And today your testimony is you spilled some water on it,

4    correct?

5    A.    Correct.

6    Q.    Okay.  And this was -- and this would have been when you

7    were at Pho 75, correct?

8    A.    Correct.

9    Q.    All right.  And did you have a glass of water or bottle of

10   water?

11   A.    No, I had a tall glass of water.

12   Q.    Tall glass of water.  It's August 10, right?  It's warm

13   out, correct?

14   A.    Yes.

15   Q.    You have been walking around the airport looking for

16   somebody for several hours, correct?

17   A.    Correct.

18   Q.    You are thirsty, it's good to have a little water, right?

19   A.    I was also hungry.

20   Q.    You were also hungry.  Dripping a little water on your

21   shirt does not cause someone to change their shirt; isn't that

22   correct?

23   A.    It was actually a large amount of water down by the bottom

24   of my shirt.

25   Q.    A large amount of water.  You had a glass?

1  A.   I had a glass, a lot bigger than this.  Like a restaurant

2  glass.

3  Q.   Okay.  All right.  So it's your testimony in front of this

4  jury that you did not change your shirt to change your

5  appearance?  Is that your testimony?

6  A.   Correct.

7  Q.   All right.  Now, when you spilled the water on your shirt,

8  you went back to the minivan and you got the black shirt,

9  correct?

10  A.   Yes.  It was actually in the back side of the minivan,

11  correct.

12  Q.   Correct.  It was in the back side of the minivan, right?

13  There was a lot of stuff in the minivan, correct?

14  A.   Correct.

15  Q.   Right.  And you took the red shirt and you stuffed it in

16  the glove box, correct?

17  A.   I changed my shirt in the front seat because I didn't want

18  to do it in the outside.  So I went, I hopped in the car, I

19  changed my shirt in the front seat, opened up the glove box,

20  and I just threw it in there.

21  Q.   You hid the shirt?

22  A.   No, it was not hidden.

23  Q.   If it's in the glove box, it's not in plain sight,

24  correct?

25  A.   I didn't think much of it, honestly.  I also had my

52

1    passport in there, which I --

2    Q.    And the black shirt is in the back seat?

3    A.    Yes.

4    Q.    Along with other items in the minivan, right?

5    A.    It was actually in the back compartment, like the back

6    doors of the minivan.  So it was in the corner of the actual

7    minivan, in the trunk.

8    Q.    All right.  And you have -- the person that you were going

9    to meet there, isn't it true that you were just there to pick

10   up a bag and then go on your way?

11   A.    No.

12   Q.    And you have no idea where you were supposed to take this

13   person, did you?

14   A.    Say that one more time, I am sorry.

15   Q.    You had no idea where in your expectation you were going

16   to take this person, correct?

17   A.    I was going to take him to the Marriott across the street

18   and check him in there.  I was actually at the Marriott waiting

19   there.

20   Q.    And you are familiar with -- and you said that -- your own

21   testimony, for what it's worth, you said you were going to get

22   $100 for doing this?

23   A.    $150.  100 for myself and 50 for any expenses, such as

24   gas, tolls, and parking at the airport, which --

25   Q.    Right.

J.A. Orellana Montalvo - Cross

53

1    A.    I was going to get.

2    Q.    Go figure, right?

3              THE COURT:  Mr. Fitzpatrick, please, just ask your

4    questions.

5              MR. FITZPATRICK:  Yes, sir.

6              THE COURT:  Comments are not necessary.

7              MR. FITZPATRICK:  Thank you.  I understand, Your

8    Honor.  I apologize.

9    BY MR. FITZPATRICK: (Continuing)

10   Q.    And you are familiar with -- there is another app that is

11   popular these days, it's called Uber, correct?

12   A.    Correct.

13   Q.    And Herndon, the Pollo Campero, and the Marriott, it's

14   about a five- to ten-minute drive away?

15   A.    Correct.

16   Q.    And at Dulles Airport, they even now have Uber stands,

17   don't they?

18   A.    I am not sure.  I am sorry, I wouldn't -- I don't go to

19   the airport very much to know that.

20   Q.    And they have -- so it's -- do you take Uber?

21   A.    No.

22   Q.    You don't?

23   A.    I have never taken Uber.

24   Q.    Is it fair to say that a Uber ride, a ten-minute Uber

25   ride, or a taxi ride for that matter, to Herndon would be a lot

J.A. Orellana Montalvo - Cross

54

1    cheaper than $150?

2    A.    I wouldn't know, honestly.

3    Q.    All right.

4    A.    But it --

5    Q.    When you returned from El Salvador, you returned on

6    July 25; is that correct?

7    A.    Correct.

8    Q.    And you entered into Miami, correct?

9    A.    Correct.

10   Q.    And did you fly from Miami back to Dulles Airport?

11   A.    There was -- actually, I missed my flight back.  So I was

12   actually there for like an extra day.  And then I went back,

13   yeah, from Miami to International Dulles, I think it was

14   Dulles.

15   Q.    Okay.

16   A.    Or, no, was it Reagan?  I don't remember.  I think it was

17   Reagan.

18   Q.    All right.  And then your parents remained in El Salvador;

19   is that correct?

20   A.    Correct.

21   Q.    And your father owns a business or two businesses in

22   Woodbridge; is that correct?

23   A.    It's actually my mother and father.  Mostly my mother, she

24   does cosmetology, she owns hair salons.

25   Q.    Okay.  And with respect to -- but at that time they --

J.A. Orellana Montalvo - Cross

55

1   your parents were still down in El Salvador, correct?

2   A.   Correct.

3   Q.   And you had the minivan to your exclusive use; isn't that

4   true?

5   A.   No.  They weren't aware that I actually had their minivan.

6   I got comfortable with it.  I have, you know, a big family and

7   I like to have my kids.  I drive like a '99 CRV, which is like

8   a Honda.

9   Q.   You had the key to the minivan, correct?

10  A.   Correct.

11  Q.   And you were using it a lot during that time period?

12  A.   Yes.

13  Q.   Correct?  And you would park it at your house, correct?

14  A.   Yes.

15  Q.   And you drove it to the beach, correct?

16  A.   Correct.

17  Q.   You drove it back to the beach?

18  A.   Correct.

19  Q.   And you would drive it around to run errands; is that

20  correct?

21  A.   Just to take my child to physical therapy and back.

22  Q.   Okay.

23  A.   I don't usually go out.

24  Q.   And you had exclusive control over that minivan from

25  June 21 up until August 10 when Homeland Security seized it

J.A. Orellana Montalvo - Cross

56

1    after your arrest, correct?

2    A.   Yes, but that was without my parents' acknowledgment.

3    Q.   You had numerous communications with your dad on

4    August 10, correct?

5    A.   Actually I had no communication with him.  My mother

6    called me that morning.  And then after that, I then received a

7    call from father's phone, but it was not father.  Come to my

8    surprise, it was actually Mr. Kevin calling me from my father's

9    phone because they were together at the beach.

10   Q.   But I just want to make sure we're clear on this.  Your

11   testimony is that you had exclusive control of that minivan

12   from June 21 until August 10; is that correct?

13   A.   I can't recall the dates, honestly, because I actually got

14   the minivan when I went to drop off my mom at the airport.  And

15   I don't --

16   Q.   Do you recall --

17   A.   I don't recall the date that I took her to the airport.

18   That was actually the time when I got my mother's minivan, is

19   when I took her to the airport.  And she told me, here, here is

20   the keys, go change the tire on my car because we had gotten a

21   flat tire on her minivan.  That's the only reason why I had the

22   minivan too.

23   Q.   With the assistance of Mr. Ruelas, I would like to show

24   you Government's Exhibit 133.

25             Do you recognize that letter?

J.A. Orellana Montalvo - Cross

57

1    A.    Yes.

2    Q.    Is that your signature at the bottom of the letter?

3    A.    Correct.

4    Q.    And that's your signature and your handwriting, correct?

5    A.    Correct.

6    Q.    And does this fairly and accurately state your

7    communication to the Department of Homeland Security or U.S.

8    Customs and Border Protection?

9    A.    Correct.

10          MR. FITZPATRICK:  Move to admit Exhibit 133.

11          MR. ENGLISH:  No objection, Your Honor.

12          THE COURT:  It's received.

13   BY MR. FITZPATRICK: (Continuing)

14   Q.    So you acknowledge to Homeland Security that you had the

15   car as of June 21, 2017, correct?

16   A.    Correct.  I just didn't remember the date on the

17   paperwork.  It was actually a long time and we never got a

18   response from the people.  So I don't remember the date on it,

19   but if it is on here on paperwork and I am looking at it, then

20   yes.

21   Q.    Well, you wouldn't have lied?

22   A.    No, of course not.

23   Q.    And you wrote -- did you write this letter on your own?

24   A.    Correct.

25   Q.    Did you have any assistance from your father, Daniel

58

1    Montalvo?

2    A.    No.

3    Q.    All right.  Well, that's interesting because I want to --

4    on the same day Daniel Montalvo and Marina Montalvo wrote a

5    letter, I would like to you Government's Exhibit 134, please.

6             Do you see 134?  Take a minute and read Government's

7    Exhibit 134, please.

8             MR. ENGLISH:  Your Honor, while he reads that, may we

9    approach the bench?

10            THE COURT:  Yes, sir.

11            NOTE:  A side-bar discussion is had between the Court

12   and counsel out of the hearing of the jury as follows:

13   AT SIDE BAR

14            MR. ENGLISH:  Your Honor, I object to this line of

15   inquiry.  This is a letter authored by someone else that my

16   client didn't write.  It is not a prior inconsistent statement.

17   It is simply hearsay.  And I don't think he should be able to

18   cross-examine him about it, and certainly not be able to admit

19   it into evidence.

20            THE COURT:  Well, he can certainly ask him whether he

21   recognizes it, right?  I don't know whether -- what's your line

22   of questioning?

23            MR. FITZPATRICK:  He has testified that he wrote it

24   on his own and that he didn't --

25            THE COURT:  The earlier letter that he signed, right?

59

1          MR. FITZPATRICK:  Correct.

2          THE COURT:  Okay.  Now this is the parents' letter?

3          MR. FITZPATRICK:  Correct, that was sent on the same

4    day, and they are remarkably similar.

5          THE COURT:  Okay.  I think he can ask him whether

6    there are similarities, whether he had anything to do with

7    writing that letter.  But it's hearsay.

8          MR. ENGLISH:  From the contents it appears the

9    parents took his letter and included it with theirs.

10         THE COURT:  Well, I don't know whether we're going to

11   get that far, depends upon whether you put the father on the

12   stand, I guess.

13         He can ask him questions about it.  It doesn't matter

14   whether he authored it or not.  We will see where we go.  And

15   you certainly object if you think it is appropriate to.

16         MR. ENGLISH:  Yes, sir.

17         THE COURT:  Your exception is noted.

18         NOTE:  The side-bar discussion is concluded;

19   whereupon the case continues before the jury as follows:

20   BEFORE THE JURY

21   BY MR. FITZPATRICK: (Continuing)

22   Q.   Have you had a chance to read Government's Exhibit 134?

23   A.   I am sorry, I did not read it.  Sorry.

24   Q.   Do you recognize the signatures at the end of Exhibit 134?

25   A.   Yes.

J.A. Orellana Montalvo - Cross

60

1    Q.    Whose signatures are those?

2    A.    My stepfather and my mother's signature.

3    Q.    What's the date of that letter?

4    A.    09/21/17.

5    Q.    What's the date of your letter?

6    A.    09/21/17.

7    Q.    Did you coordinate with your parents to write these

8    letters?

9    A.    Yes.

10   Q.    Okay.  So did your parents write your letter for you?

11   A.    Yes.

12   Q.    Okay.  So earlier you said that you wrote it, that was

13   incorrect?

14   A.    It's just embarrassing that I still can't write well.  So,

15   yes, my dad and my mother did help me write this letter because

16   of my disability of learning how to write.

17   Q.    But you did understand when you took the stand and you

18   took an oath, that that oath was to tell the truth, correct?

19   A.    Correct.

20   Q.    Okay.  Are there any other fabrications that you've stated

21   today because you are embarrassed?

22   A.    No.

23         MR. FITZPATRICK:  All right.  The Court's indulgence

24   for one minute, Your Honor.

25         Your Honor, this has previously been admitted.  I

61

1   would like to publish 194, please.  Excuse me, 94.

2   BY MR. FITZPATRICK: (Continuing)

3   Q.   Mr. Orellana, do you see 94 in front of you?

4   A.   Yes.

5   Q.   And is this a series of chats between you and your

6   girlfriend?

7   A.   Yes.

8   Q.   If you could please, Ms. Morrell, turn to -- it's page 170

9   on the bottom right, and -- actually, let's go to 169 at the

10  bottom, it's entry 47.

11          This is a communication that you had with your

12  girlfriend at approximately 2:11 p.m. on August 10, 2017; is

13  that correct?

14  A.   Correct.

15  Q.   If we can go to the top of the next page.

16          And in this chat you're having an argument with your

17  girlfriend; is that correct?

18  A.   Yes.

19  Q.   And your girlfriend says to you:  Then IDK, I don't know

20  what you want me to do.  When your dad tells you jump you ass

21  be jumping all over everything for him but at the cost of

22  everyone else.

23          Is that correct?

24  A.   Correct.

25  Q.   And that's a true statement, correct?

J.A. Orellana Montalvo - Redirect

62

1    A.    No.   That's just her opinion.   I mean, that's just what

2    she thinks.   She's angry at me.

3    Q.    When your dad tells you to do something, you do it,

4    correct?

5    A.    I mean, when he asks me for a favor to go do for the shop,

6    I always go do it, it is our family business.

7    Q.    And when your dad tells you pick up packages of cocaine

8    and heroin at the airport, you go do it, correct?

9    A.    My father never once told me go pick up anything from

10   anybody at the airport.   So I don't know where you are coming

11   with this.

12              MR. FITZPATRICK:   All right.   Thank you, sir.

13              THE WITNESS:   Thank you.

14              THE COURT:   All right.   Redirect?

15              MR. ENGLISH:   Yes, sir, Your Honor.

16        REDIRECT EXAMINATION

17   BY MR. ENGLISH:

18   Q.    Alex, when you received the iPhone photographs of the

19   co-defendant here, how big were those pictures?

20   A.    They were actually very small.

21   Q.    Can you hold your fingers out and show us about how big?

22   A.    This big.   And also my phone is cracked.

23              MR. ENGLISH:   Your Honor, may the record reflect that

24   held up his fingers reflecting, I would guess, an inch-and-

25   a-half?

J.A. Orellana Montalvo - Redirect

63

1          THE COURT:  All right, it will.

2     BY MR. ENGLISH: (Continuing)

3     Q.   Why did you believe that the person you were picking up at

4     the airport did not speak English?

5     A.   That's what I was told.

6     Q.   By whom?

7     A.   By Mr. Kevin.

8     Q.   Did you ever talk to this person yourself other than on

9     the telephone in Spanish?

10    A.   Yes.  That's the only time I talked to him, was in

11    Spanish.  I had never talked to him prior before that date.

12    Q.   How much math do you need to know to do your job as a

13    night auditor now?

14    A.   None.  Honestly, I have a calculator, and our system does

15    the entire math for us.  It shows us how much we need to drop.

16    It shows like total deposit that you need to put into the

17    deposit sheet.  It's an automatic system.  It's literally a

18    click of a button.

19    Q.   Do you normally speak to your girlfriend using English and

20    Spanish?

21    A.   Yes.  Especially like when we're arguing, we tend to

22    switch languages.  I don't know why.  It's just --

23    Q.   Now, why were you going to take this person that you were

24    picking up at the airport a comparatively short distance to the

25    Marriott?

J.A. Orellana Montalvo - Redirect

64

1   A.    I was just going to give him the Friends and Family

2   discount and check him in because of his language barrier.

3   Q.    Now, how are you entitled to a Friends and Family

4   discount?

5   A.    My brother is a manager at a Marriott Spring Hill Suites,

6   is actually where I'm working at now.  He actually got me a job

7   there, and he offers me a Family and Friends discount, which is

8   literally like $39 a night comparing to 150 or $200 a night.

9   Q.    So you're going to get a discount for this person?

10  A.    Correct.

11  Q.    Now, in this conversation from the jail when you spoke in

12  Spanish and used the word that translates as pencils, what did

13  you mean?

14  A.    I do smoke marijuana.  What I meant by pencils is actually

15  vap pens, which is a condensed THC form.  I usually get them

16  from Washington, D.C., a dispensary called Pots and Pans.  So

17  that's what I meant by pencils because it is a vap pen, like a

18  THC pen.  Instead of smoking it, actually smoking and burning

19  it, it's actually like vapor.  And that's what it is, it is a

20  vap pen.

21  Q.    Is it legal to purchase those in D.C.?

22  A.    Yes, it is legal in D.C.

23  Q.    Is it legal to possess these pens in Virginia?

24  A.    Absolutely not.

25        MR. ENGLISH:  Thank you.  I have no further

65

1    questions, Your Honor.

2         THE COURT:  All right, you may step down and resume

3    your seat.  Thank you, sir.

4         THE WITNESS:  Thank you so much.

5         NOTE:  The defendant stood down.

6    -------------------------------------------------
                        TRANSCRIPT CONCLUDED

7

8

9

10

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22
                          /s/  Norman B. Linnell
23                  Norman B. Linnell, RPR, CM, VCE, FCRR

24

25