1

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF VIRGINIA
                         Alexandria Division



-------------------------------:
                               :
UNITED STATES OF AMERICA        :
                               :
                               :
    -vs-                        :   Case No. 1:17-cr-204
                               :
                               :
ROSEMBERG M. MAJANO             :
      and                       :
JOSE A. ORELLANA MONTALVO,       :
              Defendants.        :
                               :
-------------------------------:


                          V O L U M E   1 of 2



                            TRIAL TRANSCRIPT


                         November 28-29, 2017


                Before:   Liam O'Grady, USDC Judge


                            And a Jury



APPEARANCES:

Thomas W. Traxler and Dennis M. Fitzpatrick,
Counsel for the United States

Dwight E. Crawley, Counsel for Defendant Majano

Gregory B. English, Counsel for Defendant Orellana Montalvo

Defendants, R.M. Majano and J.A. Orellana Montalvo, in person

2

<u>INDEX</u>

| <u>WITNESS</u> | <u>EXAMINATION</u> | <u>PAGE</u> |
|---|---|---|
| JAOUAD RHAZOUANI | | |
| | DIRECT | 7 |
| | CROSS | 44 |
| | REDIRECT | 53 |
| STEVEN LANE | | |
| | DIRECT | 54 |
| | CROSS | 65 |
| LAUREN MUÑOZ | | |
| | DIRECT | 66 |
| JAY D. CULLEY, JR. | | |
| | DIRECT | 85 |
| | CROSS | 134 |
| | REDIRECT | 140 |
| | RECROSS | 142 |

3

1           NOTE:  The case is called to be heard in the presence

2    of the jury panel as follows:

3    JURY PANEL IN

4           THE CLERK:  The Court calls case 1:17-cr-204, the

5    United States of America versus Rosemberg Majano and Jose

6    Alejandro Orellana Montalvo for a jury trial.

7           May I have the appearances, please, first for the

8    Government.

9           MR. TRAXLER:  Good morning, Your Honor.  Tommy

10   Traxler for the United States.  And also with me at counsel's

11   table, Your Honor, is Dennis Fitzpatrick.

12          MR. FITZPATRICK:  Good morning, Your Honor.

13          MR. TRAXLER:  Also for United States, Special Agent

14   Michael Tarantino from the Department of Homeland Security.

15          And behind us, Your Honor, is Mary Morrell, a

16   paralegal in our office.

17          THE COURT:  All right.  Good morning to each of you.

18          MR. TRAXLER:  Thank you, Your Honor.

19          MR. CRAWLEY:  Good morning, Your Honor.  Dwight

20   Crawley on behalf of Mr. Rosemberg Majano.

21          THE COURT:  All right.  Good morning, Mr. Crawley.

22          MR. ENGLISH:  Good morning, Your Honor.  Greg English

23   on behalf of Alex Orellana.

24          THE COURT:  All right.  Good morning, Mr. English.

25          Good morning, ladies and gentlemen.  My name is Liam

4

1   O'Grady, and I will be the trial judge in this case.

2         And let us begin by swearing our interpreters.  Good

3   morning, and thank you for swerving with us.

4         NOTE:  The interpreters are duly sworn.

5         INTERPRETER HORVATH:  For the record, my name is

6   Maria Horvath, federally certified court interpreter.

7         INTERPRETER LEFEBVRE:  Ana Lorena Lefebvre, federally

8   certified court interpreter.

9         THE COURT:  You have been summoned here today to

10  potentially serve on a jury on a criminal case.  And I will

11  explain it a little further in a moment, but first let's take

12  roll call and see who we have here this morning.

13        NOTE:  At this point the jury for the case is

14  selected and sworn; whereupon after the opening statements are

15  presented to the jury by counsel for each party, the case

16  continues in the presence of the jury as follows:

17  JURY IN

18        THE COURT:  All right.  Thank you, Mr. English.

19        All right, we're going to take an hour for lunch at

20  this time.  And then we'll come back and we'll begin hearing

21  the evidence from the witnesses in the case.

22        So as I said just a little while ago, it's important

23  that you not do any research, investigation, not discuss the

24  case with anyone.  Just have a good lunch, and we'll see you

25  all -- we'll come back at 2 o'clock.

5

1              For your planning purposes, we'll take a

2      mid-afternoon recess for about 15 minutes, and we'll go until

3      5:30 or so, maybe a little longer depending upon whether we

4      have a witness we're going to finish up on.

5              If at any time you need a break, any kind of comfort

6      break, you just raise your hand, and I may not see you right

7      away, but one of my wonderful folks who works with me will see

8      you and we'll let you have a recess at any time.  So keep that

9      in mind.

10             We have that annoying noise that comes on when we

11     have sidebars.  I'll do my very best to keep those to a

12     minimum.  But if at any time you want to stand up and stretch,

13     please feel free to do so.

14             All right, then you're excused.  Thank you.

15             NOTE:  At this point the jury leaves the courtroom;

16     whereupon the case continues as follows:

17     JURY OUT

18             THE COURT:  Okay.  I think you all know this, but I

19     will come in and I'll let the jury go -- I'll come in and sit

20     down before we bring the jury in.  I'll also let the jury

21     leave, and then I'll stay in court session, and that's just to

22     see if you have any issues you want to bring up before the next

23     witness is going to testify.  If you're anticipating certain

24     objections to certain evidence that you believe that the other

25     side is going to sponsor, then let's get that worked out

6

1    outside the presence of the jury so we're not at the sidebar.

2            I know it's not possible all the time, but I would

3    like to do that as much as possible.

4            All right.  Anything we need to talk about now before

5    we adjourn?

6            MR. TRAXLER:  No, nothing from the Government, Your

7    Honor.

8            MR. CRAWLEY:  No, Your Honor.

9            MR. ENGLISH:  No, sir, Your Honor.

10           THE COURT:  All right.  Then we're in recess until

11   2 o'clock.

12           NOTE:  At this point a lunch recess is taken; at the

13   conclusion of which the case continues in the absence of the

14   jury as follow:

15   JURY OUT

16           THE COURT:  All right.  Any preliminary matters?

17           MR. TRAXLER:  Nothing from the Government, Your

18   Honor.

19           MR. CRAWLEY:  No, Your Honor.

20           THE COURT:  Okay.  All right then, Joe, let's get our

21   jury.

22           NOTE:  At this point the jury returns to the

23   courtroom; whereupon the case continues as follows:

24   JURY IN

25           THE COURT:  All right, please have a seat.

1              First witness.

2              MR. TRAXLER:  Yes, Your Honor.  The United States

3    calls Officer Jaouad Rhazouani.

4              NOTE:  The witness duly affirms.

5              THE COURT:  Good afternoon.

6              Please proceed, Mr. Traxler.

7              MR. TRAXLER:  Thank you, Your Honor.

8              JAOUAD RHAZOUANI, called by counsel for the United

9    States, first duly affirming, testifies and states:

10        DIRECT EXAMINATION

11   BY MR. TRAXLER:

12   Q.   Officer Rhazouani, could you please state and spell your

13   name for the record.

14   A.   My name is Jaouad, it is J-a-o-u-a-d, Rhazouani, it's

15   R-h-a-z-o-u-a-n-i.

16   Q.   Where do you work, Officer Rhazouani?

17   A.   I work at Washington Dulles International Airport.

18   Q.   What's the name of the agency for which you work?

19   A.   U.S. Customs and Border Protection.

20   Q.   How long have you worked for that agency?

21   A.   I started in January 2008.

22   Q.   What did you do before that?

23   A.   I was enlisted in the U.S. Navy.

24   Q.   Are you assigned to a specific unit right now within the

25   Customs and Border Protection?

J. Rhazouani - Direct

8

1   A.   Yes, sir.

2   Q.   What unit is that?

3   A.   It's the Tactical Operations Unit.

4   Q.   What are the duties of the Tactical Operations Unit?

5   A.   We do screen passengers and cargo coming inbound and

6   outbound to the U.S. for any contraband, including currency,

7   weapons, ammunitions.

8   Q.   And does that contraband also include narcotics?

9   A.   Yes, sir.

10   Q.   And pursuant to what authority do you conduct these

11   baggage exams?

12   A.   It is under the scope of the border search authority.

13   Q.   Could you describe to us what the border search authority

14   is?

15   A.   It's all passengers, all persons and cargo and bags

16   coming to -- crossing the border of the United States are

17   subject to inspection from U.S. Customs and Border Protection.

18   Q.   Just what's the general purpose of exercising that

19   authority?

20   A.   Just to interdict any contraband, drugs, weapons, or any

21   illegal merchandise coming to the U.S.

22   Q.   And do you in particular have experience investigating

23   travelers who are suspected of smuggling illegal narcotics?

24   A.   Yes, sir.

25   Q.   Can you describe that experience for us.

J. Rhazouani - Direct

9

1   A.   I got that experience from first training as a CBP

2   officer, plus doing this job for nine years, almost ten years.

3   So I have had a lot of cases like this.

4   Q.   Okay.  You mentioned training.  What kind of training do

5   you have in investigating travelers who are suspected of

6   smuggling illegal narcotics?

7   A.   I had basic training as a CBP officer.  Then I had

8   advanced training to be part of the team as the Tactical

9   Operations team, they have to going through on-the-job training

10  to be familiar with these kind of cases.

11  Q.   And do you do anything in your day-to-day job to stay

12  abreast of the smuggling methods used by drug traffickers?

13  A.   Yes, sir.  We do receive a lot of intel from within CBP or

14  from other federal agencies about current trends and smuggling

15  techniques for narcotics coming to the U.S.

16  Q.   So do you consider yourself up to date on the smuggling

17  methods?

18  A.   Yes, sir.

19  Q.   I want to change gears real fast and talk for a moment

20  about the layout of Dulles Airport.  And I was hoping you could

21  describe to us what an international traveler does once he or

22  she lands at the terminal on an international flight, where he

23  or she goes.

24  A.   Upon arrival to the CBP international -- for the

25  inspection area, the first part is going through the Passport

J. Rhazouani - Direct

10

1    Control Primary.  That's where they have to represent

2    themselves to either an officer where he can ask them basic

3    questions about their trips before admitting them to the U.S.;

4    or, they can also use an electronic passport control, it's

5    called the automated passport control, which is like a kiosk

6    they have go through, they have to answer those questions

7    electronically, and they just get a receipt from the machine,

8    and they have to show the receipt to an officer before they can

9    be admitted.

10   Q.   Where do they go after they leave Passport Control

11   Primary?

12   A.   After existing the Passport Control Primary, they go to

13   the baggage carousel area where they can collect their luggage.

14   Q.   Okay.  Is that baggage carousel area, does that service

15   only international flights?

16   A.   Only international flights, sir.

17   Q.   Okay.  So what does a traveler do once he or she collects

18   his or her luggage at the carousel?

19   A.   After collecting the luggage, the passengers, they make

20   their way to an exit.  And they have to go through a hallway

21   that connects the baggage carousel and exit to the

22   International Arrival area.

23   Q.   Okay.  After they go down that hallway to the exit, how do

24   they exit?  Where do they exhibit into?

25   A.   They exit into the International Arrival where their

J. Rhazouani - Direct

11

1   family are, they wait for them outside the doors.

2   Q.   Okay.  Is that the first time that the public could be

3   present?

4   A.   Yes, sir.

5   Q.   And can you describe the International Arrivals area for

6   us.

7   A.   It's like a big waiting area with a lot of seats where

8   family members can wait for the arrivals, for their family

9   arriving from overseas.  And this is like Starbucks, there is

10  coffee shops, and other stuff, other things in there.

11  Q.   And when you're performing your duties and doing bag

12  examinations, where are you stationed?

13  A.   Normally we stay at the hallway that connects the baggage

14  carousel to the exit.  We kind of like do like a checkpoint in

15  that area.

16  Q.   Okay.  So I would like to direct your attention to the

17  afternoon of August 10, 2017.

18            Were you on duty that day?

19  A.   Yes, sir.

20  Q.   What time did you go on shift?

21  A.   I started my shift at 1 p.m.

22  Q.   What were your duties?

23  A.   My duty is to conduct roving operations, which is pretty

24  much standing at that area, between the baggage carousel and

25  the exit, and screen passengers coming through with their

J. Rhazouani - Direct

12

1    luggage.  And we can conduct secondary inspections.

2    Q.   Okay.  Do you recall a specific flight coming in that

3    afternoon?

4    A.   Yes, sir.

5    Q.   What flight was that?

6    A.   It was flight Avianca 582 arriving from El Salvador.

7    Q.   Were you familiar with that flight already?

8    A.   Yes, sir.

9    Q.   What is that flight?

10   A.   It's a flight that's arrives directly from San Salvador,

11   El Salvador.  It's a daily flight.

12   Q.   Why were you already familiar with that flight?

13   A.   It's a flight that is -- it's an interest for our team

14   because it's coming from a high risk country.

15   Q.   What's a high risk country?

16   A.   High risk country is a country that we experienced

17   narcotics coming from that area, and that we know that there is

18   a trend of smuggling illegal contraband from that area through

19   our -- in our airport and other airports in the country.

20   Q.   Is El Salvador considered a high risk country?

21   A.   Yes, sir.

22   Q.   Okay.  I want to direct your attention to about 2:40 to

23   2:50 p.m.

24        Where were you stationed at that time?

25   A.   I was at that post between the baggage carousel and the

J. Rhazouani - Direct

13

1    exit.

2    Q.   And during that time period, between 2:45 and 3, did you

3    observe anyone that you see in the courtroom today?

4    A.   Yes, sir.

5    Q.   Can you identify him by where he is sitting and what he is

6    wearing?

7    A.   Yes, it is Mr. -- the guy with the white shirt and the tie

8    and with bald head.

9           MR. TRAXLER:  Your Honor, may the record reflect that

10   the witness has identified the defendant Rosemberg Majano?

11          THE COURT:  Yes, it will.

12   BY MR. TRAXLER: (Continuing)

13   Q.   When you first observed Mr. Majano in Dulles Airport that

14   day, what was he wearing?

15   A.   He was wearing a black shirt and white pants.

16   Q.   Do you have a binder in front of you right now?

17          With the assistance of the Court Security Officer,

18   we're going to hand you a binder with exhibits.

19   A.   Okay.

20   Q.   So I would like you to turn your attention to what has

21   been marked as Exhibit 1.

22   A.   Yes, sir.

23   Q.   Do you recognize Exhibit 1?

24   A.   Yes, sir.

25   Q.   What does Exhibit 1 show?

J. Rhazouani - Direct

14

1    A.   It shows Mr. Majano on August 8, 2017.

2    Q.   Does the picture fairly and accurately reflect how Mr.

3    Majano looked when you encountered him?

4    A.   Yes, sir.

5         MR. TRAXLER:  Your Honor, the Government moves for

6    admission of Government's Exhibit 1.

7         THE COURT:  Any objection?

8         MR. CRAWLEY:  No objection.

9         THE COURT:  It's received.

10        MR. TRAXLER:  And permission, Your Honor, to publish

11   the exhibit for the jury.

12        THE COURT:  Certainly.  You may publish any exhibit

13   after it has been admitted.

14   BY MR. TRAXLER: (Continuing)

15   Q.   Officer Rhazouani, that's the attire that you were

16   describing just a moment ago?

17   A.   Yes, sir.

18   Q.   And just to go back real quick to make sure we had the day

19   right.  We're talking about August 10, 2017?

20   A.   Yes.

21   Q.   Okay.  What was Mr. Majano carrying when you first saw

22   him?

23   A.   Mr. Majano was carrying a bag of fried chicken, Pollo

24   Campero.  And also a black suitcase, a black suitcase with

25   wheels on it, and the brand I think is what is called the

15

1    Wisdom brand, was with the suitcase.

2    Q.   I would like to direct your attention to what has been

3    marked as Government's Exhibit 42-1 in that binder.

4    A.   Which one again?

5    Q.   42-1.

6    A.   Okay.

7    Q.   Do you recognize this photo?

8    A.   Yes, sir, I do.

9    Q.   What does this photo depict?

10   A.   It shows Mr. Majano after he collected his bags from the

11   baggage carousel, and he was holding the Pollo Campero bag on

12   his left hand and his suitcase on his right hand.

13   Q.   Does the photo fairly and accurately reflect what you saw

14   when Mr. Majano was approaching you on August 10?

15   A.   Yes, sir.

16        MR. TRAXLER:  Your Honor, the Government moves for

17   admission of Exhibit 42-1.

18        THE COURT:  Any objection?

19        MR. CRAWLEY:  No objection.

20        THE COURT:  Received.

21        MR. TRAXLER:  With the perception of the Court, we

22   would like to publish it for the jury.

23        THE COURT:  Yes, go ahead.

24   BY MR. TRAXLER: (Continuing)

25   Q.   Officer Rhazouani, where is this picture taken right here?

J. Rhazouani - Direct

16

1   A.   It was taken by the baggage carousel, and it looks like

2   the passenger was coming forward to the exit area.  But it was

3   the baggage carousel, international baggage carousel.

4   Q.   What's the baggage carousel that is closest to us?

5   A.   It's 19 and 18.  So I think it's 19, probably.

6   Q.   And what flight was baggage carousel 19 servicing at that

7   time?

8   A.   For that day it was Avianca 582.

9   Q.   And where was Mr. Majano walking -- you see him walking

10  towards us.  Where was he walking to?

11  A.   He was walking towards the exit.

12  Q.   And where were you situated within this?

13  A.   I was in between him and the exit.  I was at the beginning

14  of the hallway.

15  Q.   What did you do after Mr. Majano began walking towards

16  you?

17  A.   So I approached Mr. Majano and I asked him about his

18  passport.  And he gave me his passport.  And I asked him where

19  he is coming from.  He say, from El Salvador.

20  Q.   With what was the purpose of the stop?

21  A.   It was just a routine baggage inspection, random

22  inspection.

23  Q.   And did you take him anywhere?

24  A.   Yes, sir.

25  Q.   Where did you take him?

J. Rhazouani - Direct

17

1   A.   I moved him to where we have like exam tables at the area,

2   they have like privacy screens.  That's where we conduct our

3   baggage exams.

4   Q.   What did you do once you were behind the privacy screen?

5   A.   So I asked him if he has a Customs declaration.  He said

6   he doesn't have one.  So I provided him with one to fill out

7   before we can start the baggage exam.

8   Q.   Did you also ask him any oral questions?

9   A.   Yes.  I asked him about his trip, where he was coming

10  from.  When he filled out the form, I asked him the same

11  questions on the Customs form verbally, just to get another

12  indication in case he missed something.  And then asked him if

13  the bags belonged to him.  He said they belonged to him.

14       Then we --

15  Q.   Let me pause you right there.  During this conversation,

16  did Mr. Majano appear to understand English?

17  A.   Yes, sir.

18  Q.   Was he speaking English with you?

19  A.   Yes, sir.

20  Q.   And how would you characterize his English?

21  A.   It was good English.

22  Q.   Okay.  You mentioned that you asked him where he was

23  coming from.  How did he respond?

24  A.   He said he was coming from El Salvador.

25  Q.   Did he say why he was in El Salvador?

18

1    A.    He stated that he was visiting his wife, his family in El

2    Salvador.

3    Q.    Did he tell you what his plans were now that he was at

4    Dulles?

5    A.    So he stated that he lives in Georgia, the state of

6    Georgia, and he was going to meet his cousin for four hours in

7    the airport at Dulles before heading to Georgia at 8 p.m. that

8    night.

9    Q.    Okay.  I would like for you to look, if you would, at what

10   has been marked as Government's Exhibit 2 in that binder.

11   A.    Yes, sir.

12   Q.    Do you recognize what's been marked as Government's

13   Exhibit 2?

14   A.    Yes, sir.

15   Q.    And do you see the -- first of all, let me ask, what is

16   Government's Exhibit 2?

17   A.    That's the Customs declaration that Mr. Majano filled out

18   before the bag exam.

19   Q.    And did you personally watch him fill out this form?

20   A.    Yes, sir.

21          MR. TRAXLER:  Your Honor, the Government moves for

22   the admission of Government's Exhibit 2.

23          THE COURT:  Any objection?

24          MR. CRAWLEY:  Yes, Your Honor.  The Court's

25   indulgence.

19

1          MR. TRAXLER:  Your Honor, we would move what Officer

2    Rhazouani has as a Customs form front and back, and we are just

3    wanting to admit the front of the page.

4          THE COURT:  Just the first page?

5          MR. TRAXLER:  Yes, Your Honor.

6          MR. CRAWLEY:  No objection, Your Honor.

7          THE COURT:  All right, it is received.

8          MR. TRAXLER:  And permission to publish that page for

9    the jury, please.

10          THE COURT:  Yes, sir.

11   BY MR. TRAXLER: (Continuing)

12   Q.   Officer Rhazouani, directing your attention -- are you

13   familiar with these forms?

14   A.   Yes, sir.

15   Q.   What is the purpose of this form?

16   A.   It's a binding declaration.  It shows information, basic

17   information about the passenger, like names, DOBs, and passport

18   information, countries visited.  And also, they have to declare

19   anything, like any food items, any merchandise, any currency,

20   that's what it is there for.

21   Q.   Is this a standard form?

22   A.   Yes, sir.

23   Q.   Is it translated into a different languages?

24   A.   Yes, sir.

25   Q.   Is this a Spanish version?

20

1    A.    Yes, sir.

2    Q.    Directing your attention to the information called for in

3    point number 5, do you see that?

4    A.    Yes, sir.

5    Q.    What does that reflect?

6    A.    Number 5, it shows the passport, which country is the

7    passport.

8    Q.    What did Mr. Majano indicate there?

9    A.    El Salvador.

10   Q.    And directing your attention to item number 8, what

11   information does that call for?

12   A.    Number 8, it shows the countries visited during this trip.

13   Q.    What did Mr. Majano indicate there?

14   A.    He put El Salvador.

15   Q.    Finally, directing your attention to item number 9, do you

16   see that?

17   A.    Yes, sir.

18   Q.    What information does that item call for?

19   A.    It shows the flight number that the passenger took to

20   came -- took to came to the United States.

21   Q.    What did Mr. Majano indicate there?

22   A.    It shows Avianca 582.

23   Q.    Okay.  So after Mr. Majano filled out this declaration,

24   what happened next?

25   A.    After he filled out his declaration, I went again to -- I

21

1  took another binding declaration verbally from Mr. Majano, and

2  then we start the baggage exam.

3           During the bag exam we were asking him questions

4  while I'm doing the bag exam about some contents of his bags.

5  Q.   Okay.  First, let me -- I want to ask you some questions

6  about the bag.  Can you describe the bag that Mr. Majano was

7  carrying.

8  A.   The bag, it looks like a black duffel bag with wheels on

9  it.

10  Q.   So with the assistance of the Court Security Officer, I

11  would like to hand you what's been marked Exhibit 3, the big

12  black bag.

13           Do you recognize Exhibit 3?

14  A.   Yes, it looks like the bag that Mr. Majano had that day.

15  Q.   And how do you know that?

16  A.   I know from the bag itself, and also from the brand, the

17  Wisdom bag.

18  Q.   Does it have a baggage tag on it?

19           Officer Rhazouani, you can take the bag out of the

20  protective covering.

21  A.   Okay.  Yes, sir, it has a bag tag on it.

22  Q.   So do you recognize that bag?

23  A.   Yes, sir.

24  Q.   Can you describe what the baggage tag says for us.

25  A.   So it has the name on it, Majano Rosemberg.  Also has the

J. Rhazouani - Direct

22

1   flight number, Avianca 582.  Also has the date, which is 10th

2   of August.  And it said also, Avianca.  And it says also, IAD,

3   which is Dulles Airport.

4            MR. TRAXLER:  Your Honor, we move for admission of

5   Exhibit 3.

6            THE COURT:  Any objection?

7            MR. CRAWLEY:  No objection, Your Honor.

8            THE COURT:  Received.

9   BY MR. TRAXLER: (Continuing)

10  Q.   And I can't remember if you mentioned this, Officer

11  Rhazouani, so my apologies if I missed it.  But did Mr. Majano

12  make any statement about the bag to you?

13  A.   He said -- I asked him if this bag belonged to him.  He

14  said it is his bag.

15  Q.   Okay.  And then what happened after you asked him to put

16  his bag on the table?

17  A.   So I put the bag on the table, we start doing baggage

18  exam.  I was searching his bags, the contents of his bags.  And

19  I discovered he had some food, food items.  Also has like 11

20  packages, nine of milk powder packages, and two of coffee.

21            I asked him about --

22  Q.   Let me pause you right there.  Did he have any clothing in

23  his bag?

24  A.   Had only one shirt and one pants, that's all he had.

25  Q.   And you mentioned some food items.  What food items did he

J. Rhazouani - Direct

23

1    have in his bag?

2    A.   Besides the chicken, in another bag he has cookies --

3    pretty much cookies, that's all.  And the coffee.  And then the

4    milk powder.

5    Q.   I want to show you what's been marked as Exhibit 4 in the

6    binder right there.

7    A.   Yes, sir.

8    Q.   Do you recognize Exhibit 4?

9    A.   Yes, sir.

10   Q.   Were you present when this picture was taken?

11   A.   Yes, sir.

12   Q.   What does Exhibit 4 show?

13   A.   It shows the powdered milk packages and the coffee

14   packages that we found in Mr. Majano's bag.

15            MR. TRAXLER:  Your Honor, the Government moves for

16   the admission of Exhibit 4.

17            THE COURT:  Any objection?

18            MR. CRAWLEY:  No, Your Honor.

19            MR. TRAXLER:  Permission to publish?

20            THE COURT:  Yes, sir.

21   BY MR. TRAXLER: (Continuing)

22   Q.   When you first observed the bags, were these cut like they

23   are in this picture?

24   A.   No, sir.

25   Q.   Okay.  So this is after the rest of the search?

J. Rhazouani - Direct

24

1    A.    Yes, sir.

2    Q.    Now, I want to, with the assistance of the Court Security

3    Officer, hand you what has been marked as Exhibit 5.

4    A.    Yes.

5    Q.    Do you recognize Exhibit 5?

6    A.    Yes, sir.

7    Q.    What is Exhibit 5?

8    A.    Those are the milk and coffee packages that we found in

9    Mr. Majano's bags.

10   Q.    Do you see on the bag where there is an FPF number?

11   A.    Yes, sir.

12   Q.    Do you recognize that FPF number?

13   A.    Yes, sir.

14   Q.    Where do you recognize that FPF number from?

15   A.    That is the number associated to the seizure of Mr.

16   Majano's contraband.

17   Q.    Were you the seizing officer?

18   A.    Yes, sir.

19   Q.    What is the FPF number?  What's the purpose of that?

20   A.    It's a CBP generated number that is associated to any

21   seizure we do, each of them has a number that is generated by

22   CBP, it's for reference.

23   Q.    Were all items that were ceased from Mr. Majano by the CBP

24   assigned the same number?

25   A.    Yes, sir.

J. Rhazouani - Direct

25

1          MR. TRAXLER:  Your Honor, the Government moves for

2    admission of Exhibit 5.

3          THE COURT:  Any objection?

4          MR. CRAWLEY:  No objection, Your Honor.

5          THE COURT:  It is received.

6    BY MR. TRAXLER: (Continuing)

7    Q.    Did you ask Mr. Majano any questions about the powdered

8    milk and the ground coffee?

9    A.    Yes, sir, I did.  I asked him about the powdered milk.

10   And he say he is bringing it for his friends and family.  And

11   the coffee, he said it is for his own use.

12   Q.    Did the contents of Mr. Majano's bag stand out to you?

13   A.    Yes, sir.

14   Q.    Why is that?

15   A.    Because it doesn't have any clothing on him, any clothes,

16   any item for clothing on him.  He just has, mostly just the

17   food items and the coffee and the powdered milk, which doesn't

18   make any sense for somebody who has been traveling overseas.

19   Q.    What happened at that point?

20   A.    At that point I told Mr. Majano, I am going to open one of

21   the milk packages to see what's inside, what's the contents of

22   it.

23          At that point, as soon as I told him that, I put my

24   knife to start opening the bag, Mr. Majano's demeanor changed.

25   Before that point he was talking to me, you know, he was very

1    friendly.  He was talkative.  But at that point, he paused, and

2    then he start being nervous and he stopped making eye contact

3    with me.

4              And I can see he was sweating and he was shaking at

5    the time I was about to open, to cut the first bag to see

6    what's inside.

7    Q.   Okay.  So at that point had you pulled anything -- had you

8    actually cut open the powdered milk bag?

9    A.   That was before I did.  I was about to.

10   Q.   Okay.  And did the change in Mr. Majano's appearance

11   concern you in any way?

12   A.   Yes, sir, it did.

13   Q.   Why did it concern you?

14   A.   It seems like he was afraid that I would find something

15   that he is trying to hide inside those bags.

16   Q.   And what's that based off of?

17   A.   Based on his behavior.  Because before that point, he was

18   talking, he was normal, he didn't show any signs of nervousness

19   or any signs of concern.

20             But at that point when he changed his demeanor, like

21   all of a sudden it make me kind of wondering why he is doing

22   that.

23   Q.   So what did you do at that point?

24   A.   At that point I went ahead and I cut -- I cut the first

25   bag from the top with my knife.  And then at that point when I

27

1  opened it, I saw another clear plastic bag with white powder,

2  powdery substance on it, which is kind of like the color was

3  not the same as the color of the powder of the milk itself.

4  Q.   Did that give you any pause?

5  A.   Yes, sir.

6  Q.   Why is that?

7  A.   It looks like how it is smuggled.  And also the color of

8  it, it looks like narcotics.

9  Q.   So what did you do at that point?

10 A.   At that point, the first thing I did I called for

11 assistance, backup from my co-workers, from other CBP officers

12 in the area.

13 Q.   And how did you call for them?

14 A.   They were like very close to me.  So I just called them by

15 name.

16 Q.   Okay.  And so, then what happened?

17 A.   Then at that point we decided to take Mr. Majano to our

18 Secondary Inspection area to complete the baggage exam.

19 Q.   What's the Secondary Inspection area?

20 A.   The Secondary Inspection area, it's like where we conduct

21 most of our inspections for Immigration, for Customs, and for

22 Agriculture.

23 Q.   Where was that in relation to where the privacy screen

24 was?

25 A.   It was next to it.  It was like it was just right there,

28

1    it is only like a door in between the areas.

2    Q.   So what happened once you got into the Secondary

3    Inspection area?

4    A.   So at that point we had the canine, canine officer

5    present.  The first thing we did, we tried to -- we used the

6    canine officer to see if he can alert to the contents of the

7    bag to see if it is narcotics or no.

8         So the canine actually did examine Mr. Majano and his

9    bags, and it positively alerted to the contents of the bag for

10   narcotics.

11   Q.   Have you worked with canine dug sniffing dogs before?

12   A.   Yes, sir, I did.

13   Q.   And are you familiar with how they alert when they smell

14   narcotics?

15   A.   Yes, sir.

16   Q.   How do they alert?

17   A.   The canines, after they sniff in the bags, they sit down

18   automatically.  If it is positive alert, they sit down.  And

19   they sit down and they show interest on the bag.

20   Q.   What did the canine do when it sniffed Mr. Majano's bag?

21   A.   The canine actually sat down and he was alerted to the

22   bag.  And the handler actually was by there to say -- he

23   confirmed that the dog alerted to narcotics.

24   Q.   So then what did you do after that?

25   A.   Then we tested the powder to see what kind of narcotics we

1  had, we were dealing with.  And it was positive for cocaine.

2  Q.   And what did you do in response to that test?

3  A.   After the test was positive, Mr. Majano was handcuffed and

4  was taken to a holding cell in the Secondary area.

5  Q.   What did you do during that time?

6  A.   At that time me and -- we finished opening the other bags.

7  As we found the contraband in one bag, we obviously have ten

8  more packages to go through.  And we found narcotics in each

9  single bag, in every single one of them.

10  Q.   So all the bags of powdered milk and ground coffee?

11  A.   Yes, sir.

12  Q.   I would like to show you what has been marked as

13  Exhibit 6, it's in your binder.

14  A.   Yes, sir.

15  Q.   Do you recognize Exhibit 6?

16  A.   Yes, sir.

17  Q.   Were you present when this photograph was taken?

18  A.   Yes, sir.

19  Q.   What does Exhibit 6 show?

20  A.   It shows the powdered milk package, and what's inside is

21  the plastic bag with cocaine on it.

22           MR. TRAXLER:  Your Honor, we move for admission of

23  Government's Exhibit 6.

24           THE COURT:  Any objection?

25           MR. CRAWLEY:  No objection.

J. Rhazouani - Direct

30

1          MR. TRAXLER:  Permission to publish?

2          THE COURT:  Yes, sir.

3    BY MR. TRAXLER: (Continuing)

4    Q.   Does this picture fairly and accurately reflect how the

5    substance looked inside the packages of powdered milk?

6    A.   Yes, sir.

7    Q.   I would also like for you to take a look at what has been

8    marked as Exhibit 7 in your binder, please.

9    A.   Yes, sir.

10   Q.   Do you recognize Exhibit 7?

11   A.   Yes, sir.

12   Q.   Were you present when this photograph was taken?

13   A.   Yes.

14   Q.   What does Exhibit 7 show?

15   A.   It shows all the packages that we took from the milk and

16   the coffee packages, that's all the bags we found inside the

17   milk and the coffee packages.

18          MR. TRAXLER:  Your Honor, we move for admission of

19   Exhibit 7.

20          THE COURT:  Any objection?

21          MR. CRAWLEY:  No objection.

22          MR. TRAXLER:  Permission to publish, Your Honor?

23          THE COURT:  Yes, sir.

24   BY MR. TRAXLER: (Continuing)

25   Q.   So it looks like some of these bags are different colors.

J. Rhazouani - Direct

31

1   Could you explain to us why.

2   A.   Okay.  Some of them were inside powdered milk, that's why

3   they had the white color on the outside.  Some of them were

4   inside coffee, that's why they had that coffee color on them.

5   And some of them also were inside some kind of like chocolate

6   milk powder too, so that's why they have kind of like a

7   brownish color too.

8   Q.   Did you do anything to weigh the drugs after you found

9   them?

10   A.   Yes, sir, we did.

11   Q.   I would like to you what's been marked as Exhibit 8 in

12   your binder.

13   A.   Yes, sir.

14   Q.   Do you recognize Exhibit 8?

15   A.   Yes, sir.

16   Q.   Were you present when this photograph was taken?

17   A.   Yes.

18   Q.   What does Exhibit 8 show?

19   A.   It shows the weighing of all the packages that we found

20   that day on Mr. Majano's bags.

21            MR. TRAXLER:  Your Honor, we move for admission of

22   Exhibit 8.

23            THE COURT:  Any objection?

24            MR. CRAWLEY:  No objection.

25            MR. TRAXLER:  And permission to publish, Your Honor?

J. Rhazouani - Direct

32

1        THE COURT:  Yes.

2    BY MR. TRAXLER:  (Continuing)

3    Q.   Looking at Exhibit 8, what did the scale register the

4    weight as of the drugs?

5    A.   It was 8,377 grams.

6    Q.   And did that still include the plastic packaging that the

7    drugs were in?

8    A.   Yes, sir.

9    Q.   What did you do after you weighed the drugs?

10   A.   After we weighed the drugs, we start the -- we finish

11   examining everything, and we start the seizure end process.

12   And then we contacted HSI to take over the investigation.

13   Q.   Okay.  Were you the seizing officer of the drugs?

14   A.   Yes, sir.

15   Q.   I would like to show you what has been marked as Exhibits

16   9 and 10.

17            Mr. Ruelas, the hard boxes over here.

18            Officer Rhazouani, do you see the FPF control number

19   on the bag or the box of these items?

20   A.   Yes, sir.

21   Q.   And do you recognize that number?

22   A.   Yes, sir, I do.

23   Q.   And how about for the other box?

24   A.   Yes, sir.

25   Q.   Do you recognize that number as well?

J. Rhazouani - Direct

33

1    A.    Yes, sir.

2    Q.    Are they the same numbers?

3    A.    Same numbers, yes.

4    Q.    What's that FPF number?

5    A.    That's the same FPF number for the narcotics we found in

6    Mr. Majano's bag.

7    Q.    Do you know what these items are that you are holding?

8    A.    Yes, sir.  This is the narcotics, this is the cocaine, and

9    that's the heroin.

10          MR. TRAXLER:  Your Honor, the Government moves for

11   the admission of Exhibits 9 and 10.

12          THE COURT:  Any objection?

13          MR. CRAWLEY:  No objection.

14          THE COURT:  All right, received.

15   BY MR. TRAXLER: (Continuing)

16   Q.    Officer Rhazouani, would you mind holding up the items so

17   that we can see them.

18          And how about the other exhibit, can you hold up one

19   of those items.

20   A.    Three bags here, one, two, and three.

21   Q.    Were these the substances that were found in Mr. Majano's

22   luggage?

23   A.    Yes.

24   Q.    I think that's all we need from those boxes.

25          Were you the seizing officer of any other items that

J. Rhazouani - Direct

34

1    were taken that day?

2    A.   Yes, sir.  Also during that personal search of Mr. Majano,

3    during the pat-down, we found some currency, some money on

4    his -- on him.  We seized that money as well.

5    Q.   Were you the seizing officer for that money?

6    A.   Yes, sir.

7    Q.   Did you do the count for that money as well?

8    A.   Yes, sir, I did.

9    Q.   I would like to show you what has been marked as

10   Exhibit 11, with the assistance of the Court Security Officer.

11   A.   Yes, sir.

12   Q.   Do you see the FPF control number on that item?

13   A.   Yes, sir.

14   Q.   Do you recognize that number?

15   A.   Yes, sir.

16   Q.   What is that number?

17   A.   The same number that is associated to the seizure of Mr.

18   Majano's narcotics and currency.

19          MR. TRAXLER:  Your Honor, the Government moves for

20   the admission of Exhibit 11.

21          THE COURT:  Any objection?

22          MR. CRAWLEY:  No objection, Your Honor.

23          THE COURT:  Received.

24   BY MR. TRAXLER: (Continuing)

25   Q.   And how much money was taken from Mr. Majano?

J. Rhazouani - Direct

35

1    A.    It was $786.

2    Q.    What currency was that in?

3    A.    It was U.S. dollars.

4    Q.    Now, you can set that aside.  I want to shift gears again

5    and talk about surveillance footage maintained by Dulles

6    Airport.

7              Do you know whether Dulles Airport has surveillance

8    cameras in the area?

9    A.    Yes.

10   Q.    Have you reviewed any of the surveillance footage in this

11   case?

12   A.    Yes.

13   Q.    I would like for you to look at Exhibit 40 in your binder,

14   please.

15   A.    Yes, sir.

16   Q.    Do you recognize what has been marked as Exhibit 40?

17   A.    Yes, sir.

18   Q.    What is Exhibit 40?

19   A.    That's a CD that contains surveillance from Dulles Airport

20   on August 10, 2017.

21   Q.    How do you know that?

22   A.    Because I already seen it, I already write the date and my

23   initials on it too.

24   Q.    So you have reviewed this CD?

25   A.    Yes, sir, I did.

1   Q.   And what confirmed to you that this was surveillance

2   footage of August 10?

3   A.   Because I saw the video and I know the layout of Dulles

4   Airport.  So it was exactly, exactly Dulles Airport during that

5   day.

6   Q.   And did it accurately reflect how Dulles Airport looked on

7   August 10 as you remember it?

8   A.   Yes, sir.

9          MR. TRAXLER:  Your Honor, we move for admission of

10  Exhibit 40.

11         THE COURT:  Any objection?

12         MR. CRAWLEY:  No, Your Honor.

13         THE COURT:  Received.

14  BY MR. TRAXLER: (Continuing)

15  Q.   Now, I would also like for you to look in your binder at

16  Exhibits 41 through 45.

17  A.   Yes, sir.

18  Q.   Do you recognize Exhibits 41 through 45?

19  A.   Yes, sir.

20  Q.   What are Exhibits 41 through 45?

21  A.   They are more CDs for surveillance footages from Dulles

22  Airport during that day, on August 10.

23  Q.   Do you recall that they are excerpts from what you saw as

24  Exhibit 40?

25  A.   Yes, sir, it has my name on it, my signature on it too and

37

1    the date.

2              MR. TRAXLER:  Your Honor, we move for the admission

3    of Exhibits 41 through 45.

4              THE COURT:  Any objection?

5              MR. CRAWLEY:  No sir, Your Honor.

6              THE COURT:  They are received.

7              MR. TRAXLER:  Your Honor, with your permission, we

8    would like to play what has been marked as Exhibit 41.

9              THE COURT:  All right, go ahead.

10             NOTE:  The video recording is played.

11   BY MR. TRAXLER: (Continuing)

12   Q.   Officer Rhazouani, do you recognize this area?

13   A.   Yes, sir.

14   Q.   What is this area?

15   A.   That's the exits from the Passport Control Primary to the

16   baggage carousel at Dulles Airport.

17   Q.   And who is this gentleman walking towards us?

18   A.   That's Mr. Majano.

19   Q.   Could you pause it, Ms. Morrell.

20             Well, did you recognize the gentleman walking past?

21   A.   Yes, sir.

22   Q.   Who was that?

23   A.   That was Mr. Majano on August 10, 2017.

24   Q.   Where was he walking into at that time?

25   A.   He was exiting the Primary, the Passport Control Primary

38

1    going towards the baggage carousel to collect his bags.

2    Q.    What is he carrying?

3    A.    That's the fried chicken, Pollo Campero.

4    Q.    Did you look in that bag of fried chicken?

5    A.    Yes, sir, we did.

6    Q.    What happened to that bag of fried chicken after you all

7    detained Mr. Majano?

8    A.    We asked Mr. Majano if he wanted to give the bag to

9    somebody outside, family member who was waiting outside, or he

10   can eat if he wants to.  He said he only wanted two pieces and

11   we can throw the rest of it.  So we just throw it in the trash.

12   Q.    Did you look in the bag for anything of evidentiary value?

13   A.    Yes, we did search the bag as parts of the baggage exam.

14   Q.    Did you find anything in it?

15   A.    No, sir.

16   Q.    Okay.  I would also like to show you or play what has been

17   marked as Exhibit 42, with the permission of the Court.

18              THE COURT:  Yes, sir.

19              MR. TRAXLER:  Thank you.

20              NOTE:  The video recording is played.

21   BY MR. TRAXLER: (Continuing)

22   Q.    What does this footage show?

23   A.    It shows the baggage carousel 19.

24   Q.    If we could fast forward, Ms. Morrell, to 2:47.40 seconds,

25   please.

J. Rhazouani - Direct

39

1          And do you recognize anyone in this footage?

2    A.   I can see Mr. Majano.

3    Q.   Where is Mr. Majano in this?

4    A.   He is by the carousel right now, by the baggage carousel

5    holding the chicken, the chicken bag in his left hand.

6    Q.   And remind us, where were you positioned during this time?

7    A.   I was all the way by the exit, it was kind of like further

8    away.

9    Q.   Okay.  Ms. Morrell, if you would, please, fast forward to

10   2:50.15 seconds, please.

11          Officer Rhazouani, could you tell us what is going on

12   in this video.

13   A.   It shows Mr. Majano just pick up his bag from the baggage

14   carousel.  And he was looking at the bag, looking at the bag

15   tag to make sure that it's his bag.  And then he is walking

16   toward --

17   Q.   Are you standing in the hallway at that time?

18   A.   Yes, I was standing in the hallway at this time.

19   Q.   Okay.

20   A.   So now Mr. Majano is walking towards the exit, toward the

21   hallway where I was standing.

22   Q.   All right.  Ms. Morrell, if we could, please, show

23   Exhibit 43, with the permission of the Court.

24          THE COURT:  Yes, go ahead.

25          NOTE:  The video recording is played.

1  BY MR. TRAXLER: (Continuing)

2  Q.   What does Exhibit 43 show?

3  A.   That shows exactly the hallway that leads to the exit of

4  the -- from the further inspection area, CBP area in Dulles

5  Airport.  And that's up top, it's like where we do normally

6  conduct roving inspections.

7  Q.   Where is the international baggage claim in relation to

8  this?

9  A.   It would be all the way to the end.  Like where the

10 passengers are walking toward, that's the exit.

11 Q.   And what are the things that look like little cubicles?

12 A.   Those are the examinations area where we want to conduct

13 our baggage exam, the tables and the privacy screens.

14 Q.   Where did you conduct the examination of Mr. Majano's bag?

15 A.   I was all the way up top to the left.

16 Q.   Ms. Morrell, if we could, please, fast forward to 2:52.00

17 seconds.

18      What's going on right here?

19 A.   So it shows that after I stopped Mr. Majano and I took him

20 to that baggage Secondary area, it's all the way to the left.

21 And it shows Mr. Majano, he was carrying his bag, and then

22 right now I see him filling out the Customs form.

23 Q.   If we could, Ms. Morrell, fast forward to 3:03.45 seconds.

24      And do you see, Officer Rhazouani, you with Mr.

25 Majano in the corner still?

J. Rhazouani - Direct

41

1    A.    Yes, sir.

2    Q.    And who are the people across the hallway from you?

3    A.    Those are the other CBP officers conducting inspections at

4    the same time too.

5    Q.    And do you see the officers walking towards you?

6    A.    Yes, sir.

7    Q.    What is happening at this point?

8    A.    At that point, yeah, that's when I found the narcotics

9    inside Mr. Majano's bag, and I called my fellow CBP officers

10   for assistance.

11   Q.    Okay.  Ms. Morrell, if we could fast forward to 3:06.25

12   seconds.

13         And are you all still with Mr. Majano at that same

14   screen?

15   A.    Yes, sir.  At this point we're walking Mr. Majano from

16   that baggage area, from the baggage area to the Secondary, and

17   we're just walking towards Secondary right now.

18   Q.    Where is Secondary that you all are walking to?

19   A.    It should be right there to the right.  So the door, it

20   should be to the right.  And we are just walking towards

21   Secondary at this moment.  That's the door that connects

22   Secondary to the hallway.

23   Q.    Thank you.  With the permission of the Court, we would

24   like to play Exhibit 45.

25               THE COURT:  Go ahead.

J. Rhazouani - Direct

42

1              NOTE:  The video recording is played.

2    BY MR. TRAXLER: (Continuing)

3    Q.    What does Exhibit 45 show?

4    A.    That's the baggage Secondary area at Washington Dulles

5    International Airport.

6    Q.    And do you see the areas that are marked 9, 10, 11, and

7    12?

8    A.    Yes, sir.

9    Q.    What are those?

10   A.    These are different areas where we conduct different kind

11   of inspections for Customs inspections, Immigration

12   inspections.  You know, each one is for a different kind of

13   Secondary inspections.

14   Q.    Ms. Morrell, if we could fast forward to 3:07.10 seconds,

15   please.

16              Where did you all conduct the examination of Mr.

17   Majano's bags?

18   A.    It appears number 8.

19   Q.    Where is that in the video?

20   A.    It should all the way to left of the video.

21   Q.    Does this show you all walking into that area?

22   A.    It shows some movement there, but not clear shots, no.

23   Q.    Where did you all put Mr. Majano as you searched his bags?

24   A.    We put him on the right side.  You can see Mr. Majano, he

25   was standing right there.  Actually, that's when we called the

J. Rhazouani - Direct

43

1    canine to conduct the exam on his bag.

2              So Mr. Majano, he just was standing there by the

3    inspection area.  And his bags, we put his bags on the ground

4    in front of him.

5    Q.   If we could, Ms. Morrell, fast forward to 3:09.13 seconds,

6    please.

7              Where was the canine located?

8    A.   It was in the cage by number 12, but the baggage, he is

9    number 12, you can see him right now, Officer Stone and his

10   canine.

11   Q.   Was that the canine that was used on Mr. Majano's bag?

12   A.   Yes, sir.  It's a narcotics canine.

13   Q.   What's going on right now in the video?

14   A.   So the canine, the first one, they inspected Mr. Majano,

15   they sniffed around Mr. Majano to see if he had any more -- any

16   narcotics on him.  And then we are going to the back to inspect

17   the bag.

18             And after the dog sniffed around the bag, he alerted

19   to the presence of narcotics.

20   Q.   Okay.  I think we're done with that video.

21             MR. FITZPATRICK:  The Court's indulgence.

22   Q.   So when we saw the video of people coming down the hallway

23   before you and Mr. Majano took -- or before you took Mr. Majano

24   to the privacy screen, what are those people doing?

25   A.   People walking through?

J. Rhazouani - Cross

44

1   Q.   Right, they were walking down towards --

2   A.   Yeah, they were walking towards the exit.  They are

3   exiting the further inspection area, CBP area, and going

4   towards the exit to meet their families or whoever is on the

5   other side.

6   Q.   And they weren't being stopped, so not everyone is being

7   stopped?

8   A.   Yeah, we don't stop everybody.  We conduct random exams

9   because we cannot stop every single person coming through.  So

10  we just stop randomly.

11           MR. TRAXLER:  Okay.  No further questions, Your

12  Honor.

13           THE COURT:  All right, thank you.

14           Cross-examination.

15           MR. CRAWLEY:  Thank you, Your Honor.

16      CROSS-EXAMINATION

17  BY MR. CRAWLEY:

18  Q.   Okay.  Good afternoon.

19  A.   Good afternoon.

20  Q.   So on August 10, you were at Dulles Airport, correct?

21  A.   Yes, sir.

22  Q.   And you were dressed as you are dressed today,

23  essentially, correct?

24  A.   Yes, sir.

25  Q.   So you were in uniform?

J. Rhazouani - Cross

45

1  A.   Yes, sir.

2  Q.   You had a badge.

3  A.   Yes, sir.

4  Q.   And by having such uniform and such bag, you were

5  displaying your authority, correct?

6  A.   Yes, sir.

7  Q.   And you would agree with me that Dulles Airport is a

8  pretty crowded airport, correct?

9  A.   Yes, sir.

10 Q.   And according to you, you observed my client near the

11 carousel where the baggage or the bags were coming in from El

12 Salvador, correct?

13 A.   Yes, sir.

14 Q.   And you are familiar with that flight from El Salvador,

15 correct?

16 A.   Yes, sir.

17 Q.   And how long would you say it takes to travel direct from

18 El Salvador to Dulles?

19 A.   I'm not sure.  Five hours probably.

20 Q.   About five hours.  And that bag was checked, correct?

21 A.   Prior to Customs?

22 Q.   Yes.  I mean, based on what you observed, it had a bag tag

23 on it, correct?

24 A.   Yes, sir.

25 Q.   And it appeared on the carousel, correct?

1    A.    Yes, sir.

2    Q.    So all reasonable inferences would be that that bag was

3    checked, correct?

4    A.    Yes, it was checked luggage.

5    Q.    So that was checked luggage.  So that means for five hours

6    that bag was outside of my client's presence, correct?

7    A.    Yes.

8    Q.    And that means that for five hours as that bag flew from

9    El Salvador to the United States, my client didn't have any

10   control over that bag, correct?

11   A.    Probably.

12   Q.    And from the time that that bag left the plane until it

13   hit the carousel, my client didn't have any control over that

14   bag, correct?

15   A.    Probably.

16   Q.    And in fact, that's the same bag that you indicated

17   contained approximately eight kilos worth of narcotics,

18   correct?

19   A.    Yes, sir.

20   Q.    Now, when you approached my client in your uniform

21   displaying your badge of authority, it's your testimony that

22   there were a number of people in that area, correct?

23   A.    Yes, sir.

24   Q.    And you singled him out?

25   A.    No, sir.

J. Rhazouani - Cross

47

1   Q.   Well, you went to him and asked to speak with him?

2   A.   Yes, sir.

3   Q.   And that means that you didn't go to anyone else at that

4   point, you went to him, correct?

5   A.   Yes, sir.

6   Q.   And so, in essence, you singled him out, correct?

7   A.   It was random inspection, I don't stop --

8   Q.   Yes.

9   A.   Okay.

10  Q.   And it was a polite encounter, correct?

11  A.   Yes, sir, very polite.

12  Q.   In fact, he did not attempt to flee from you at that

13  point, correct?

14  A.   No, sir.

15  Q.   In fact, he did not become combative with you at that

16  point, correct?

17  A.   No, sir.

18  Q.   In fact, he did not appear nervous at that point, correct?

19  A.   No, sir.

20  Q.   He voluntarily went with you as you requested, correct?

21  A.   Yes, sir.

22  Q.   Carrying a bag that you later determined to have

23  approximately eight kilos of narcotics, correct?

24  A.   Yes, sir.

25  Q.   And then you asked him to step behind a screen, correct?

J. Rhazouani - Cross

48

1    A.   Yes, sir.

2    Q.   Now, at this point he is away from everyone else; isn't

3    that true?

4    A.   Yes, sir.

5    Q.   I mean, essentially, the other passengers?

6    A.   Yes.  It's not 100 percent privacy screen.  You can see

7    other passengers passing by.

8    Q.   But he is essentially away from the other passengers at

9    that point?

10   A.   Yes, sir.

11   Q.   And your purpose in carrying him over to that area is

12   because you wanted to investigate a little bit more about what

13   he had in that bag, correct?

14   A.   Yes, sir.

15   Q.   And that was based on your training and experience, that

16   you thought that there may be some issue here?  You weren't

17   certain, but you thought there may be an issue?

18   A.   Yes, sir, based on where he is coming from, probably he

19   may have something.

20   Q.   Yes.  So once you got him in that area, once again, he was

21   still cooperative, correct?

22   A.   Yes, sir.

23   Q.   And you told him at some point, hey, I want to take a look

24   in your bag, correct?

25   A.   Yes, sir.

J. Rhazouani - Cross

49

1   Q.   And at no point when you said, I want to take a look in

2   your bag, did he say, hey, hey, stop, don't do that?

3        He did not say that, correct?

4   A.   No, sir.

5   Q.   And at no point when you said, hey, that I want to look in

6   your bag, did he becomes nervous by you just saying that,

7   correct?

8   A.   No, sir.

9   Q.   He didn't start to stutter, correct?

10  A.   No, sir.

11  Q.   He didn't start to sweat, correct?

12  A.   No, sir.

13  Q.   He didn't attempt to flee, correct?

14  A.   No.

15  Q.   And it was only once you opened the bag and you indicated

16  that you noticed there were items that you thought were

17  suspicious, that means you thought the bags of powdered milk

18  and coffee, those were suspicious to you, correct?

19  A.   Yes, sir.

20  Q.   And at that point you said, hey, do you mind if I take a

21  look in these bags, correct?

22  A.   I didn't say, do you mind?  I said, I'm going to open your

23  bag or suitcase.

24  Q.   Yes.  And when you said that, at that point, once you

25  said, hey, I'm going to open these bags, at that point he

J. Rhazouani - Cross

50

1    wasn't still nervous, correct?

2    A.   Well, when I say, I'm going to open the powdered milk in

3    there, he did become nervous.

4    Q.   And in fact, what he said to you at that point is, go

5    ahead and open the bag, but just seal it up?

6    A.   Well, he didn't say anything.

7    Q.   He did not say that to you?

8    A.   He said nothing.

9    Q.   At that point, he did not turn and try to run, correct?

10   A.   No.  He was -- first, he was cornered, there is nowhere he

11   can run because it was privacy screen behind him.  There was a

12   table between us.  And there was like five or six more officers

13   around the area.  So there is no where for him to --

14   Q.   But he didn't become combative with you?

15   A.   No, he wasn't.

16   Q.   And he wasn't stuttering?

17   A.   No, sir.

18   Q.   In fact, you then opened the bag?

19   A.   Yes, sir.

20   Q.   You cut into the bag?

21   A.   Yes, sir.

22   Q.   And that's when you said that he appeared nervous?

23   A.   No, it was before I opened the bags.  When I told him, I'm

24   going to open the bag, then when he became nervous.

25   Q.   Okay.  And at that point once you opened the bag and you

J. Rhazouani - Cross

51

1    became more suspicious of what you found, you again asked him

2    to come with you?

3    A.   I called backup first, so we have like four officers.

4    Then we walk him with us.

5    Q.   Well, in the video no one is holding his arm?

6    A.   Yeah, but we were surrounding him.  So there is no way he

7    can --

8    Q.   I understand.  I just want you to answer my question.  At

9    that point, you weren't holding his arm?

10   A.   No, I was not.

11   Q.   You weren't dragging him over there?

12   A.   No, sir.

13   Q.   In fact, again, he doesn't say anything like, oh, you got

14   me?  He didn't make any statements to that effect?

15   A.   No, sir.

16   Q.   He didn't say anything like, yes, that's my drugs and I

17   want to admit to it, correct?

18   A.   No, he didn't.

19   Q.   And in fact, he didn't do anything of that sort and he

20   didn't attempt to flee, even though I understand your point, he

21   did not attempt to flee?

22   A.   No, he didn't.

23   Q.   Okay.  He didn't try to fight you?

24   A.   No.

25   Q.   Correct?

J. Rhazouani - Cross

52

1     A.   No, he didn't.

2             MR. CRAWLEY:  The Court's indulgence.

3             THE COURT:  Yes.

4     BY MR. CRAWLEY: (Continuing)

5     Q.   Now, early in your testimony you talked about a Customs

6     form you asked him to fill out.  Do you recall that testimony?

7     A.   Yes, sir.

8     Q.   But you indicated also that he spoke English very well,

9     correct?

10    A.   Yes, sir.

11    Q.   Did you ask him if he preferred English over Spanish?

12    A.   No, we didn't.  I didn't.

13    Q.   Was he allowed to choose the Customs form for himself?

14    A.   Yes, sir, he can.

15    Q.   And which language was that Customs form in?

16    A.   It was in Spanish.

17            MR. CRAWLEY:  No further questions.

18            THE COURT:  All right.

19            MR. TRAXLER:  Just brief redirect, Your Honor,

20    please.

21            THE COURT:  Do you want to do them one at a time, or

22    do you want to do the rest of cross?

23            MR. ENGLISH:  Your Honor, I was just going to say

24    that I have no questions of this witness.

25            THE COURT:  All right.  Thank you, Mr. English.

J. Rhazouani - Redirect

53

1          Then redirect.

2          MR. TRAXLER:  Thank you, Your Honor.

3      REDIRECT EXAMINATION

4  BY MR. TRAXLER:

5  Q.   Officer Rhazouani, I want to circle back to when you

6  stopped Mr. Majano and opened his bag and saw the bags of

7  powdered milk and ground coffee.

8          What did Mr. Majano say when you asked him about the

9  bags of powdered milk and ground coffee?

10 A.   He said the powdered milk was to bring as a gift for

11 friends and family.  And the coffee was for his own use.

12         MR. TRAXLER:  No further questions, Your Honor.

13         THE COURT:  All right.  May the officer be excused?

14 Or do you want him held for possible testimony?

15         MR. TRAXLER:  We hold him for possible recall, Your

16 Honor.

17         THE COURT:  Okay.  Then, Officer, you are excused at

18 this time, but you may be recalled later in the case.  So

19 please don't discuss the testimony you have given so far with

20 anyone until our trial is over.  All right?

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  Thank you, sir.

23         NOTE:  The witness stood down.

24         THE COURT:  All right, next witness.

25         MR. FITZPATRICK:  Thank you, Your Honor.  Officer

S. Lane - Direct

54

1    Steven Lane.

2              THE COURT:  All right.

3              NOTE:  The witness is sworn.

4              THE COURT:  Please go ahead.

5              MR. FITZPATRICK:  Thank you, Your Honor.

6              STEVEN LANE, called by counsel for the United States,

7    first being duly sworn, testifies and states:

8         DIRECT EXAMINATION

9    BY MR. FITZPATRICK:

10   Q.   Good afternoon, sir.  If you could please state your full

11   name, and spell your first and last name.

12   A.   Steven Lane.  S-t-e-v-e-n L-a-n-e.

13   Q.   Sir, who do you work for?

14   A.   U.S. Customs and Border Protection.

15   Q.   And how long have you worked for U.S. Customs and Border

16   Protection?

17   A.   Since 2006.

18   Q.   And the acronym is CBP; is that correct?

19   A.   Yes.

20   Q.   And is CBP a division of the Department of Homeland

21   Security?

22   A.   Yes, sir.

23   Q.   And what is your current assignment with CBP?

24   A.   I am the seized property specialist.

25   Q.   How long have you been a seized property specialist?

55

1    A.    Since 2009.

2    Q.    And what's the location of your current assignment?

3    A.    In Sterling, Virginia.

4    Q.    How far is your location in Sterling, Virginia from Dulles

5    Airport?

6    A.    Approximately five- to seven-minute drive.

7    Q.    Describe the responsibilities of a secured property

8    specialist.

9    A.    I am in charge of anything that Customs and Border

10   Protection, ICE, or Border Patrol seizes.  Any property that

11   seizes comes to me, and that then it begins the forfeiture

12   process.

13         I am in charge of the vault.  I'm the only one with

14   the combination and/or keys to the vault where all the evidence

15   is stored.  I take care of any manipulations, any corrections

16   that need to be made.

17         When a seizure is done, before it's approved, I go

18   into the CCAT System to make sure that all the correct laws

19   were input, everything was done correctly before it is

20   approved.

21   Q.    Is it fair to say that it's your job to make sure that a

22   proper record is kept of all property that is seized by CBP?

23   A.    Yes.

24   Q.    All right.  I want to direct your attention to

25   Government's Exhibit -- first we'll start with 9.  This would

1    be -- it has been previously admitted, the box of heroin.

2    There should be some coded numbers there.

3              What is an FPF number?

4    A.   It is the Fines, Penalties and Forfeiture number.  It is

5    how Fines, Penalties and Forfeiture Division as well as Seized

6    Property track our cases.

7    Q.   And is that number reflected on that box?

8    A.   Yes, it's the very first number up here.

9    Q.   All right.  And how does that -- distinguish that, the

10   Fines, Penalties and Forfeiture number from a DC number.

11   A.   Well, you have three different types of numbers.  You have

12   an incident number, which is CBP only, it will tell you what

13   kind of incident you have.  If you have just a seizure, if you

14   have a seizure and arrest, or if you have just an arrest.

15             Then you have an FPF case number, that is when there

16   is seized property, and that's how we track our cases.

17             And then if ICE takes the case, then they issue a

18   number, the DC number.

19   Q.   Okay.  And ICE is the prior name to HSI, Homeland Security

20   Investigations?

21   A.   Correct.

22   Q.   All right.  And so, the DC number is an investigative

23   number assigned by Homeland Security Investigations?

24   A.   Yes, sir.

25   Q.   Previously known as ICE?

S. Lane - Direct

57

1  A.   Yeah.   Forgive me, I'm old school, so I'm always saying

2  ICE.

3  Q.   That's perfectly fine.   So what is the -- when did you --

4  let's go to Exhibit 10, please.   I think you may have to look

5  at the bag on that one.

6  A.   Yes.

7  Q.   Do you see the FPF number on there?

8  A.   Yes.

9  Q.   What's the FPF number?   If you could read it out.

10  A.   2017 -- do you want me to break it down?

11  Q.   Yes, please.

12  A.   We break it down into the year, which is 2017.   5401 is

13  our port code and our location.   The next six numbers is that

14  number of seizure for that fiscal year.   So this would be 246th

15  seizure.   There is a long form seizure and a short form

16  seizure.

17       Short form seizures, there is different stipulations,

18  if the value is a certain amount.   Normally with our narcotic

19  cases, you're going to have, unless it's for like personal use,

20  you're going to have it on a long form.

21       So this is a long form seizure.   So this is the 246th

22  long form seizure from this port of the year 2017, fiscal year.

23  And then the last two is the violator.   So for this case, this

24  is violator 1.

25  Q.   So this was the evidence seized from what person?

S. Lane - Direct

58

1  A.   Well, this is the cocaine, this was from Rosemberg Majano

2  Herrera.

3  Q.   All right.  And both of these, 9 and 10, the heroin and

4  the cocaine, when did these comes into your possession?

5  A.   I signed custody on 8/11 of 2017.

6  Q.   Are you familiar with when the seizure for these items

7  took place?

8  A.   Yes, on the 10th, 8/10/2017.

9  Q.   All right.  And was this the only large seizure of

10 narcotics at Dulles Airport on August 10?

11 A.   Yes.

12 Q.   All right.  Thank you, you can put that down.  I'm sorry,

13 let me ask you one more question about that, I apologize.

14          The DC number, is the DC number reflected on there?

15 A.   It is on the chain of custody.

16 Q.   Can you read out the DC number?

17 A.   DC13CR17DC0006.

18 Q.   All right.  And the DC number that is assigned to that

19 case by HSI is going to track with the FPF number that is

20 assigned by CBP; is that correct?

21 A.   Yes.  In our CCAT system, all three numbers are in that

22 system.  It's really on the first page.  The violator info,

23 you'll have the violator name, the address, any pertinent

24 information to the violator, the seizing officer, the search

25 officer, as well as your incident number, FPF case number, and

S. Lane - Direct

59

1    the DC number.

2    Q.   All right.   Thank you.   Now, you are familiar with

3    narcotics that have to go to the DEA lab for analysis?

4    A.   Yes.

5    Q.   How does the process work generally?

6    A.   Generally, if CBP is the seizing agency, CBP will seize

7    it.  ICE will accept prosecution.   Sometimes ICE will take it

8    right away and take it to the lab themselves.

9          If for whatever reason they can't make it within the

10   72-hour time period, which is -- they have 72 hours to bring it

11   to the CBP permanent vault.   If it can't be done within that

12   time frame, then they will turn it over to myself, I will lock

13   it in the vault, and then whenever they can make it to the lab,

14   they will come and check it out from me and take it to the lab.

15   Q.   The narcotics that we just discussed in Exhibits 9 and 10,

16   were those transported to the DEA lab for analysis?

17   A.   Yes.

18   Q.   And are you familiar with who transported them?

19   A.   I believe it was Agent DeRose and Tarantino.

20   Q.   Okay.  I want to show you Government's Exhibit -- you have

21   a binder in front of you, Government's Exhibit 13.

22          Do you recognize that document?

23   A.   Yes.

24   Q.   And what is that document?

25   A.   This is the 6051S chain of custody.

S. Lane - Direct

60

1   Q.   Okay.  And do you recognize your handwriting on there?

2   A.   Yes, sir.

3   Q.   And where is -- when it indicates that it leaves your

4   vault and goes to the DEA lab, do you see an entry for that?

5   A.   Yes, I do.

6   Q.   And who made that entry?

7   A.   It was Special Agent Tarantino.

8   Q.   And is that the gentleman seated to my left?

9   A.   Yes, sir.

10  Q.   All right.  And then when it was -- when the items are

11  returned from the lab, where do they go?

12  A.   To myself.

13  Q.   They come back into your custody?

14  A.   Yes, sir.

15  Q.   All right.  In this case, for Government's Exhibit 13,

16  which corresponds -- what does this chain of custody correspond

17  with?

18  A.   This is for the cocaine.

19  Q.   And when was it returned to your vault?

20  A.   On September 1, 2017.

21  Q.   All right.  And is that the item that you saw in

22  Government's Exhibit 10, the cocaine?

23  A.   Yes.

24          MR. FITZPATRICK:  All right.  Move to admit

25  Exhibit 13.

S. Lane - Direct

61

1          THE COURT:  Any objection?

2          MR. CRAWLEY:  No objection.

3          THE COURT:  Received.

4    BY MR. FITZPATRICK: (Continuing)

5    Q.   I want to turn to Government's Exhibit 14.

6    A.   Okay.

7    Q.   Can you describe, what is Government's Exhibit 14?

8    A.   It is heroin.

9    Q.   Okay.  And do you recognize your writing on that document?

10   A.   Yes, sir.

11   Q.   Now, did you have to take a special inventory of this when

12   it was returned from the DEA lab?

13   A.   Yeah.  What happened was it was sent out -- when it was

14   analyzed by the DEA, they had stated that there was

15   approximately 4,000 grams of coke and 4,000 of heroin.

16          So, therefore, they sent it back, instead of

17   separating it at the DEA lab, for some reason they put

18   everything in a box and sealed it.  So when it came back, I

19   read the lab report noticing that it was two separate

20   narcotics.

21          We can't -- in the CBP vault, we can't store two

22   separate narcotics in the same box or bag.  So I had to

23   separate it, and I created this chain of custody for that line

24   item of heroin.

25   Q.   Okay.  And it has the same, at the upper left-hand corner

1  it has the same FPF number that was initially generated upon

2  the seizure; is that correct?

3  A.   Yes, sir.

4          MR. FITZPATRICK:  All right.  Move to admit

5  Government's Exhibit 14.

6          MR. CRAWLEY:  No objection.

7          THE COURT:  Received.

8  BY MR. FITZPATRICK: (Continuing)

9  Q.   And then I will show you -- let's go to Government's

10  Exhibit 34, please.

11  A.   Okay.

12  Q.   Mr. Ruelas, if you could show him -- I am going to start

13  with 34 and then I will go to 31 after that.

14          Do you see 34 in front you have, Officer Lane?

15  A.   Yes, sir.

16  Q.   What is that document?

17  A.   It is the 6051 chain of custody for U.S. currency.

18  Q.   All right.  And who was this U.S. currency seized from?

19  A.   Jose M. Orellana.

20  Q.   And does this also come into your custody in the vault?

21  A.   Yes, sir.

22  Q.   All right.  And does this document accurately reflect the

23  inventory of the money seized from Jose Orellana?

24  A.   Yes.

25          MR. FITZPATRICK:  All right.  Move to admit

1    Government's Exhibit 34.

2             MR. ENGLISH:  No objection, Your Honor.

3             THE COURT:  Received.

4    BY MR. FITZPATRICK: (Continuing)

5    Q.   All right.  The money, there is a different FPF number

6    that is assigned to this.  Can you explain that to the ladies

7    and gentlemen of jury, why it gets a different number.

8    A.   It could be for different reasons.  Some are multiple

9    violators.  Some I have seen them where if they go into a house

10   and they have different evidence in different rooms or

11   different drawers, sometimes they put separate case numbers.

12   But most of the time you will have a different violator.

13   Q.   Now, there is a number right below that, number 3, it says

14   Investigative Case Number.  Do you recognize that number?

15   A.   Yes.

16   Q.   And what case is that?

17   A.   DC13CR17DC0006.

18   Q.   And is that the HSI case number that is assigned to their

19   investigation of Mr. Majano and Mr. Orellana on August 10?

20   A.   Yes, sir.

21   Q.   All right.  If we could take a look, please, at

22   Government's Exhibit 31, the bag that I just gave you.  That's

23   the physical -- can you describe Government's Exhibit 31,

24   please.

25   A.   This is U.S. currency seized, sealed in an evidence bag.

S. Lane - Direct

64

1    Q.   And that has -- does that have the same FPF and DC numbers

2    that is reflected in Government's Exhibit 34?

3    A.   Yes.

4         MR. FITZPATRICK:  Move to admit Government's

5    Exhibit 31.

6         THE COURT:  Any objection?

7         MR. ENGLISH:  No objection, Your Honor.

8         THE COURT:  Received.

9         MR. FITZPATRICK:  I want to show -- the Court's

10   indulgence.

11   BY MR. FITZPATRICK: (Continuing)

12   Q.   Sir, if you could turn to Government's Exhibit 16, please.

13   A.   16?

14   Q.   16, please.  I just want to have you look at this, I am

15   not going to admit it through you.  I just want you to look at

16   it.

17   A.   Okay.

18   Q.   Just are you familiar with a document like this?

19   A.   Yes.

20   Q.   Just tell the jury what you know this document to be.

21   A.   It's the DEA lab report.  Once it's analyzed by the DEA,

22   this is their report that they send back with the narcotics.

23   Q.   All right.  And in the upper-right corner, right beneath

24   where it says Chemical Analysis Report -- do you see the first,

25   it says Case Number.

S. Lane - Cross

65

1    A.   Yes.

2    Q.   What does that say?

3    A.   That's the DC case number that is associated with all of

4    the property that was seeded.

5    Q.   On August 10?

6    A.   Yes.

7    Q.   Including the cocaine; is that correct?

8    A.   Yes, sir.

9         MR. FITZPATRICK:  All right.  The Court's indulgence

10   for one moment, sir.

11        THE COURT:  Yes, sir.

12        MR. FITZPATRICK:  Officer Lane, I don't have any

13   further questions for you.  Please answer counsel's questions.

14        THE WITNESS:  Yes.  Thank you.

15        MR. CRAWLEY:  No questions, Your Honor.

16        THE COURT:  Thank you, Mr. Crawley.

17        Mr. English.

18     CROSS-EXAMINATION

19   BY MR. ENGLISH:

20   Q.   That form you refer to as a lab report, that's a DEA-7,

21   isn't it?

22   A.   No.  This is a lab report.  The DEA-7 is a request for lab

23   analysis.

24   Q.   It's not reflected on there?

25   A.   No.

L. Muñoz - Direct

66

1          MR. ENGLISH:  Thank you.  No further questions, Your
2   Honor.

3          THE COURT:  Okay.  Any redirect?

4          MR. FITZPATRICK:  No, sir.  Thank you.

5          THE COURT:  All right.  May Officer Lane be excused?

6          MR. FITZPATRICK:  Officer Lane may be excused, yes,
7   Your Honor.

8          THE COURT:  All right.  Then you're excused with our
9   thanks, sir.  Please don't discuss the testimony you have given
10  with anyone until our trial is over.  All right, sir?

11         THE WITNESS:  Yes, sir.

12         THE COURT:  Thank you.

13         NOTE:  The witness stood down.

14         THE COURT:  All right, next witness.

15         MR. FITZPATRICK:  Yes, sir.  DEA chemist Lauren
16  Muñoz, please.

17         THE COURT:  All right.  Are you all right for another
18  15, 20 minutes, and then we'll take our afternoon break?  Okay,
19  great.

20         NOTE:  The witness is sworn.

21         THE COURT:  Please proceed.

22         MR. FITZPATRICK:  Thank you, Your Honor.

23         LAUREN MUÑOZ, called by counsel for the United
24  States, first being duly sworn, testifies and states:

25      DIRECT EXAMINATION

67

1   BY MR. FITZPATRICK:

2   Q.   Good afternoon, ma'am.  If could you please state your

3   full name, and please spell your first and last name so Mr.

4   Linnell can take it down.

5   A.   My name is Lauren Muñoz.  L-a-u-r-e-n M-u-ñ-o-z.

6   Q.   Ma'am, what is your occupation?

7   A.   I am a senior forensic chemist with the Drug Enforcement

8   Administration, otherwise known as DEA.

9   Q.   How long have you been a senior forensic chemist?

10  A.   I have been a senior forensic chemist for seven years now.

11  Q.   And what is your educational background in chemistry?

12  A.   I have a Bachelor's of Science in chemistry from the

13  College of New Jersey, and a Master's in forensic science from

14  Drexel University.

15  Q.   Do you also get additional training through your service

16  with the DEA?

17  A.   Yes, I do.

18  Q.   Can you just briefly summarize that.

19  A.   I complete the -- or I completed the basic forensic

20  chemist training program with DEA.

21  Q.   I want to show you Government's Exhibit 131.  You have a

22  binder in front of you.

23        What is Government's Exhibit 131?

24  A.   This is a copy of my CV.

25  Q.   All right.  Is that fair and accurate and up to date for

L. Muñoz - Direct

68

1    your qualifications?

2    A.   Yes, it is.

3            MR. ENGLISH:  Excuse me, Your Honor.  I'm prepared to

4    stipulate that she is an expert in the forensic analysis of

5    drugs.

6            THE COURT:  All right.

7            MR. FITZPATRICK:  Thank you.

8            THE COURT:  Mr. Crawley, you as well?

9            MR. CRAWLEY:  I do, Your Honor.

10           THE COURT:  All right.  There is a stipulation that

11   she is qualified as a DEA chemist to do the examination on the

12   cocaine and heroin in this case.

13           Do you want to admit her CV?

14           MR. FITZPATRICK:  Thank you very much, Your Honor,

15   yes.

16           THE COURT:  Any objection to the exhibit, the CV?

17           MR. CRAWLEY:  No, sir.

18           THE COURT:  All right, it will be received.

19           MR. FITZPATRICK:  Thank you, Your Honor.  And so the

20   record is clear, I'm offering her as a forensic chemist in the

21   scientific analysis of controlled substances.

22           THE COURT:  All right, she will be received for that

23   purpose.

24           MR. FITZPATRICK:  Thank you very much, sir.

25   BY MR. FITZPATRICK: (Continuing)

L. Muñoz - Direct

69

1    Q.    Ma'am, briefly describe -- what is the primary job that

2    you do day to day?

3    A.    I analyze exhibits for the presence or absence of

4    controlled and non-controlled substances.  And then I testify

5    to my findings in a court of law.

6    Q.    Do you work within a laboratory?

7    A.    I do.

8    Q.    And where is your laboratory located?

9    A.    The laboratory is located in Largo, Maryland.

10   Q.    Is that a secure facility?

11   A.    It is.

12   Q.    And how do you receive controlled substances in order to

13   perform your analysis?

14   A.    When I am assigned an exhibit -- an exhibit is anything

15   that potentially could have a controlled substance in it -- I

16   go to what is called the vault.  The vault is just like a bank

17   vault.  Transactions occur at the vault where an evidence

18   specialist, someone whose job it is to maintain all the

19   evidence, hands me a piece of evidence that has been assigned

20   to me.

21         So then that piece of evidence comes into my

22   possession where I go back to my bench, which is where I work

23   on the evidence, and then proceed with analysis.

24   Q.    Okay.  So cases for you to work on are assigned to you

25   through your supervisory or administrative chain; is that

L. Muñoz - Direct

70

1   correct?

2   A.   Yes.

3   Q.   So you don't work with any one particular agency; is that

4   right?

5   A.   No.  I analyze exhibits from many agencies.  DEA is the

6   primary agency I work -- you know, I work at DEA, but I analyze

7   exhibits from FBI, ATF, Homeland Security, and then many state

8   and local agencies as well.

9   Q.   For instance, someone within DEA can't just call you, an

10  agent out in the field can't just call you up and say, hey,

11  Lauren, I would like you to analyze these drugs?  It has to go

12  through a formal procedure; is that correct?

13  A.   That's correct.  Once an exhibit comes into my

14  laboratory's vault, that piece of evidence is assigned to any

15  chemist.  In this particular case, the exhibit was assigned to

16  me.

17  Q.   And are you made aware of sort of the background facts of

18  a controlled substance seizure when you take it in to do an

19  analysis?

20  A.   No.  The only thing that I'm aware of is that it is

21  potentially a controlled substance.  There is a piece of

22  inventory, it is call the DEA-7, that the agent fills out to

23  tell me what he or she believes the controlled substance is.

24        But beyond that, I have no awareness of the

25  background of the case or anything beyond that.

L. Muñoz - Direct

71

1   Q.   And does the DEA-7 influence your scientific analysis in

2   any way?

3   A.   No, it does not.  It might gear me in one specific

4   direction depending on if it's plant material versus powder.

5   But beyond that, no.

6   Q.   I want to show you Government's Exhibits 9 and 10, the two

7   boxes again, please.

8   A.   Thank you.

9   Q.   How many bags are in that Government's Exhibit 10?

10  A.   May I see my notes to refer to how many bags are in there?

11  I can't see from this piece right here.

12  Q.   Sure.  Or you can move it out, I don't have a problem with

13  -- what is actually in the bag?

14  A.   Okay.

15  Q.   Oh, that just has one, I'm sorry, I apologize.  Look at

16  the sheet on the front -- you have a label on the back there of

17  the bag.

18  A.   Yeah.

19  Q.   Do you recognize that?

20  A.   This is something that I am not aware of.  This is from

21  the Homeland Security.

22  Q.   Okay.

23          MR. CRAWLEY:  Objection, Your Honor, if she is not

24  aware of it.

25          THE COURT:  Well, that's her testimony.  So,

72

1    overruled.

2              MR. FITZPATRICK:  I'm actually referring to the other

3    side.  I think there is a labelled affixed on the other side.

4    BY MR. FITZPATRICK: (Continuing)

5    Q.   Do you recognize that?

6    A.   I do.

7    Q.   And how do you recognize that?

8    A.   I recognize it because this DEA evidence label has my

9    signature on it, it has the case number and exhibit number that

10   is associated with the contents, and it's all of my handwriting

11   here.

12   Q.   And what is the exhibit number that is affixed there that

13   you wrote?

14   A.   It's Exhibit 1.01.

15   Q.   Okay.  And does that have a D.C. number on it?

16   A.   It does.

17   Q.   And what is the D.C. number?

18   A.   It is DC13CR17DC0006.

19   Q.   And did you write that number on the label?

20   A.   I did.

21   Q.   And where did you get that number from?

22   A.   This number that I just stated is the case number.  And

23   the case number is what I look at on the DEA-7, that inventory.

24   Q.   That is submitted by the submitting law enforcement

25   agency?

L. Muñoz - Direct

73

1    A.    That is correct, yes.

2    Q.    All right.  Thank you, you can -- and there is 1.01, do

3    you correspond that with your lab sheet that we're going to get

4    to in a second?

5    A.    Yes.  So the original case number had only one exhibit.

6    The reason why it says 1.01, there is another subexhibit, there

7    is another -- there is 1.02.  So when I initially received this

8    evidence, I had to subexhibit or split it because the contents

9    were different.

10   Q.    Okay.  If we can go to Government's Exhibit 9 now, the

11   other box.

12          And I will ask you to look at that, the handwritten

13   label that has red on it.  Do you recognize your writing on

14   there?

15   A.    I do.

16   Q.    And is this one of the substances in that case number that

17   you analyzed for this case?

18   A.    Yes.  These two bags here are Exhibit 1.02.

19   Q.    Okay.  And then the third bag, what is that?

20   A.    This is all of the exterior packaging.  I separated it

21   simply because it was rather bulky.  So these two packages are

22   just the evidence itself.

23   Q.    Okay.  So the heroin is contained in two bags and then the

24   cocaine is contained in the other bag?

25   A.    That is correct, yes.

L. Muñoz - Direct

74

1    Q.   And then you put all the extra packaging in the fourth

2    bag?

3    A.   All of the extra packaging is in this bag right here.

4    Q.   All right.  Thank you, if you could please return that to

5    Mr. Ruelas.  Thank you very much.

6         I want to put up Government's Exhibit 7, it has been

7    previously admitted, Your Honor, Government's Exhibit No. 7,

8    please.  If we could publish that.

9         Do you happen to recognize the substances there?

10   A.   I do.

11   Q.   And how do you recognize the substances?

12   A.   I recognize it because when I received the evidence, it

13   was in this same condition.  There were many bags that had this

14   brown granular substance.  It's not conveyed perfectly in this

15   photo, but you can see the darker brown material that ended up

16   covering all of those bags.

17   Q.   But you notice that there were substances within the bags,

18   correct?

19   A.   Correct.  So each of the bags came double-wrapped.  So it

20   was a bag within a bag.

21        Each of the bags was covered in this granular

22   material, but I wanted to see the interior contents.  So what I

23   did was a pealed away those outer bags to see what the inner

24   powder looked like.

25   Q.   Okay.  For this case, let's begin -- let's discuss the

L. Muñoz - Direct

75

1    first steps and take us through a progression for the testing

2    of the heroin and the cocaine from sort of the beginning to

3    end.

4            What's the first step that you take?

5    A.   Well, once I receive the evidence from the vault, I take

6    it back to my bench, which is my work area.  And the first

7    thing I do is obtain a gross weight of the exhibit.

8            A gross weight is the wait of everything.  That's the

9    exterior packaging, so it was the box, all of the interior

10   bags, and then the material.  So that is all from outer to

11   inner layers.

12   Q.   And then do you reflect that -- do you take that

13   measurement down?

14   A.   Yes.  So all of the analysis that I do, all of the

15   observations that I make, I use a program to write up all of

16   those things.  And then I complete the report.

17   Q.   And then do you reflect the gross weight on your final

18   report?

19   A.   Yes, I do.

20   Q.   And if you could please turn to Government's Exhibit 16,

21   please.  It's in a binder that you should have there.  Mr.

22   Ruelas is kindly going to give it to you.

23           Do you see 16 in front of you?

24   A.   Yes.

25   Q.   Let me, just for the sake of simplicity, Your Honor, at

L. Muñoz - Direct

76

1    this point in time I would move in Government's Exhibit --

2             Well, tell us, what is 16?

3    A.   This is a copy of my report that shows everything from the

4    case number, the exhibit number, what I have identified, and

5    the tests I've used to make my identification.

6    Q.   And this was for your analysis of the drugs that you've

7    just identified for the jury?

8    A.   Yes.

9    Q.   All right.  And the conclusions that you reached in your

10   report, did you reach your conclusions to a reasonable degree

11   of scientific certainty in forensic chemistry?

12   A.   Yes, I did.

13            MR. FITZPATRICK:  Move to admit Government's Exhibit

14   16.

15            THE COURT:  Any objection?

16            MR. CRAWLEY:  No, sir.

17            MR. ENGLISH:  No objection.

18            MR. FITZPATRICK:  All right.  If we can publish 16.

19   Thank you very much, Your Honor.  Publish 16.

20   BY MR. FITZPATRICK: (Continuing)

21   Q.   We left off with your gross weight.  Is that reflected

22   there under Exhibit Details?

23   A.   Yes, it is.

24   Q.   And tell again the ladies and gentlemen of the jury, what

25   is ghost weight?

L. Muñoz - Direct

77

1    A.    The gross weight is everything, from the outer box to the

2    inner plastic bags, and down to the power itself.

3    Q.    So after that, do you continue on with your weighing

4    process after that?

5    A.    Yes.  So after the gross weight, I first have to take

6    inventory of what is inside the packaging.  So I count the

7    number of bags.  I count and I look at what the evidence looks

8    like.

9    Q.    Okay.  And walk the jury through, please, your weighing

10   process.  How do you determine what is the actual weight of the

11   controlled substances?

12   A.    Okay.  So once I have an inventory of what is inside the

13   box, I then obtain what is called a net weight.  So net weight

14   is just the weight of the contents or the powder by itself.

15   That doesn't include any packaging, or bags, or anything of

16   that nature.

17         So it's just the weight of the powder by itself.

18   Q.    And how do you do that?

19   A.    I use a balance.  So what I do is I weigh the items full.

20   So I weigh the powder within a bag.  And then I weigh the bag

21   just by itself.

22         So in that, I get the weight of the powder by itself.

23   Q.    Okay.  And when you conducted your weighing analysis in

24   this case, did you do it separately for heroin and cocaine?

25   A.    So in this particular exhibit, there were two subexhibits.

L. Muñoz - Direct

78

1   When I looked at the powder, there was a white powder and a tan

2   powder.  So I subexhibited the two.

3   Q.   And for the weighing of the cocaine, what did you -- what

4   did the cocaine that you analyzed weigh?

5   A.   So Exhibit 1.01, which I identified as cocaine

6   hydrochloride, the net weight was 3,854 grams.

7   Q.   Okay.  And then for the heroin, what did the heroin weigh?

8   A.   Exhibit 1.02, which I identified as heroin hydrochloride,

9   the net weight was 4,005 grams.

10  Q.   Okay.  And you have some remarks beneath the weighing

11  there.  Can you explain for the jury what those remarks mean.

12  A.   That is applying to Exhibit 1.02, so the heroin

13  hydrochloride.  I removed two grams of that powder to submit to

14  a special program.  That powder gets sent to another laboratory

15  in the DEA system, it is called the Special Testing and

16  Research Laboratory, where they analyze the powder to determine

17  the source of it.  So where the heroin came from.

18  Q.   Okay.  And then I was actually referring to above that

19  there is, under Remarks, there is an Exhibit 1.01:  The net

20  weight was determined by direct weighing.

21  A.   Oh, my apologies.

22  Q.   That's all right.  Can you please explain that for the

23  jury.

24  A.   Okay.  So those remarks is referring to the uncertainty.

25  Now, uncertainty doesn't mean error.  Uncertainty is just a

L. Muñoz - Direct

79

1    range of values that could be attributed to a result.

2          And in that, it means for any measurement -- so when

3    I get a net weight, there is going to be an uncertainty

4    associated with it.

5    Q.   Okay.  And what is -- can you give us sort of a

6    layperson's example of what those remarks mean.

7    A.   Okay.  So if you look -- oh, it's highlighted.  Okay.  So

8    if you look at the net weight where it says 3,854 grams and

9    4,005 grams, there is a little plus or minus and then one gram.

10   That is the uncertainty associated with those weights.

11         Now, I can never know the true net weight of each of

12   those exhibits.  I can just get as close as possible to the

13   true weight.

14         Now, if I weighed each of those exhibits 100 times, I

15   would get 95 times out of 100 times a number between those plus

16   or minus numbers.

17         So for Exhibit 1.01, the net weight is 3,854 grams

18   plus or minus one gram.  So if I weighed it 100 times, 95 times

19   out of 100 I would have gotten a net weight between 3,853 grams

20   to 3,855 grams.

21   Q.   All right, thank you.  And then let's turn now to your

22   actual chemical analysis of the substances.  Why don't we start

23   with 1.01.  We can keep that up on the screen.

24         1.01 says that there were five -- number of units,

25   five.  What does that mean?

L. Muñoz - Direct

80

1    A.    So when I first opened up the exhibit and I saw that there

2    was white powder and brown powder, five of the bags had a white

3    powder that I eventually identified as cocaine hydrochloride.

4    Q.    Okay.  And what was your -- let's stick with 1.01, you

5    identified five bags.  What's your testing procedure for those

6    five bags?

7    A.    If you look at the bottom two lines, it gives a summary of

8    tests.  The bottom two lines of the report.  Yes.

9           So for Exhibit 1.01, I did several tests.  Gas

10   chromatography, otherwise known as GC.  Gas chromatography/mass

11   spectometry, otherwise known as GC/MS.  Infrared spectroscopy,

12   otherwise known as IR.  And a Scott's Color Test.

13   Q.    Okay.  Now, for those tests, you said you had five units,

14   did you do those tests on a substance from each bag?

15   A.    I didn't do all these tests on each bag.  The requirement

16   is that I have to do at least two tests on each unit, which I

17   did.

18   Q.    Okay.  And describe how you test each of the bags of

19   cocaine.

20   A.    In this exhibit, what I did to test those five bags was I

21   started out using a GC and a GC/MS.  Then once I confirmed that

22   the exhibit contained cocaine, I then proceeded with even more

23   analysis, which included the IR and the color test.

24   Q.    So you took a substance from each of the five bags and

25   tested each one independently?

L. Muñoz - Direct

81

1    A.    Yes.

2    Q.    What is a composite test?

3    A.    So once I've screened all those five units, I make what is

4    called a composite.  A composite is just a representative of

5    each of those units.

6              So I've taken about three grams from each of those

7    bags to make a 15-gram representative sample or composite.

8    Q.    So for the cocaine, is it fair to say with the five

9    individual tests and then the composite tests, you did a total

10   of six tests for the cocaine?

11   A.    Even more than that.

12   Q.    Even more than that?

13   A.    Yes.

14   Q.    And was the conclusion for all six tests-plus cocaine?

15   A.    Yes.

16   Q.    Did you receive any negative tests in your testing of the

17   cocaine?

18   A.    No.

19   Q.    Turning to the heroin, 1.02.  There were six bags of

20   heroin; is that correct?

21   A.    That is correct.

22   Q.    All right.  Without being overly repetitive, did you go

23   through the same testing procedure for the heroin that you did

24   for the cocaine?

25   A.    Yes, for the screening I did.  I started out by using a GC

L. Muñoz - Direct

82

1    and a GC/MS.  And then for the composite, I did the same test

2    except I did not do a color test.

3    Q.   Okay.  And why don't you do a Scott's Color Test on

4    heroin?

5    A.   Because that's not applicable to heroin.

6    Q.   Okay.  But just for clarity -- and you also did a

7    composite test for the heroin as well?

8    A.   Yes, I did.

9    Q.   So there was a total of at least seven analyzes done,

10   testings done of the heroin?

11   A.   I believe it was eight separate tests.

12   Q.   Okay.  And did they all test positive for heroin?

13   A.   Yes, in each of them confirmed heroin.

14   Q.   Did you receive any negative tests?

15   A.   No, I did not.

16   Q.   So it's fair to say there was at least 13 total

17   examinations that came back in this case for controlled

18   substances, if not more?

19   A.   Yes.

20           MR. FITZPATRICK:  All right.  The Court's indulgence

21   for one moment, sir.

22           THE COURT:  Yes, sir.

23           MR. FITZPATRICK:  Ms. Muñoz, I don't have any further

24   questions for you.  Please answer counsel's questions, please.

25   Thank you.

83

1          THE COURT:  All right.  Any cross-examination?

2          MR. CRAWLEY:  No questions.

3          MR. ENGLISH:  Your Honor, I have no questions of this

4   witness.

5          THE COURT:  I'm sorry, no questions?

6          MR. ENGLISH:  No questions, sir.

7          THE COURT:  All right.  May Ms. Muñoz be excused?

8          MR. TRAXLER:  Yes, sir.

9          MR. ENGLISH:  Yes, sir.

10          THE COURT:  Thank you, you are excused at this time.

11   Please don't discuss the testimony you've given with anyone

12   until our trial is over.  All right?

13          THE WITNESS:  Okay.  Thank you, Your Honor.

14          THE COURT:  Okay, thank you.

15          NOTE:  The witness stood down.

16          THE COURT:  All right, let's take our mid-afternoon

17   break at this time.  We'll take 15 minutes and then we will

18   come back and we will hear testimony.

19          All right, you are excused.  Thank you.

20          NOTE:  At this point the jury leaves the courtroom;

21   whereupon the case continues as follows:

22   JURY OUT

23          THE COURT:  All right.  The heroin and the cocaine

24   and the money have now been admitted into evidence, but can I

25   ask at the end of the day that either Homeland Security or the

84

1   U.S. Attorney's Office keep the drugs and the money in their

2   safekeeping versus bringing it down to the Clerk's Office?  Is

3   there any objection to that?

4           MR. CRAWLEY:  No objection, Your Honor.

5           MR. ENGLISH:  No, sir, Your Honor.

6           MR. FITZPATRICK:  We will do that, Your Honor.

7           THE COURT:  Thank you, that helps us a lot.

8           MR. FITZPATRICK:  Happy to.

9           THE COURT:  All right, anything before we break?

10          MR. FITZPATRICK:  No, sir.

11          THE COURT:  All right, then we're in recess.

12          NOTE:  At this point a recess is taken; at the

13  conclusion of which the case continues in the absence of the

14  jury as follows:

15  JURY OUT

16          THE COURT:  All right.  Any preliminary matters?

17          MR. TRAXLER:  Nothing from the Government, Your

18  Honor.

19          THE COURT:  Okay.  All right, let's get our jury,

20  Joe.

21          NOTE:  At this point the jury returns to the

22  courtroom; whereupon the case continues as follows:

23  JURY IN

24          THE COURT:  All right, please be seated.

25          Next witness.

85

1          MR. TRAXLER:  Thank you, Your Honor.  The United

2   States called Special Agent Jay Culley.

3          NOTE:  The witness is sworn.

4          THE COURT:  Please, go ahead.

5          MR. TRAXLER:  Thank you, Your Honor.

6          JAY D. CULLEY, JR., called by counsel for the United

7   States, first being duly sworn, testifies and states:

8       DIRECT EXAMINATION

9   BY MR. TRAXLER:

10  Q.    Could you please state and spell your full name for the

11  record.

12  A.    My name is Jay D. Culley, Jr.  That is C-u-l-l-e-y.

13  Q.    What is your present position, Agent Culley?

14  A.    I am a special agent with Homeland Security

15  Investigations.

16  Q.    Is Homeland Security Investigations also known as HSI?

17  A.    It is.

18  Q.    How long have you been a special agent with HSI?

19  A.    I have been a special agent with HSI and its predecessor

20  INS since September 10, 2001.

21  Q.    What did you do before to 2001?

22  A.    Prior to 2001 I was employed by the U.S. Border Patrol as

23  a Border Patrol agent under INS since February 1998.

24  Q.    And how about before that?

25  A.    Prior to that I was in the United States Navy.

J.D. Culley, Jr. - Direct

86

1    Q.    Where are you currently detailed as an HSI agent?

2    A.    I am assigned to the Office of the Assistant Special Agent

3    in Charge, Dulles Airport.

4    Q.    What do your duties involve?

5    A.    My duties involve investigating violations of Immigration

6    and Customs laws of the United States.

7    Q.    Do you investigate travelers who are suspected of

8    smuggling illegal narcotics?

9    A.    I do.

10   Q.    And have you taken classes on contraband smuggling?

11   A.    I have.

12   Q.    Can you describe those classes.

13   A.    Certainly.  When I attended the U.S. Border Patrol

14   Academy, we had extensive training on smuggling and smuggling

15   techniques, as well as periodic refresher trainings and

16   advanced trainings throughout my career.

17   Q.    Do you also have personal experience in investigating

18   travelers who are investigated for smuggling illegal narcotics?

19   A.    Yes, sir.

20   Q.    Can you very generally just describe that experience for

21   us.

22   A.    Sure.  I have been assigned to the airport group doing

23   just that for the last two years.  Prior to that, for

24   approximately another two years in 2007, 2008, I did the same

25   type of work.

J.D. Culley, Jr. - Direct

87

1    Q.   I would like to direct your attention to the afternoon of

2    August 10, 2017.

3              Were you working on that day?

4    A.   Yes.

5    Q.   Can you tell us where you were at around 3:30 p.m.

6    A.   I was at our office at Dulles Airport.

7    Q.   Did you receive a call?

8    A.   I did.  I received a call from Special Agent Tarantino.

9    Q.   And what was the call about?

10             MR. ENGLISH:  Objection, Your Honor, hearsay.  The

11   contents of the call would be hearsay.

12             THE COURT:  Is it offered for the truth of it or just

13   to --

14             MR. TRAXLER:  It's just the effect on the listener,

15   Your Honor.

16             THE COURT:  Overruled, I will permit it.  So it's

17   just offered -- the statement is offered that Agent Culley

18   received the information and what he did thereafter.

19             All right, go ahead.  You may answer the question.

20             THE WITNESS:  Thank you.  I was told that CBP had

21   a -- had discovered narcotics on a traveler inbound to the

22   United States.

23   BY MR. TRAXLER: (Continuing)

24   Q.   And what did you do in response to that call?

25   A.   The office that I was at was not physically within the

J.D. Culley, Jr. - Direct

88

1    airport, it was on airport grounds, so I immediately went over

2    to the Secondary Exam area of Customs and Border Protection.

3    Q.    The Secondary Exam area in Dulles Airport?

4    A.    Yes, sir.

5    Q.    When you walked into the Secondary Inspection area, did

6    you see anyone in there that you see in the courtroom today?

7    A.    Yes, Special Agent Tarantino was there.

8    Q.    Was anyone else in there?

9    A.    Mr. Majano.

10   Q.    Can you identify him by where he is sitting and what he is

11   wearing?

12   A.    Yes, he is sitting at the defense table, white shirt,

13   brownish gold tie, I believe.

14   Q.    What was going on when you walked into the Secondary

15   Inspection area?

16   A.    CBP had discovered narcotics in Mr. Majano's belongings.

17   Q.    Where was Mr. Majano?

18   A.    Mr. Majano was physically in a detention cell within

19   Secondary.

20   Q.    Did you hear Mr. Majano make any statements?

21   A.    He stated that he was bringing the bags for a friend in El

22   Salvador, and was going to be paid $500 for doing so.

23   Q.    Did he mention the name of the friend from El Salvador?

24   A.    He said Edwin Luna.

25   Q.    While you were in there, did he mention anything about

J.D. Culley, Jr. - Direct

89

1    meeting his cousin at the airport?

2    A.    Yes.  He initially said that he was going to be picked up

3    by his cousin.

4    Q.    And what happened next?

5    A.    Special Agent Tarantino and I began discussing our options

6    on how we could further the investigation.  While we were doing

7    so, our supervisor, Special Agent Joe Tsuyi, arrived, as well

8    as several our members of our investigative group to assist.

9    Q.    And what did you decide to?

10   A.    It was determined that we would take Mr. Majano out into

11   the reception area for International Arrivals where the general

12   public gathers to welcome their travelers.

13   Q.    Did Mr. Majano agree to that?

14   A.    Yes.  Mr. Majano was very cooperative.

15   Q.    Did he make any statement about -- statements about why he

16   was agreeing to that?

17   A.    He commented that he didn't want to be the only one

18   getting in trouble for this.

19   Q.    And so, after Mr. Majano agreed to cooperate, what did you

20   do?

21   A.    We had our other special agents assigned to our group go

22   out into the public areas to set up surveillance posts so that

23   we could maintain a visual on Mr. Majano as well as attempt to

24   identify anybody who was there to pick him up.

25   Q.    What did you do?

J.D. Culley, Jr. - Direct

90

1    A.    I obtained two suitcases that were empty for Special Agent

2    Tarantino and myself so that we could walk out with Mr. Majano

3    without being readily identified as law enforcement.

4    Q.    So after you retrieved the suitcases, then what did you

5    do?

6    A.    We went ahead and took Mr. Majano out from Secondary, the

7    CBP Secondary Exam, through the hallway to the International

8    Arrivals, the public area.

9    Q.    Did you allow Mr. Majano to carry anything?

10   A.    Yes, we gave Mr. Majano back his suitcase that he had

11   brought in minus the narcotics, as well as his cell phone.

12   Q.    Did you know the number for that cell phone?

13   A.    I did.  It began with 770.  I don't recall the whole

14   number.

15   Q.    And did he make any other statements to you as you were

16   walking towards the International Arrivals area?

17   A.    Yes.  It is approximately a 30- to 45-second walk, and Mr.

18   Majano mentioned that if he wasn't picked up, he was supposed

19   to take a taxi to a hotel.  However, we weren't able to get

20   particulars or details at that moment because we were in the

21   process of walking out.

22   Q.    Okay.  So what happened when you walked out into the

23   International Arrivals area?

24   A.    When you exit the Customs area at Dulles Airport, you walk

25   through -- there is two barriers that provide a bit of a

J.D. Culley, Jr. - Direct

91

1    passage way, and the general public is outside those to greet

2    the arrivers.

3           There is a Starbucks Coffee shop right at the end of

4    that chute, that passageway.  We instructed Mr. Majano to go

5    out, walk in front of the Starbucks and stay in front of the

6    Starbucks, which was out of the congestion of the arrival area.

7    Q.   Were there other HSI agents that you could see around?

8    A.   Oh, yes, there were several.

9    Q.   Did you have eyes on Mr. Majano?

10   A.   Yes.

11   Q.   How far away were you standing from him?

12   A.   It varied.  I was anywhere from a few feet to 15 or

13   20 feet.

14   Q.   While you were in the International Arrivals area during

15   this time, did you notice anyone else that stood out to you?

16   A.   Yes, I did.  I observed an individual that turned out to

17   later be Mr. Orellana.

18   Q.   Do you see him in the courtroom today?

19   A.   Yes, sir.

20   Q.   Can you identify him by where he is sitting and what he is

21   wearing?

22   A.   Yes, sir.  He is at the rear defense table, he is in a

23   suit, black suit, gray tie.

24   Q.   What did you observe Mr. Orellana doing?

25   A.   Mr. Orellana seemed to be far more focussed on those in

J.D. Culley, Jr. - Direct

92

1    the area.  It appeared he recognized Mr. Majano immediately as

2    his eyes -- we could observe his eyes see Mr. Majano and track

3    him and immediately get on the phone.

4           So that made us suspect that Mr. Orellana was the

5    individual that was there to pick up Mr. Majano.

6    Q.   What was Mr. Orellana wearing at this time?

7    A.   He was wearing a red polo shirt, I believe sunglasses on

8    his head.

9    Q.   So what happened as you were standing out in the

10   International Arrivals area with Mr. Majano?

11   A.   We stood there with Mr. Majano, not approaching Mr.

12   Majano.  And nobody did approach Mr. Majano for several

13   minutes.

14          At one point Mr. Majano began walking towards the

15   ramp.  The ramp is an exit point for the airport that leads

16   down to commercial pickup for taxis and bus as well as the

17   public parking lot.  And Mr. Majano began to proceed, looked at

18   his phone and then began to proceed towards there.

19   Q.   What did you do?

20   A.   We also followed.  We had our surveillance team reposition

21   themselves on the lower level.  Special Agent Tarantino and I

22   caught up to Mr. Majano to find out what was going on, and he

23   told us that he was directed by phone to go down to the lower

24   level to the taxis.

25   Q.   Did he say who had called him and given him that

J.D. Culley, Jr. - Direct

93

1   instruction?

2   A.   A number from El Salvador.

3   Q.   So describe to us the area that you walked to as you

4   walked down the ramp.

5   A.   So when you go down the ramp, the main traffic goes, at

6   the bottom of the ramp kind of goes catty-corner where the exit

7   is.  The exit there, you can either go out and get into a taxi

8   that they have positioned.

9          You can cross one road, there is a center waiting

10  area, that is where you could catch a bus to a hotel.

11         And then there is another road that if you cross that

12  road, that's the public parking lot if you're short term.  So

13  if you were going to pick up somebody who was flying into the

14  country, that's where you would more than likely park to come

15  in.

16         Inside the airport itself on that level is actually

17  pretty -- it's not very crowded.  Traffic usually flows

18  through, there is a lot of space there, that's not utilized

19  much.

20  Q.   I want to go back.  You said as you were walking down the

21  ramp, that Mr. Majano had received a call from El Salvador?

22  A.   Yes, sir.

23  Q.   Did he show you the call?

24  A.   He showed me, yes, he did.  It was a 503 number, which is

25  the country code for El Salvador.

J.D. Culley, Jr. - Direct

94

1   Q.   And what did you do when you got down to the commercial

2   pickup area?

3   A.   We had Mr. Majano wait downstairs for several minutes

4   while we repositioned our surveillance team outside in the

5   event Mr. Majano was instructed to go to a car that was waiting

6   in the parking lot possibly.

7   Q.   And then what did you do?

8   A.   Once we had our surveillance team positioned, including

9   myself, I went outside and left Mr. Majano with Special Agent

10  Tarantino at that time, and crossed into the public parking

11  lot.

12           After we were all situated, Mr. Majano was allowed to

13  exit the terminal.

14  Q.   And did you exit the terminal as well?

15  A.   Yes.

16  Q.   And describe the area right outside of that area.

17  A.   Right outside, immediately outside the doors, you're on

18  the sidewalk.  That sidewalk is separated from the road by

19  concrete barriers for security.

20           There is generally not a lot of people waiting in

21  that area unless they're crossing the road, waiting for the

22  crosswalks to cross the road.  Once they're allowed to cross,

23  they cross to either the buses or the parking lot.

24  Q.   When you exited outside of the commercial pickup area, did

25  you see anyone?

J.D. Culley, Jr. - Direct

95

1    A.   Yes.  Mr. Orellana stood out to us because his behavior

2    was out of the ordinary.  He was sitting on one of the concrete

3    barriers smoking a cigarette on his phone.  He wasn't getting

4    into a taxi.  He didn't appear to be waiting for a bus.  And he

5    didn't appear to be going to a vehicle.

6    Q.   So I would like to show you, I think you might have a

7    binder up there, what is marked as Exhibit 23.

8    A.   Yes, sir.

9    Q.   Do you recognize Exhibit 23?

10   A.   Yes, sir.

11   Q.   What does Exhibit 23 show?

12   A.   It's a photo of Mr. Orellana sitting on the concrete

13   barrier.

14   Q.   Does it fairly and accurately reflect what you saw when

15   you went outside of the commercial pickup area?

16   A.   It does.

17          MR. TRAXLER:  Your Honor, we would move to admit

18   Exhibit 23.

19          THE COURT:  Any objection?

20          MR. ENGLISH:  No objection, Your Honor.

21          THE COURT:  Received.

22          MR. TRAXLER:  Can we please publish -- thank you.

23   BY MR. TRAXLER: (Continuing)

24   Q.   What was Mr. Orellana doing when you saw him outside of

25   the commercial pickup area?

J.D. Culley, Jr. - Direct

96

1   A.   He appeared to be looking at his cell phone and smoking a

2   cigarette.

3   Q.   Okay.  And I would also like for you, if you would, to

4   flip to Exhibit 101.  It may be in another binder.

5   A.   Okay.  Yes.

6   Q.   Do you recognize Exhibit 101?

7   A.   Yes, I do.

8   Q.   What does Exhibit 101 show?

9   A.   101 is a photo that looks to be taken from the vantage

10  point of Mr. Orellana when he was sitting on that concrete

11  barrier.

12  Q.   What's the area shown in Exhibit 101?

13  A.   This area is the sidewalk immediately outside the terminal

14  door, the first road where the taxis would pick you up on, as

15  well as the center island where you would go to wait for a bus.

16  Q.   Does it fairly and accurately represent what you saw on

17  August 10?

18  A.   Yes.

19         MR. TRAXLER:  Your Honor, we would move to admit

20  Exhibit 101.

21         MR. ENGLISH:  No objection, Your Honor.

22         THE COURT:  Received.

23  BY MR. TRAXLER: (Continuing)

24  Q.   Do you recognize anybody in the distance in this photo?

25  A.   I do.

J.D. Culley, Jr. - Direct

97

1   Q.    Who do you recognize?

2   A.    One of our special agents, Dave Popp.

3   Q.    Was he participating in the surveillance operation?

4   A.    Yes.

5   Q.    Now, I would like for you to turn to Exhibit 102, please.

6         Do you recognize what has been marked as Exhibit 102?

7   A.    I do.

8   Q.    What does Exhibit 102 show?

9   A.    102 is a second photo.  Again, it appears to be taken from

10  the vantage point of Mr. Orellana when he was waiting at the

11  concrete barrier.  And it appears to be a closer photo of

12  Special Agent Popp.

13  Q.    Does it fairly and accurately show what you saw on

14  August 10?

15  A.    Yes.

16        MR. TRAXLER:  Your Honor, we move to admit

17  Exhibit 102.

18        MR. ENGLISH:  No objection, Your Honor.

19        THE COURT:  Received.

20  BY MR. TRAXLER: (Continuing)

21  Q.    From what vantage point does this photo appear to be

22  taken?

23  A.    It appears to be taken from Mr. Orellana's vantage point

24  when he was sitting on the concrete barrier.

25  Q.    While you were in the commercial pickup area, did Mr.

J.D. Culley, Jr. - Direct

98

1    Orellana, that you saw, ever make face-to-face contact with Mr.

2    Majano?

3    A.    No.

4    Q.    How about before then when you were up in the

5    International Arrivals area?

6    A.    No.

7    Q.    What did you do after you went outside and saw Mr.

8    Orellana?

9    A.    We went out -- Mr. Orellana had walked back in.  Mr.

10   Majano we allowed to come out on the sidewalk.  We waited

11   approximately five minutes, and then returned back inside to

12   the lower level.

13   Q.    What did you do at that point?

14   A.    At that point we again got together to discuss how we

15   wanted to proceed.  We re-established our surveillance points

16   back up on the International Arrivals floor, and we returned

17   upstairs with Mr. Majano.

18   Q.    And during that time, did you see anyone in the vicinity?

19   A.    Yes, Mr. Orellana was back upstairs in that general

20   vicinity.

21   Q.    And where did you see him in that area?

22   A.    He was walking back and forth.  Again, he stood out, his

23   behavior was out of the ordinary from people waiting for their

24   arriving travelers.  He continually walked back and forth.  He

25   was on his phone.  He kept -- it seemed that he was keeping an

J.D. Culley, Jr. - Direct

99

1    eye on Mr. Majano but not approaching him.

2    Q.    And did that behavior concern you in any way?

3    A.    It seemed -- it stood out as out of the ordinary.  It's

4    what drew our attention to Mr. Orellana in the first place.

5    Q.    And what happened at that point?

6    A.    At that point Mr. Majano walked over to where I was, to my

7    surveillance position, which was towards the inside seating

8    area of the Starbucks, to show me a text that was instructing

9    him to go take a taxi to Pollo Campero in Herndon.

10   Q.    What is Pollo Campero?

11   A.    Pollo Campero is a popular restaurant serving Peruvian

12   chicken, El Salvadoran chicken in Herndon, Virginia.

13   Q.    Did you recognize the number that had sent him that text

14   message?

15   A.    It began with a 503, which again I know from experience is

16   the country code for El Salvador.

17   Q.    What did you do after Mr. Majano received this text

18   message?

19   A.    I alerted our surveillance team, and we proceeded back

20   down to the lower level near the commercial arrivals because,

21   as I said, it wasn't as congested and we could speak with Mr.

22   Majano without it being obvious we were speaking to him.

23   Q.    What happened once you were on the lower level?

24   A.    He received, Mr. Majano received a phone call from a 503

25   number.

J.D. Culley, Jr. - Direct

100

1  Q.   Did Mr. Majano tell you what took place on that phone

2  call?

3  A.   Yes.  He said that he, the pickup person, was scared and

4  wanted him to take a taxi and met him at Pollo Campero.

5  Q.   So what did you do with Mr. Majano at that point?

6  A.   At that point we alerted our team and we returned upstairs

7  and went back into CBP Secondary.

8  Q.   What happened when you were back in CBP Secondary?

9  A.   We had -- Mr. Majano was then interviewed further to just

10 discuss what the phone call had said while the rest of us

11 planned on how we wanted to proceed, whether we wanted to end

12 our investigation there or whether we wanted to go ahead and

13 try to take Mr. Majano to Pollo Campero and see if anybody

14 would pick him up or approach him there.

15 Q.   At any time that you were at Dulles, did you see Mr.

16 Orellano ever make face-to-face contact with Mr. Majano?

17 A.   No.

18 Q.   Did you ever see Mr. Orellana with anyone else at the

19 airport?

20 A.   No.

21 Q.   What was the decision -- what did you decide to do with

22 Mr. Majano?

23 A.   We decided that we would proceed with the investigation by

24 taking Mr. Majano to Pollo Campero and having surveillance set

25 up in Pollo Campero as well as the surrounding area in order to

J.D. Culley, Jr. - Direct

101

1   identify anybody attempting to pick him up.

2   Q.   What did you do after that decision was made?

3   A.   We sent out the majority of our surveillance team ahead of

4   us to position themselves in the area of Herndon, the Pollo

5   Campero.

6   Q.   What you did do?

7   A.   I printed out an Uber sign so that I could put it in my

8   dashboard to make it less obvious that my vehicle was a law

9   enforcement vehicle.  It's actually an unmarked police car, but

10  this way it appeared to be any other Uber vehicle.

11  Q.   What happened after you printed out and put the Uber decal

12  on your car?

13  A.   Myself and Supervisory Special Agent Joe Tsuyi took Mr.

14  Majano from CBP Secondary out our back door and we put him in

15  the car and took him to Pollo Campero.

16  Q.   What happened when you arrived at Pollo Campero?

17  A.   When we arrived at Pollo Campero, we pulled up, we allowed

18  Mr. Majano to get out, with his suitcase, again minus the

19  drugs, the narcotics, and we left the area.

20  Q.   Where did you go when you left the area -- let me pause

21  you real quick.  Did you see Mr. Majano go inside?

22  A.   Yes, we did, we observed him go inside.

23  Q.   Then where did you go?

24  A.   We departed the parking lot and looped around, and we set

25  up a surveillance post that was half a block off Elden Street,

J.D. Culley, Jr. - Direct

102

1    which is the main street in Herndon that Pollo Campero sits on.

2    Q.   So I would like to show you what has been marked as

3    Exhibit 38.

4    A.   Yes, sir.

5    Q.   Do you recognize Exhibit 38?

6    A.   I do.

7    Q.   What is Exhibit 38?

8    A.   This is a map, street view map of Pollo Campero and the

9    surrounding areas.

10   Q.   Does it fairly and accurately reflect the area around

11   Pollo Campero as you remember it on August 10?

12   A.   Yes.

13           MR. TRAXLER:  Your Honor, we move to admit

14   Exhibit 38.

15           MR. CRAWLEY:  No objection.

16           THE COURT:  Received.

17   BY MR. TRAXLER: (Continuing)

18   Q.   Can you describe to us using this map where you were

19   posted.

20   A.   Certainly.  So if you can see right almost in the middle

21   of the map there is an orange dot, the labels are hard to read,

22   but it says Pollo Campero.  That's the restaurant we dropped

23   Mr. Majano and had surveillance on.

24           When we departed, we exited that first exit there and

25   we turned east, which would be towards the right of the photo,

J.D. Culley, Jr. - Direct

103

1    and proceeded up Elden Street.  We took a right on the next

2    street, I can't make out what it is, and looped around.

3            And we ended up setting up surveillance, if you look

4    at the bottom of the picture, in the middle there is a white

5    building with a brownish dot, it's a car center, a car shop,

6    and we parked in that lot.

7    Q.   So that big street in front of Pollo Campero, what street

8    is that?

9    A.   That is Elden Street.

10   Q.   How long did you wait in that car lot?

11   A.   I would estimate we were there 45 minutes.

12   Q.   Did you eventually leave the car lot?

13   A.   I did, yes.

14   Q.   Where did you go?

15   A.   We had an agent inside Pollo Campero for surveillance on

16   Mr. Majano, and he had been in there quite sometime.  So to

17   make it not as obvious that he was working with us, I relieved

18   him and went inside Pollo Campero.

19   Q.   What did you do when you walked into Pollo Campero?

20   A.   I ordered food.

21   Q.   And then what did you do?

22   A.   I just took a seat next to a window on the east side of

23   the building facing the front, which in this case would be

24   facing down.

25   Q.   Did you sit with Mr. Majano?

J.D. Culley, Jr. - Direct

104

1    A.    I did not.

2    Q.    Did you see Mr. Majano at Pollo Campero?

3    A.    I did.  He was seated to my right on the interior side of

4    the restaurant behind me, closer towards the restrooms, which

5    are at the rear of the restaurant.

6    Q.    Were you facing Mr. Majano?

7    A.    I was not.

8    Q.    So your back was to him?

9    A.    Yes, it was.

10   Q.    Why was that?

11   A.    I wanted to watch anybody that was coming into the

12   restaurant.  To my knowledge, there wasn't a public exit or

13   entrance behind me by the restrooms.  So if Mr. Majano decided

14   to leave, I would be able to see him.

15   Q.    And you mentioned you were sitting next to a window that

16   looked east?

17   A.    Yes, that's correct.

18   Q.    Did you see anything outside of that window that stood out

19   to you?

20   A.    Yes.  Several times I saw -- we had previously called out,

21   taking notice of a white Toyota Sienna minivan that was in the

22   vicinity.  And we suspected it was driven by Mr. Orellana.

23   Q.    Did you see that white minivan?

24   A.    From Pollo Campero I saw it numerous times.

25   Q.    What did you see?

J.D. Culley, Jr. - Direct

105

1   A.   I saw it essentially making a circuit.  Now, I could only

2   see from Pollo Campero east.  And I would see it drive up Elden

3   and then it would turn into the plaza.  This, up in the top

4   right of this map is a large shopping center plaza, and I would

5   see it turn in there and then return, exit, and turn west on

6   Elden.  And I saw it do that numerous times.

7   Q.   Did that concern you?

8   A.   Not concern as much as stood out.  It was --

9   Q.   Why did it stand out to you?

10  A.   Well, it's out of the ordinary to observe the same vehicle

11  make, I would estimate, 15 or 20 circuits in that same several

12  minutes apart.  And other agents had called out that they

13  believed it to be Mr. Orellana from the airport.

14  Q.   And did anything take place while you were in Pollo

15  Campero eating your food?

16  A.   Yes, sir.  Mr. Orellana came in.

17  Q.   And can you describe what happened.

18  A.   Well, initially I wasn't certain it was Mr. Orellana.  As

19  he entered and ordered some food, I was not making eye contact,

20  I was not being obvious that I was watching him.

21  Q.   So you said you saw somebody walk in.  What color shirt

22  was that person wearing?

23  A.   He was wearing a black shirt, dark gray or black shirt.

24  Q.   Why did you suspect it might be Mr. Orellana?

25  A.   Well, he had a similar build that we saw at the airport.

1    He looked -- his facial features were the same.  And we

2    suspected it to be the same individual.

3    Q.   So I would like show you what has been marked as

4    Exhibit 51-1 in your binder.

5         Do you recognize Exhibit 51-1?

6    A.   Yes.

7    Q.   What's 51-1?

8    A.   It's a DVD.

9    Q.   51-1?

10   A.   I apologize.  Excuse me.  I apologize, it's a photograph.

11   Q.   What's in this photograph?

12   A.   It looks like a still photograph from the surveillance

13   camera in Pollo Campero.  This camera specifically would be at

14   the rear of the restaurant near the restrooms facing the front

15   of the restaurant.

16        And in this photograph, Mr. Orellana can be seen in

17   the black shirt almost center of the photograph.

18        Mr. Majano is on the right-hand side seated in a

19   booth.  And I am in a reddish shirt in a booth on the left-hand

20   side.

21   Q.   Does this photograph fairly and accurately show what you

22   recall from August 10?

23   A.   Yes.

24        MR. TRAXLER:  Your Honor, we move to admit

25   Government's Exhibit 51-1.

107

1      MR. ENGLISH:  No objection, Your Honor.

2      THE COURT:  Received.

3  BY MR. TRAXLER: (Continuing)

4  Q.   Now I want to focus your attention, Agent Culley, to the

5  time stamp at the top of the photograph.

6  A.   Yes, sir.

7  Q.   Is that time stamp consistent with your recollection?

8  A.   No, it's not.

9  Q.   Can you describe how it's off.

10  A.   It appears to be further -- the timing appears to be off.

11  I believe it is behind, I would have to verify, but it is not

12  the correct time.

13  Q.   But otherwise, does this photo show what you recall from

14  August 10?

15  A.   Yes, it does.

16  Q.   And which one is you in this photograph?

17  A.   So I'm in a booth.  There is two individuals with reddish

18  shirts.  I'm in the lower both, my back is to you.  And --

19  Q.   Where is the window that you were looking out of?

20  A.   Well, you can see the window sill immediately to my left,

21  and it's a large window that allowed me to see out.

22  Q.   Do you see Mr. Majano in this photo?

23  A.   Yes, sir.

24  Q.   Where is he sitting?

25  A.   He's sitting on the far right, he's in white pants, black

1    shirt, and his head is bald.  He is sitting at a booth on his

2    phone.

3    Q.   How about Mr. Orellana, do you see him in this photo?

4    A.   I do, he is about to walk past Mr. Majano.  He's in a

5    black shirt, dark pants.

6    Q.   Was that different from what you had seen him in at Dulles

7    Airport?

8    A.   It was.

9    Q.   How?

10   A.   At Dulles Airport he was wearing a red shirt.

11   Q.   What happened when the person at the time you suspected

12   was Mr. Orellana walked into the restaurant?

13   A.   He ordered some food and then proceeded to the restrooms.

14   Q.   And then what happened after that?

15   A.   He exited the restrooms, got his food -- waited for a

16   couple minutes, got his food from the counter, and exited and

17   ate outside at an outdoor dining area.

18   Q.   Did he have to walk past Mr. Majano to go to and from the

19   restrooms?

20   A.   Yes, both ways.

21   Q.   Did you see Mr. Orellana stop and make face-to-face

22   contact with Mr. Majano?

23   A.   No.

24   Q.   At any point after you saw Mr. Orellana in Pollo Campero,

25   did you see the white minivan again?

J.D. Culley, Jr. - Direct

109

1    A.   Yes.  Once he finished eating, I saw -- I was able to see

2    the white minivan come around the southeast side of Pollo

3    Campero heading east, staying in the parking lot.  At one point

4    the van was parallel to my window and I was able to clearly see

5    Mr. Orellana driving.

6    Q.   And for how long did you see the white minivan,

7    approximately?

8    A.   Several minutes.  It parked in an area directly east of my

9    location, directly out my window in a sparsely populated

10   parking area.

11   Q.   What did the white minivan appear to be doing to you?

12   A.   Well, it had appeared to be doing countersurveillance,

13   looking for --

14          MR. ENGLISH:  Objection, Your Honor, to the

15   conclusion of the witness.  He has not been qualified as an

16   expert.

17          THE COURT:  Lay a foundation, if you would.

18   BY MR. TRAXLER: (Continuing)

19   Q.   So remind us again, Agent Culley, how long had you seen

20   this white minivan driving?

21   A.   Over an hour.

22   Q.   And are you familiar with the countersurveillance

23   techniques used by people trying to avoid detection?

24   A.   Certainly.

25   Q.   And how do you have that familiarity?

J.D. Culley, Jr. - Direct

110

1    A.   Through training and experience.

2    Q.   And is that based on your years of investigating people

3    suspected of smuggling contraband?

4    A.   Yes, sir.

5              THE COURT:  You may answer the question then.

6    Q.   So how did you interpret the driving behavior of the white

7    minivan?

8    A.   Sir, the circuitous nature that he was taking back and

9    forth on Elden, in and out of plazas, in and out of gas

10   stations and other businesses in the area at a slow rate,

11   without stopping, without shopping, without patronizing these

12   locations, appeared that he was looking for law enforcement or

13   looking for something.

14   Q.   Thank you.  And what happened then after you saw this

15   driving behavior?

16   A.   Then he came and ate at Pollo Campero.  He left and parked

17   east of Pollo Campero where I could see him.  A short time

18   later Mr. Majano got up and walked towards the front of the

19   restaurant to exit.

20   Q.   What did you do at that point?

21   A.   At that point I notified the surveillance team that Mr.

22   Majano was exiting.  And I also exited a distance behind Mr.

23   Majano.

24   Q.   Where did Mr. Majano go when he left Pollo Campero?

25   A.   He walked directly across the frontage road, so to speak,

1    the parking lot road in front of Pollo Campero, to wait at the

2    curb an Elden Street.

3    Q.   Ms. Morrell, can we show Exhibit 38, please.

4         Where did he wait on Elden Street?

5    A.   So if you're able to see the Pollo Campero, to the left of

6    it, the west of it on the picture to the left -- oh, thank you.

7    There is the large parking lot.

8         Mr. Majano actually walked out and walked slightly

9    west.  So he was standing on Elden Street right south of the

10   parking lot.

11   Q.   Were there parking spots --

12        MR. ENGLISH:  Excuse me, Your Honor, may we approach

13   the bench, sir?

14        THE COURT:  Yes, sir.

15        NOTE:  A side-bar discussion is had between the Court

16   and counsel out of the hearing of the jury as follows:

17   AT SIDE BAR

18        THE COURT:  Yes, sir.

19        MR. ENGLISH:  Your Honor, at this point I have raised

20   no Bruton issue or made any objection to anything that Mr.

21   Majano has told law enforcement.  But at this time when he is

22   working with law enforcement, I would like to make a motion in

23   limine with respect to anything he said about what he said to

24   my client or my client said to him when he approached the

25   vehicle.

1          What is coming next is he is going to go up to the

2   vehicle --

3          THE COURT:  Orellana is going to come up the vehicle?

4          MR. ENGLISH:  Yes, sir.  And I object to the agent's

5   testifying to anything that was said between my client and the

6   co-defendant because it is simply hearsay.

7          MR. TRAXLER:  Your Honor, I can make this easy.

8   We're not going to elicit that.  I will ask Agent Culley not --

9   specifically not to say any comments that Mr. Orellana or may

10   not have made.

11          MR. ENGLISH:  I would ask then if counsel could have

12   a moment to speak to the witness to make sure he doesn't blurt

13   it out.

14          THE COURT:  No.  He can just say, without saying what

15   Mr. Orellana may have said, please tell me what happened next.

16          MR. ENGLISH:  That will resolve it.  Thank you, Your

17   Honor.

18          THE COURT:  All right, good.  Thank you.

19          NOTE:  The side-bar discussion is concluded;

20   whereupon the case continues before the jury as follows:

21   BEFORE THE JURY

22          THE COURT:  All right, please proceed.

23   BY MR. TRAXLER: (Continuing)

24   Q.   So, Agent Culley, where we left off, I believe, is that

25   Mr. Majano had walked in front out on -- in front of Pollo

J.D. Culley, Jr. - Direct

113

1  Campero on Elden Street.  And I want to ask you some questions

2  about what happened next, but I would ask you not to relay any

3  comments that may have been made during the upcoming

4  interaction.

5  A.  Yes, sir.

6  Q.  So what happened after Mr. Majano walked out in front of

7  Pollo Campero on Elden Street?

8  A.  Mr. Majano, as I said, walked to the curb south of the

9  parking lot and waited there for several minutes.  I exited.

10  And you can see a row of hedges on the west side, that's to the

11  left on the photo of that parking lot.  I walked around back

12  there, and we had a surveillance vehicle in the parking lot,

13  and I got into the rear of that vehicle.

14  Q.  And what happened after you got into the vehicle?

15  A.  In short, just a minute or two, we observed a white

16  minivan similar to what we were watching -- observed Mr.

17  Orellana driving, drive west, that's towards the left of your

18  photo on Elden.

19        Elden Street is a busy street despite this photograph

20  not having vehicles, it's a busy street.  There is no stop

21  signs, no stop lights, there is no pulloff, there is no loading

22  zones.

23        And we observed this white minivan stop in the middle

24  of the lane right next to Mr. Majano.

25  Q.  And what did the car you were in do at that point?

J.D. Culley, Jr. - Direct

114

1    A.    I apologize, can you repeat that?

2    Q.    What did the car that you were in do when the white

3    minivan pulled up to Mr. Majano?

4    A.    Well, we had already discussed, we were not going to allow

5    Mr. Majano to get into a vehicle.  So as soon as we saw that

6    white minivan stop next to Mr. Majano, we immediately departed

7    the parking lot.

8               And we exited at that exit on the east side of Pollo

9    Campero.  In the photo it's just to the lower right side of

10   Pollo Campero, that first exit.  That's where we exited and

11   pulled westbound on Elden so that we could conduct a vehicle

12   stop with the white minivan.

13   Q.    Could you see, when you pulled out into the exit, the

14   driver of the white minivan?

15   A.    No, I couldn't see the driver, but we did see the license

16   plate, which we had confirmed earlier.

17   Q.    And what did the white minivan do when you pulled out into

18   that driveway?

19   A.    It immediately accelerated quickly westbound on Elden

20   without picking up Mr. Majano.

21   Q.    What did the car that you were in do?

22   A.    We followed it.  We activated our emergency lights and

23   siren to conduct a vehicle stop.

24   Q.    And did the car pull over?

25   A.    It did.

J.D. Culley, Jr. - Direct

115

1    Q.   Where did the car pull over?

2    A.   It pulled over -- could we zoom back out?  Thank you.

3         Okay.  So again, just for orientation, Pollo Campero

4    is right in the middle of the photograph with a dot.  If you

5    count two streets running north and south to the left of Pollo

6    Campero, that's where we conducted the vehicle stop.  The

7    minivan made a right and stopped at Van Buren.

8    Q.   Van Buren.  Let me ask you about the acceleration.  Was it

9    a noticeable acceleration to you?

10   A.   Oh, clearly there was weight transfer in the van that

11   indicated how quickly and rapidly it was attempting to pull

12   away.

13   Q.   So after you conducted the vehicle stop on Van Buren, what

14   did you do?

15   A.   We immediately got out and went to -- well, we had an

16   agent go to the passenger's side as well as two of us go to the

17   driver's side in order to make contact with the driver.

18   Q.   Could you see inside the vehicle at that time?

19   A.   Yes.  When I approached the driver's --

20   Q.   Was there anything impeding your view inside the vehicle?

21   A.   No.

22   Q.   Did you have a clear line of sight?

23   A.   Yes.

24   Q.   What did you see inside the vehicle as you approached?

25   A.   Correction.  Coming up to the vehicle, I was not able to

1    see.  But as we approached, I could see through the window

2    clearly.

3    Q.   What did you see through the window?

4    A.   I observed Mr. Orellana, looked like -- it appeared like

5    he was having a tantrum, he was beating the steering wheel.  It

6    appeared that he was yelling or very angry when we approached.

7    Q.   Was there anyone else in the minivan with Mr. Orellana at

8    that time?

9    A.   No, he was alone.

10   Q.   What was Mr. Orellana wearing when you saw him?

11   A.   A black shirt.

12   Q.   So what happened after you approached the van and observed

13   this behavior?

14   A.   We identified ourselves.  We opened the driver's side

15   door.  We identified ourselves again.  Had Mr. Orellana step

16   out.  By that time several other members of our surveillance

17   team had arrived on scene.  And one of those, one of the

18   special agents secured the vehicle, turned it off, and observed

19   Mr. Orellana's phone next to the driver's seat turned on.

20   Q.   And did you actually see the phone?

21   A.   I did.

22   Q.   And what did the phone show?

23   A.   The agent brought it out and we looked at it.  The call

24   log was open and displayed on the phone.

25   Q.   So I would like to show you what has been marked as

J.D. Culley, Jr. - Direct

117

1   Exhibit 30 in your binder.

2   A.   Yes, sir.

3   Q.   Do you recognize Exhibit 30?

4   A.   I do.

5   Q.   What is Exhibit 30?

6   A.   This looks like a photograph of Mr. Orellana's phone at

7   the time of the arrest.

8   Q.   Does it fairly and accurately reflect what you saw when

9   you looked at the phone on August 10?

10  A.   Yes.

11          MR. TRAXLER:  Your Honor, move to admit Exhibit 30.

12          MR. ENGLISH:  No objection, Your Honor.

13          THE COURT:  It's received.

14  BY MR. TRAXLER: (Continuing)

15  Q.   So looking at Exhibit 30, do you see the first number at

16  the top?

17  A.   Yes.

18  Q.   Do you recognize that number?

19  A.   That's Mr. Majano's number.

20  Q.   And how do you know that?

21  A.   He showed it to us when we were interviewing him prior to

22  conducting this surveillance observation.

23  Q.   And how many calls did the call log reflect were made to

24  Mr. Majano's call?

25  A.   The (3) afterwards indicates there was three calls.

J.D. Culley, Jr. - Direct

118

1   Q.   And do you see *67?

2   A.   I do.

3   Q.   What is *67?

4   A.   It's a method to block your number, the calling number

5   from the recipient's caller ID so it would not display the

6   caller's phone number.

7   Q.   And how do you know that?

8   A.   Based on experience.

9   Q.   And when was the last call, according to the call log

10  made, to Mr. Majano's phone?

11  A.   7:48 p.m.

12  Q.   When was that in relation to when the white minivan pulled

13  up to Mr. Majano on Elden Street?

14  A.   Minutes.  This call would have been minutes before that.

15  Q.   Do you also see on the call log where it indicates calls

16  with somebody named Pops?

17  A.   Yes.

18  Q.   And do you see on the call log where there is a 503

19  number?

20  A.   Yes.

21  Q.   What's that 503, do you know?

22  A.   Well, +503 indicates it's a country code that was dialed,

23  or was calling from.  And that is the country code for El

24  Salvador.

25  Q.   And the call log indicates WhatsApp audio.  What is that?

J.D. Culley, Jr. - Direct

119

1  A.    WhatsApp is a third-party application that allows you to

2  text and make phone calls.

3  Q.    So what did you do after you saw the cell phone that was

4  from Mr. Orellana's car?

5  A.    Well, I actually took it from the agent who found it.  And

6  I put it in airplane mode and attempted to turn off the auto

7  lock feature.

8  Q.    Why did you put it in airplane mode?

9  A.    It's our policy, when we find a telephone that has

10 potential evidentiary value, we put it in airplane mode so,

11 one, it can't communicate with the cloud.  Because that's a

12 whole other legal issue, if you want to look what's on

13 somebody's cloud from the phone.

14          And secondly, it prevents it from being remotely

15 wiped.

16 Q.    What do you mean by remotely wiped?

17 A.    Well, smart phones have features where you can -- that a

18 third-party can call into the phone and delete content from it.

19 Q.    And how do you know that?

20 A.    Based on training and experience.

21 Q.    So what did you do after you put the phone in airplane

22 mode?

23 A.    I put the phone in airplane mode.  I attempted to turn off

24 the auto lock.  And I left it like that.  We put into it -- we

25 left it like that until we got it to the office.

J.D. Culley, Jr. - Direct

120

1   Q.    So what happened as the arrest transpired?

2   A.    So during that time other agents were with Mr. Orellana.

3   We had other agents still yet who had picked up Mr. Majano

4   because he had been on the curb.

5         Mr. Orellana was very, very angry.  He was adamant

6   that we were not allowed to look in his phone.  That we were

7   not allowed to search his phone.  He said that multiple times.

8   Q.    What happened to the white minivan?

9   A.    We seized the white minivan.  And I took it, I was

10  actually assigned to drive it back to our Sterling office.

11  Q.    Why the Sterling office?

12  A.    Well, the Sterling office, as opposed to our Dulles

13  office, the Sterling office has a secure parking lot in the

14  back that is surrounded by approximately a 14-foot wall with

15  concertina wire and a metal gate that controls access.  So it's

16  a secure parking lot.

17  Q.    Is that where you always take seized vehicles?

18  A.    Yes.

19  Q.    And that evening, did you search the white minivan?

20  A.    I did do an inventory on the white -- or, correction, a

21  search of the white minivan.  In order to seize it, we have to

22  remove all personal effects from it.  And that's exactly what I

23  did.

24  Q.    And what did you do when you took the personal effects out

25  of the white minivan?

J.D. Culley, Jr. - Direct

121

1    A.   Well, I placed them in two -- it's red mesh bags.  I

2    placed all the property into two red mesh bags, that property

3    which would fit in them.  There was a significant amount of

4    property that would not.  For example, there was like a beach

5    umbrella.  Several lawn chairs and a car seat.  Things like

6    that that would not fit in the bag.

7    Q.   Was this still on August 10?

8    A.   Yes, it was in the evening.

9    Q.   Was it pretty late in the evening?

10   A.   I would estimate that it was 8, 8:30 in the evening.

11   Q.   Okay.  What did you do with the red mesh bags once you

12   finished putting the personal effects in them?

13   A.   Once we were finished, I transported them to our Dulles

14   office and secured them inside our Dulles office.

15   Q.   Where did you secure them inside your Dulles office?

16   A.   I put them in Special Agent Tarantino's desk area.

17   Q.   Is the Dulles office area secured?

18   A.   Yes.

19   Q.   How is it secured?

20   A.   It's secured by key cards and alarm system.

21   Q.   Now I want to switch gears a moment.  Have you reviewed

22   surveillance tapes in this case?

23   A.   Yes.

24   Q.   And in general, what areas did you see in the surveillance

25   tapes?

J.D. Culley, Jr. - Direct

122

1    A.    The surveillance tapes I observed were from the public

2    area International Arrivals at Dulles Airport, as well as

3    surveillance tapes from Pollo Campero.

4    Q.    Did those surveillance tapes fairly and accurately reflect

5    what you observed on August 10?

6    A.    Yes.

7    Q.    So I would like for you to flip in your binder, if you

8    would, and look at Exhibits 46 through 51.

9    A.    Yes.

10   Q.    Do you recognize these exhibits?

11   A.    I do.

12   Q.    What are they?

13   A.    They're DVDs.

14   Q.    And have you reviewed those DVDs?

15   A.    I did.

16   Q.    How do you know?

17   A.    Well, I know that because at the time when I finished

18   reviewing them, I initialed them and dated them on the date I

19   reviewed them.

20             MR. TRAXLER:  Your Honor, move to admit Exhibits 46

21   through 51.

22             MR. ENGLISH:  No objection, Your Honor.

23             THE COURT:  They're received.

24             MR. TRAXLER:  And with your permission, Your Honor,

25   we would like to play Exhibit 46.

J.D. Culley, Jr. - Direct

123

1          THE COURT:  Yes, go ahead.

2          NOTE:  The video recording played.

3  BY MR. TRAXLER: (Continuing)

4  Q.   Agent Culley, what is this area?

5  A.   This area is the area I was describing immediately outside

6  the passenger exit where people can stand around and weight for

7  arriving travelers.

8          This shows -- this angle you can clearly see the

9  Starbucks Coffee that we had Mr. Majano -- had instructed Mr.

10  Majano to stand in front of.

11  Q.   Does the timestamp at the bottom, is that consistent with

12  your memory?

13  A.   Yes.

14  Q.   I want to focus you on coming up at 4:10.37 seconds.  Ask

15  you to describe what is going on here.

16  A.   Now?

17  Q.   Yes.

18  A.   I apologize.  Okay.  So, is it possible to pause?  I can

19  see -- right where I touched the screen, that's one of our

20  special agents, that is Special Agent Popp, he is on

21  surveillance.

22          Right behind him walking towards the camera right

23  here is Mr. Orellana --

24  Q.   I am afraid they can't see where your finger is pointing.

25  A.   Oh, I apologize, I though you also could see.

J.D. Culley, Jr. - Direct

124

1    Q.   No worries.  If you can just describe that.

2    A.   Sure.  So at the bottom, towards the center of the photo,

3    is Special Agent Popp, he is wearing a greenish shirt, he has a

4    beard.  His arms are crossed.

5              Right above him, right above him is Mr. Orellana.

6    Mr. Orellana is wearing a red shirt.

7              And right to the immediate left in another reddish

8    shirt is myself, you're looking at my back.

9              Now, you can see Mr. Orellana, the direction he is

10   looking.  If you follow his gaze to the left of the picture,

11   immediately -- you can see a woman in a white tank top.

12   Immediately to the left of that woman is Mr. Majano, he is

13   wearing white jeans, a black shirt, and you can make out his

14   bald head.  He is walking, essentially, away from the camera

15   parallel to Starbucks.

16   Q.   And situate us, when in your operation was this taking

17   place?

18   A.   This was immediately after we took Mr. Majano out of CBP

19   Secondary and into the public zone.  Mr. Majano in this

20   photograph is still walking to the front of Starbucks where we

21   told him to take up position.

22   Q.   Ms. Morrell, if you would continue playing the video.

23             What is Mr. Orellana doing here?

24   A.   Well, he clearly has seen Mr. Majano and has followed him

25   with his eyes.  Now he is getting on his phone and walking back

J.D. Culley, Jr. - Direct

125

1  to potentially get a better look at Mr. Majano.

2  Q.   If you would pause, Ms. Morrell.

3        How long do you recall this taking place?

4  A.   Well, this was -- I would say that whole episode was 30,

5  45 seconds.

6  Q.   Okay.

7  A.   And as I said, it was within seconds of us departing the

8  secure area of the airport.

9  Q.   Okay.  Ms. Morrell, if you would continue playing.

10        Where is Mr. Orellana as we watch now?

11  A.   Okay.  So if you look on the right side of the screen, his

12  hands are in his pocket.  There is somebody obscuring him right

13  now.  But now he just got on his phone and he is slowly making

14  his way off, out of frame.

15  Q.   Where was Mr. Majano?

16  A.   Mr. Majano is right in the middle of the frame.  He is

17  still wearing his white pants, black shirt, and he has his bag

18  in his right hand.  You can see his bald head.  And he is

19  looking around.

20  Q.   Ms. Morrell, if you would fast forward, please, to 4:12.29

21  seconds.

22        Do you see Mr. Orellana?

23  A.   Yes, I do.  He is on a phone, he is walking from right to

24  left, and he is about to go off screen.

25  Q.   Ms. Morrell, if you would fast forward to 4:13.10

J.D. Culley, Jr. - Direct

126

1    seconds, please.

2    A.    Okay.  Again, Mr. Orellana is at the bottom of the screen.

3    You can see him clearly right in the middle with his red shirt.

4         Mr. Majano is off to the right of center of screen.

5    Again, you can see what he was wearing.

6    Q.    And are HSI agents in that area?

7    A.    Yes, yes.  We have surveillance set up around him.

8    Q.    Ms. Morrell, if you would, please, fast forward to

9    4:17.25 seconds.

10        Do you see Mr. Majano here?

11   A.    I do.

12   Q.    Where is Mr. Majano?

13   A.    Correction, stand by, please.

14   Q.    If I could direct your attention to the bottom right.

15   A.    Thank you.  Mr. Majano is at the bottom right.  He is on

16   his phone.  He is looking towards the left of the camera right

17   now.

18   Q.    Okay.

19   A.    So Mr. Majano just picked up his suitcase and is walking

20   from right to left.

21   Q.    What did you do?

22   A.    We followed him.  That's when he went to go down the ramp

23   towards the commercial loading and parking lot.

24   Q.    With the Court's permission, we would like to play

25   Exhibit 47.

J.D. Culley, Jr. - Direct

127

1           THE COURT:  Go ahead.

2           NOTE:  The video recording is played.

3  BY MR. TRAXLER: (Continuing)

4  Q.   What area does Exhibit 47 show?

5  A.   So this is a surveillance camera of Dulles Airport, but

6  this is immediately outside of the terminal.  This is the area

7  I described as having the concrete barriers for security.

8           All these people that are walking from right to left

9  have just crossed the street, whether they're coming from a bus

10 or the public parking lot, that's the direction that those

11 things are.

12 Q.   If we could, Ms. Morrell, fast forward to 4:57.55 seconds.

13          Do you recognize anybody in this frame?

14 A.   I do.  That's Mr. Orellana in the red shirt who just came

15 over and leaned on -- sat on the concrete barrier and has a

16 cigarette.

17 Q.   Does this timestamp, 4:38, appear accurate to you?

18 A.   Yes.  This is about the time that Mr. Majano was

19 instructed to come outside to the taxis.

20 Q.   Ms. Morrell, if we could fast forward to 4:40, just

21 4:40.00 seconds.

22          And do you recognize anybody aside from Mr. Orellana?

23 A.   I do.  Coming up on Mr. Orellana's left-hand side walking

24 towards the curb is one of our surveillance agents, Special

25 Agent Popp.

J.D. Culley, Jr. - Direct

128

1    Q.    Where is he walking to?

2    A.    In that direction, he was crossing the road and he set up

3    position at the bus, the median where you catch the buses.

4    Q.    Is that the area that we saw in Exhibits 101 and 102?

5    A.    It is.

6    Q.    And do you see anybody else walking down that you

7    recognize?

8    A.    I'm sorry, on the left-hand side walking down looking at

9    the phone, that's myself in the red shirt.  And I am crossing

10   near Mr. Orellana right then.

11   Q.    Ms. Morrell, if we could fast forward to 4:41.50 seconds.

12         And what did Mr. Orellana do when he finished sitting

13   out in the commercial pickup area?

14   A.    He proceeded back inside the airport, as he is doing now.

15   Q.    All right.  Ms. Morrell, if we could play Exhibit 48,

16   please.

17         NOTE:  The video recording is played.

18   BY MR. TRAXLER: (Continuing)

19   Q.    What does Exhibit 48 show?

20   A.    This is from the surveillance camera upstairs at the

21   International Arrivals.  Again, it's the camera from the

22   vantage point where you can see Starbucks.

23   Q.    Does the timestamp of this surveillance tape appear

24   accurate to you?

25   A.    It does.

J.D. Culley, Jr. - Direct

129

1    Q.   Now I would like to focus your attention at 4:53.23 coming

2    up to ask if you recognize anybody?

3    A.   So Mr. Majano is back standing -- it's hard to see.  He is

4    right here in the bottom right quadrant.  He has the suitcase

5    on the ground, it's black, his hand is on it.  And you can see

6    his white jeans and black shirt.

7           At this vantage point, you're looking at his right

8    shoulder.

9    Q.   Does this show when you all took him back up to the

10   International Arrivals area after being in the commercial

11   pickup area?

12   A.   That's correct.

13   Q.   Ms. Morrell, if we could fast forward to 4:54.11 seconds.

14   A.   Okay.  So Mr. Orellana is passing right behind Mr. Majano

15   at that point, he is on the phone and walking towards the

16   camera.

17   Q.   If we could, Ms. Morrell, fast forward to 4:57.35

18   seconds.

19   A.   So Mr. Orellana is at the bottom left-hand corner of the

20   frame.

21          Mr. Majano is walking right to left in the center of

22   the frame, but over towards the right side, slightly off

23   center.  And there you can see him a little bit better right

24   there.

25          As you can see, now he has made a turn, he is walking

J.D. Culley, Jr. - Direct

130

1    towards the Starbucks, which the seating area is over in that

2    corner.

3    Q.   Where was you during this time?

4    A.   I was actually over in the seating area.  If you see the

5    Starbucks logo on the post, that's me in front of it.  And I am

6    making my way over to the seating area, which is around the

7    right-hand side.

8    Q.   Ms. Morrell, if we could fast forward to 5:08.40 seconds,

9    please.

10           Where are you and Mr. Majano during this time?

11   A.   During this time, this is after Mr. Majano came to speak

12   to me in the seating area, you can see me coming out of that

13   area now.

14           Mr. Majano is going to follow and we're going to walk

15   away from the cameras to another ramp that will take us down to

16   commercial --

17   Q.   Why were you doing that?

18   A.   This was immediately after Mr. Majano had showed me the

19   text message instructing him to go to the Pollo Campero.

20   Q.   Ms. Morrell, if we could fast forward to 5:09.30 seconds,

21   please.

22           Do you recognize anybody here?

23   A.   I do.  Mr. Orellana is walking from the left to the right

24   side of the screen at the bottom.  He appears to be on the

25   phone.  And of course, he is still wearing his red shirt at

J.D. Culley, Jr. - Direct

131

1    this time.

2    Q.   And what direction was he walking?

3    A.   He was walking away from the camera in the direction that

4    Mr. Majano and I had went.

5    Q.   All right.  Ms. Morrell, if we could play Exhibit 49,

6    please.

7              NOTE:  The video recording is played.

8    BY MR. TRAXLER:  (Continuing)

9    Q.   What does Exhibit 49 show?

10   A.   So where the previous camera was showing the Starbucks,

11   this is immediately to the left of the Starbucks.  This is

12   showing two ramps.  The ramp up goes to passenger pickup.  So

13   if you're just driving to the airport, you're going to pull

14   over on the curb and throw bags and pick somebody up, you would

15   go up to exit.

16             If you're going to go to the taxi, buses, or public

17   parking, you would go down that ramp on the right-hand side.

18   Q.   Ms. Morrell, if we could fast forward to 5:06.48 seconds,

19   please.

20   A.   There is Mr. Orellana, as you can see, at the bottom of

21   the screen.

22   Q.   What direction is he looking?

23   A.   Right now he's looking over towards the Starbucks, in that

24   direction.

25   Q.   Ms. Morrell, now if we could please play Exhibit 51.

J.D. Culley, Jr. - Direct

132

1                 NOTE:  The video recording is played.

2     BY MR. TRAXLER: (Continuing)

3     Q.    Do you recognize Exhibit 51?

4     A.    Yes.

5     Q.    What does Exhibit 51 show?

6     A.    This is the surveillance camera from the Pollo Campero

7     restaurant in Herndon.  This particular camera is back against

8     the back wall where you would go to the restrooms.  And this is

9     showing the front, towards the front of the restaurant.

10    Q.    And are you in this film?

11    A.    I am.

12    Q.    Where are you?

13    A.    I'm seated at the left-hand side.  There is the two people

14    with the red shirts, I am at the lower booth.  You're looking

15    at my back.

16    Q.    Is Mr. Majano in this frame?

17    A.    He is.  He is on the right-hand side, white jeans, black

18    shirt, in the booth.

19    Q.    Again, directing your attention to the timestamp, is that

20    consistent with your memory?

21    A.    No, that's off.

22    Q.    Does it look to be about 30 minutes off?

23    A.    It does, approximately.

24    Q.    Ms. Morrell, if we could please fast forward to 7:08.59.

25    A.    So in this, you can see Mr. Orellana at the counter

133

1    ordering food.  Except now he has changed, he is wearing a

2    black shirt instead of the red.

3    Q.   Ms. Morrell, if we could pause.

4          In what direction is Mr. Orellana looking in this

5    frame?

6    A.   In this frame he is looking directly at the soda machine.

7    He is filling up his cup, it looks like.

8    Q.   Can you continue playing, Ms. Morrell.

9          And during this time you didn't look up and look

10   directly at Mr. Orellana.

11   A.   No.  I knew he was there, I saw him come in, and I knew --

12   I was able to see him out of peripheral vision.  But, no, I

13   didn't make eye contact or look directly at him.

14   Q.   In what direction is Mr. Orellana walking now?

15   A.   He is walking towards the restrooms, he just passed Mr.

16   Majano.

17   Q.   Ms. Morrell, if we could please fast forward until

18   7:11.11.

19   A.   Okay.  So there is Mr. Orellana, he just exited from the

20   area of the restrooms.

21          MR. TRAXLER:  With the Court's indulgence, please.

22          THE COURT:  Yes, sir.

23          MR. TRAXLER:  That's all the questions I have, Agent

24   Culley.  If you would please answer the opposing counsel's

25   questions.

1          THE WITNESS:  Yes, sir.  Thank you.

2          THE COURT:  Mr. Crawley.

3     CROSS-EXAMINATION

BY MR. CRAWLEY:

5     Q.    Good afternoon.

6     A.    Good afternoon, sir.

7     Q.    I just want to go back to your earlier statements

8     regarding my client, Mr. Majano.

9          As it relates to him, you indicated initially that

10    when you spoke with him, you had overheard him talking to some

11    other people, is that your statement?

12    A.    I'm sorry, can you restate that.

13    Q.    Maybe I misunderstood it.

14    A.    We were discussing Mr. Orellana?

15    Q.    Mr. Majano, my client.

16    A.    Majano, okay.  I apologize.

17    Q.    My client.  So initially when you talked about him, the

18    first set of questions you were asked, you gave me the

19    impression that you overheard him talking with certain other

20    agents; is that correct?

21    A.    Yes.  And I spoke with him directly.  Mr. Majano wasn't

22    having any -- didn't seem to have any problems communicating

23    with us in English.

24    Q.    Okay.  So when you say he was talking to other agents,

25    were you in that room?

J.D. Culley, Jr. - Cross

1    A.    Yes, sir.

2    Q.    Okay.  Who were those agents?

3    A.    Special Agent Tarantino as well as CBP officers were

4    present.  I don't recall which CBP officers specifically.

5    Q.    Okay.  I am bad with names, so you have to forgive me if I

6    say it incorrectly.  Was Rhazouani, was he there?

7    A.    Yes, CBP Officer Rhazouani was in the area.

8    Q.    Okay.  And when you heard my client talking with him

9    present, your statement was that he said he was bringing a bag

10   from El Salvador for a gentleman named Edwin Luna, correct?

11   A.    Yes, that's right, he was doing a favor for a friend named

12   Edwin Luna.

13   Q.    And Edwin Luna, meaning that Mr. Luna was in El Salvador

14   and had asked my client to bring a bag to the United States,

15   correct?

16   A.    That's my understanding, yes, sir.

17   Q.    Okay.  And he also indicated to you, according to you,

18   that he had family in this area, meaning my client had family

19   in this area, correct?

20   A.    Yes.  I believe he said he had a cousin that was going to

21   pick him up.

22   Q.    And during the course of your investigation, you have been

23   able to determine that he does in fact have family in this

24   area, correct?

25   A.    Sir, I can't speak to that.

1    Q.   Meaning you haven't been able to verify that?

2    A.   Sir, I haven't done research into Mr. Majano's family

3    members.

4    Q.   Okay.  As it relates to his demeanor, you indicated that

5    he was very cooperative, correct?

6    A.   Correct.

7    Q.   And at no point did you see him act nervous, correct?

8    A.   He appeared nervous with the situation, but he was willing

9    to cooperate with us.

10   Q.   Okay.  Well, at no point did he became combative with you,

11   correct?

12   A.   Absolutely not.

13   Q.   At no point did he attempt to flee, correct?

14   A.   No, that's correct, he did not.

15   Q.   In fact, at different stages during this investigation

16   that you were engaged in with my client, you allowed him to

17   walk freely of his own free will to different locations,

18   correct?

19   A.   That is correct.

20   Q.   And that was for the purpose of trying to determine who

21   the intended recipient of these packages was, correct?

22   A.   Correct.

23   Q.   And he assisted you by making certain calls or receiving

24   calls, correct?

25   A.   He did.

J.D. Culley, Jr. - Cross

137

1    Q.    And once he did receive those calls, he then turned over

2    that information to you, correct?

3    A.    Yes, he did.

4    Q.    At no point did he try to avoid any of the requests that

5    you had made of him, correct?

6    A.    That's correct.

7    Q.    And in fact, at the end of your surveillance of Pollo

8    Campero, after taking down his co-defendant, you indicated that

9    my client was sitting on the curb, was that your testimony?

10   A.    I didn't mean sitting.  He was waiting, still waiting on

11   the curb where he had been waiting.

12   Q.    By himself, correct?

13   A.    Yes, sir.

14   Q.    And at no point did he attempt to flee at that point,

15   correct?

16   A.    That's correct, he did not.

17   Q.    At no point during your interaction with my client or your

18   observations of him with the other agents did you hear my

19   client admit to knowing that there were drugs in that

20   container, correct?

21   A.    No, I didn't hear that.

22            MR. CRAWLEY:  No further questions.

23            THE COURT:  All right.  Mr. English.

24   BY MR. ENGLISH:

25   Q.    Special Agent, is it fair to say that my client, Mr.

J.D. Culley, Jr. - Cross

138

1    Orellana, had no contact with Mr. Majano at Dulles

2    International Airport; is that right?

3    A.    That's correct.

4    Q.    And similarly, he had no contact with Mr. Majano at the

5    Pollo Campero; is that right?

6    A.    Not inside, no, sir.

7    Q.    Now, you described his actions of driving a van around

8    every few minutes as being countersurveillance.  But in truth,

9    isn't that also consistent with someone who is looking for

10   someone and can't find them?

11   A.    Potentially, sir.  However, Mr. Orellana had --

12   Q.    I think you answered my question.

13   A.    I apologize.

14   Q.    Now, the driving around actually brought attention on him,

15   didn't it?

16   A.    It did.

17   Q.    Now, where the van my client was driving pulled up by Mr.

18   Majano, that's actually a bus stop; isn't it?

19   A.    I don't know, sir.

20   Q.    Now, the van my client was driving stopped once you

21   activated your emergency lights, didn't it?

22   A.    Yes, he did.

23   Q.    Now, when you and the other agents approached the van, you

24   pulled your guns on him, didn't you?

25   A.    Yes.

J.D. Culley, Jr. - Cross

139

1    Q.   And when you took the van back to the parking lot and went

2    to inventory it, you never saw a digital scale, did you?

3    A.   I did not.

4    Q.   But the van looked like it was stuffed with stuff that you

5    would find in a family van, didn't it?

6    A.   It did.

7    Q.   I mean, it had a bunch of CDs, DVDs, and electronic items?

8    A.   Yes.

9    Q.   And miscellaneous bottles of liquid?

10   A.   Yes.

11   Q.   Miscellaneous charms and trinkets?

12   A.   Yes.

13   Q.   Miscellaneous kitchenwares?

14   A.   I don't recall kitchenwares, but --

15   Q.   Miscellaneous clothing, glasses, and shoes?

16   A.   Yes.

17   Q.   Miscellaneous toys?

18   A.   Yes.

19   Q.   A child's car seat?

20   A.   Yes.

21   Q.   A multicolored umbrella?

22   A.   Yes, correct.

23   Q.   Maroon bag containing a maroon folding chair and white

24   tapered pole?

25   A.   I can't speak to the tapered pole, but the chair, yes.

140

1   Q.   A green bag containing a green folding chair?

2   A.   Yes.

3   Q.   A green/blue folding chair?

4   A.   Yes.

5   Q.   And there were two mesh bags containing materials, weren't

6   there?

7   A.   Correct.  I put those, I put the belongings in the mesh

8   bags.

9   Q.   So there was, to put it perhaps impolitely, a lot of junk

10  in the back of that car, wasn't there?

11  A.   Yes, sir.

12          MR. ENGLISH:  Thank you, sir, I have no further

13  questions.

14          THE COURT:  Thank you.  Any redirect?

15          MR. TRAXLER:  Yes, Your Honor, just briefly.

16          THE COURT:  Sure.

17      REDIRECT EXAMINATION

18  BY MR. TRAXLER:

19  Q.   Agent Culley, Mr. Crawley asked you a number of questions

20  about Mr. Majano being able to walk freely.  Do you remember

21  those questions?

22  A.   Yes, sir.

23  Q.   When you all had Mr. Majano in Dulles Airport and Pollo

24  Campero, how many agents were around him at a time, roughly?

25  A.   Roughly eight to ten.

J.D. Culley, Jr. - Redirect

141

1    Q.    Did you all have eyes on him the whole time?

2    A.    The whole time.

3    Q.    Were you all giving him instructions on what to do the

4    whole time?

5    A.    Yes.

6    Q.    Mr. English asked you a question about whether his client,

7    Mr. Orellana, had contact with Mr. Majano at Dulles Airport and

8    at Pollo Campero.  Do you recall those questions?

9    A.    Yes, sir.

10   Q.    Are you aware of electronic contact between Mr. Orellana

11   and Mr. Majano?

12   A.    Yes.  I now know that there were frequent -- there were

13   text messages and phone calls.

14   Q.    Let me direct your attention, if I can, to what has been

15   admitted as Government's Exhibit 30.

16              Do you recall Exhibit 30?

17   A.    I do.

18   Q.    Did Exhibit 30 suggest to you that there was electronic

19   contact between Mr. Orellana and Mr. Majano?

20   A.    There is very clearly three calls from Mr. Orellana to Mr.

21   Majano's phone.

22              MR. TRAXLER:  Thank you, Your Honor.  No further

23   questions.

24              THE COURT:  All right.  May Agent Culley be excused?

25              MR. ENGLISH:  May I, Your Honor?

142

1          THE COURT:  Yes, you may.

2      RECROSS-EXAMINATION

3  BY MR. ENGLISH:

4  Q.   Sir, the three calls that you just described were

5  telephone calls, weren't they?

6  A.   Correct, sir.

7  Q.   They weren't texts, right?

8  A.   No, that's correct, they were telephone calls.  I

9  apologize.

10          MR. ENGLISH:  Thank you, sir.

11          THE COURT:  All right.  May the agent be excused?

12          MR. TRAXLER:  We would like for him to be excused,

13  but subject to recall, Your Honor.

14          THE COURT:  All right.  You're excused at this time,

15  but subject to recall.  So check in and make sure we know where

16  you are.

17          THE WITNESS:  Yes, Your Honor.

18          THE COURT:  Don't discuss the testimony you have

19  given with anyone between now and the end of our trial.  All

20  right?

21          THE WITNESS:  Yes, sir.

22          THE COURT:  All right.  Thank you, have a good

23  evening.

24          NOTE:  The witness stood down.

25          THE COURT:  All right.  I think we'll conclude for

1    the evening.  Can you all be back at 9 o'clock tomorrow morning

2    to continue?  All right, great.

3          Then very important, don't do any investigation,

4    don't do any research, don't discuss the testimony you have

5    heard or anything about the case with anybody else.  Go home,

6    have a good evening.

7          And it's very important.  You read, especially

8    evidently on the West Coast, it's very popular that every time

9    you get on a jury, you think that you should write a book about

10   it.  And that's not what your role is.  And so, this case needs

11   to be decided based on what you hear in this courtroom on the

12   witness stand.

13         So it's the first thing I'll ask you tomorrow, is

14   whether you have heeded my request.  And I'm certain that every

15   one of you will.

16         So have a good evening, you are excused that this

17   time.  We will see you tomorrow.  Remember to leave your

18   notebooks in the jury room.

19         NOTE:  At this point the jury leaves the courtroom;

20   whereupon the case continues as follows:

21   JURY OUT

22         THE COURT:  All right, have a seat.

23         I just wanted to talk about jury instructions for a

24   minute.  I put together a template.  And did you all have a

25   chance to look at it?  Any comments?

144

1              Mr. English, any --

2              MR. ENGLISH:  Yes, sir, if I may approach.

3              THE COURT:  Yes.

4              MR. ENGLISH:  Your Honor, for a number -- if I may

5      move this.  Your Honor, for number 17, it was in the

6      alternative.  And I assume the charts and summaries will be

7      admitted into evidence.

8              THE COURT:  You know, I don't know whether they are

9      going to be offered.  If they are, then I would -- if they are

10     sponsored properly, I would be prepared to admit them.

11             So obviously this is in the alternative.  We will see

12     where the evidence takes us.

13             MR. ENGLISH:  Yes, sir.  For number 18, false

14     exculpatory statements.  It lists my client.  There has been no

15     evidence to date that my client has offered any kind of a false

16     exculpatory statement.  I believe that he asserted his Fifth

17     Amendment rights when questioned by the agents.  And what he

18     said was very, very minimal.

19             THE COURT:  The Government submitted a list that

20     captured a lot of different situations that may or may not

21     exist at the end of the day, and we will modify them as

22     necessary once our evidence is closed.  But we will keep an eye

23     on 18, absolutely.

24             MR. ENGLISH:  Yes, sir.  And for number 19, it says:

25     Coercion or bribery of a witness, pertaining to my client.

1    There has been no evidence of that.

2              THE COURT:  Right.  We will look at 19 as well.

3              MR. ENGLISH:  And similarly, Your Honor, for number

4    23, let me flip there.  My pages are sticking together.

5              My client will testify, Your Honor, so I believe 23

6    won't apply.

7              THE COURT:  Well --

8              MR. ENGLISH:  You may want to wait and see.

9              THE COURT:  And Mr. Majano may not testify.  I don't

10   know -- so we may have one of each.

11             MR. ENGLISH:  Yes, sir.

12             THE COURT:  Okay.  So we will have to make it clear

13   that, as you suggested earlier, that the jury must look at each

14   defendant separately.

15             MR. ENGLISH:  Yes, sir.  And, Your Honor, for -- the

16   pages are being uncooperative.

17             THE COURT:  That's all right, take your time.

18             MR. ENGLISH:  For number 28, for 404(b) evidence, I

19   haven't received a 404(b) notice, and I am not aware of any

20   404(b) evidence that the Government has.

21             THE COURT:  Okay.

22             MR. ENGLISH:  Finally, Your Honor, for number 29,

23   willful ignorance or willful blindness, as it's called.  Your

24   Honor, I would concede that that instruction would apply to the

25   co-defendant, but, Your Honor, I don't see how by any stretch

146

1    the evidence we have heard would apply to my client.

2          So I would ask if the Court gives it, it makes it

3    clear it only pertains to the co-defendant.

4          THE COURT:  Okay.  Thank you, Mr. English.

5          MR. ENGLISH:  Otherwise, I would think these are full

6    and complete.

7          THE COURT:  Do you have any others that you want to

8    add at this time?

9          MR. ENGLISH:  No, sir, Your Honor, I think they are

10   very full.

11         THE COURT:  Okay.  Thank you.

12         MR. ENGLISH:  Thank you, sir.

13         THE COURT:  All right, thank you.

14         Mr. Crawley, why don't you --

15         MR. CRAWLEY:  I have nothing to add at this time,

16   Your Honor.  I do have -- I think the Government and I are

17   resolving our issues regarding certain exhibits.  So I don't

18   anticipate any issues tomorrow morning.

19         To the extent that we might, we will take it up

20   before -- I don't know if the Court wishes us -- I know you

21   told the jury to get here at 9, but do you want us to get here

22   a little bit before or just be here at 9?

23         THE COURT:  I kind of think we're taking care of it

24   right now.  But if we need five minutes, we can do it at

25   9 o'clock tomorrow morning.

147

1              MR. CRAWLEY:  No problem, Your Honor.  I am not

2    anticipating any issues.

3              THE COURT:  Okay.

4              MR. CRAWLEY:  Hopefully we will be done tomorrow.

5              THE COURT:  All right.  It appears that the

6    Government has four more witnesses.  And then Mr. English has a

7    number of witnesses.

8              Do you want to respond now, Mr. Traxler?

9              MR. TRAXLER:  Well, Your Honor, we do have one

10   instruction that we want to add, and it's the statement or

11   conduct of a defendant when multiple defendants are on trial.

12             I think it's an instruction that will be more

13   favorable to the defense, but we just think in a case like

14   this, it should be added.

15             And I brought copies here, and I would pass it up.

16   We did adapt the O'Malley instruction on this to remove a

17   sentence that said:  You may not in any way, however, consider

18   the alleged statement of whatever defendant it's applicable to

19   when evaluating the case against the other defendant.

20             And we don't think that that is appropriate here.  I

21   mean, we had one Bruton issue that we resolved amicably over

22   here.

23             So we do think that the other statements that came

24   out that Mr. Majano was making could be considered against Mr.

25   Orellana as well.

1          MR. ENGLISH:  Your Honor, if I may.  I think that the

2    statements of the co-defendant are in many ways exculpatory for

3    my client.

4          So I agree that the jury should be able to consider

5    the --

6          THE COURT:  So you're in agreement --

7          MR. ENGLISH:  In other words, I agree with the

8    Government.

9          THE COURT:  -- to removing that sentence?

10         MR. ENGLISH:  Yes, sir.

11         THE COURT:  Okay.  All right.

12         MR. TRAXLER:  And then, Your Honor, with respect to

13   the other objections that Mr. English raised, we can take them

14   up tomorrow if it suits Your Honor after the evidence is in and

15   I can explain then why I think those instructions are

16   appropriate.

17         THE COURT:  Yeah.  We need to have a final jury

18   instruction conference after the close of the evidence, and we

19   can handle most of those at that time.

20         MR. TRAXLER:  Okay.  Thank you, Your Honor.

21         THE COURT:  All right.  Anything else we need talk

22   about tonight?

23         MR. TRAXLER:  Nothing from the Government, Your

24   Honor.

25         THE COURT:  Mr. English?

149

1          MR. ENGLISH:  No, sir.

2          THE COURT:  Mr. Crawley, anything else you want to

3   discuss?

4          MR. CRAWLEY:  No, sir.

5          THE COURT:  All right.  Then I think we're done for

6   today.  We will see you all tomorrow morning at 9 o'clock.

7          Thank you.  We're in recess.

8          NOTE:  The November 28, 2017 portion of the case is

9   concluded.

10     --------------------------------------------------

11

12

13

14

15

16

17

18

19          I certify that the foregoing is a true and

20      accurate transcription of my stenographic notes.

21

22

23                    _____
                      /s/  Norman B. Linnell
24                    Norman B. Linnell, RPR, CM, VCE, FCRR

25