```
                  UNITED STATES DISTRICT COURT
                  EASTERN DISTRICT OF VIRGINIA
                       Alexandria Division




-------------------------------:
                               :
UNITED STATES OF AMERICA        :
                               :
                               :
     -vs-                       :    Case No. 1:17-cr-204
                               :
                               :
ROSEMBERG M. MAJANO            :
        and                     :
JOSE A. ORELLANA MONTALVO,      :
              Defendants.        :
                               :
-------------------------------:
```

```
                       PARTIAL TRANSCRIPT
                  (Counsel's Opening Statements)

                      November 28, 2017


              Before:   Liam O'Grady, USDC Judge


                       And a Jury
```

APPEARANCES:

Thomas W. Traxler and Dennis M. Fitzpatrick,
Counsel for the United States

Dwight E. Crawley, Counsel for Defendant Majano

Gregory B. English, Counsel for Defendant Orellana Montalvo

Defendants, R.M. Majano and J.A. Orellana Montalvo, in person

2

INDEX

OPENING STATEMENTS BY:

MR. FITZPATRICK                                          3
MR. CRAWLEY                                             17
MR. ENGLISH                                             19

3

1               NOTE:  A portion of the case is heard on November 28,

2   2017 in the absence of the jury as follows:

3   JURY OUT

4               THE COURT:  All right.  Are we ready for our jury?

5               MR. FITZPATRICK:  Yes, Your Honor.

6               MR. CRAWLEY:  Yes.

7               MR. TRAXLER:  Yes, Your Honor.

8               MR. ENGLISH:  Yes, Your Honor.

9               THE COURT:  All right.  Joe, let's get our jury,

10  please.

11              NOTE:  At this point the jury returns to the

12  courtroom; whereupon the case continues as follows:

13  JURY IN

14              THE COURT:  All right, please be seated.

15              Opening statement, Mr. Fitzpatrick.

16              MR. FITZPATRICK:  Thank you very much, Your Honor.

17              May it please the Court, Your Honor.

18              THE COURT:  Yes, sir.

19              MR. FITZPATRICK:  Thank you.

20              Good afternoon, ladies and gentlemen.

21              This case -- well, as Judge O'Grady explained to you,

22  my job at this point is to lay out sort of a brief roadmap of

23  what the Government's evidence will be in this case.

24              Ladies and gentlemen, this case is about a

25  conspiracy, a criminal agreement to import from El Salvador

4

1    into the United States four kilograms of heroin and four

2    kilograms of cocaine.  That's a lot of heroin, that's a lot of

3    cocaine.

4              You will hear testimony in this case that the

5    wholesale street value of that cocaine is approximately

6    $400,000.  The cocaine trafficking business, you will hear

7    testimony, is a money-making venture.

8              These two defendants in this case today, Mr.

9    Rosemberg Majano, the man seated right here, and Mr. Jose

10   Orellana Montalvo, the man seated at the back, were part of

11   that conspiracy.  They played key roles.

12             Mr. Majano brought the cocaine and the heroin into

13   the United States from El Salvador on Avianca Flight 582 on

14   August 10, 2017.  He arrived at Dulles Airport.

15             Mr. Orellana Montalvo was there to pick him up and

16   deliver the cocaine elsewhere, we submit to you, for further

17   distribution within Northern Virginia and within the D.C.

18   region.

19             Now, as I explained to you earlier, the cocaine and

20   heroin trafficking business is a money-making venture.

21   Everybody makes money.  Some people make a lot of money, some

22   people make a little bit of money, but everybody makes money.

23   Some people make money on a fee-for-services basis.  That could

24   be the case in this case.

25             As an example of why there is such a demand for

1    cocaine and heroin and why there is -- there are these criminal

2    conspiracies that engage in this, you will hear testimony in

3    this case that a kilogram of, let's say, cocaine, currently

4    costs about $30,000 out on the streets of Northern Virginia and

5    in the D.C. region.

6            But when you extrapolate it out -- and a simple one

7    is when that cocaine gets sold, say in gram quantities, that

8    cocaine could be sold for $65, $85, $100, whatever the market

9    will bear.  That kilogram of cocaine, which is a thousand

10   grams, right, that turns into $65,000, $85,000, or $100,000.

11   You will hear testimony in this case that that is sort of the

12   current market value of these drugs.

13           To further orient you, a kilogram of cocaine, a

14   kilogram of heroin is 1,000 grams, it's about 2.2 pounds.

15           So in this case we're talking about 17 pounds of

16   illegal controlled substances coming from El Salvador into the

17   streets of Northern Virginia and the wider D.C. region.

18           I want to take you through some of the evidence in

19   this case.  And I think the best way to do it -- pardon me,

20   Your Honor -- is to walk you through just a few slides.  And

21   you will see this in the evidence today.

22           Starting here, ladies and gentlemen, at about

23   12:41 -- it's a little difficult to read, but when the evidence

24   comes in in this case you will have this in the jury room.  At

25   12:41, on a communication device called WhatsApp -- WhatsApp is

6

1    an encrypted communication device.  It allows people

2    communicating -- it has end-to-end encryption.  So it's a very

3    secure and private communication.  These devices or these

4    messages were retrieved, ladies and gentlemen, in this case off

5    of Mr. Orellana Montalvo's phone after he was arrested on

6    August 10.  You will see that the top message was delivered on

7    August 10, 2017, at 16:41 UTC.

8         Now, UTC is a standard time measurement.  It is

9    Eastern Standard Time plus four.  So 16:41 is actually 12:41 in

10   the afternoon.

11        What you notice from this message at the very top is

12   that a person by the name of Kamalion, K-a-m-a-l-i-o-n, at a

13   phone number that begins +503 -- that is an El Salvador

14   exchange.  So this is a message coming from Kamalion in El

15   Salvador to Mr. Orellana Montalvo.  And what he sends to Mr.

16   Orellana Montalvo are two photographs.  And he sends

17   photographs of Mr. Majano.

18        Right at 12:41 you already see coordinated activity,

19   El Salvador to Orellana Montalvo sending pictures of Mr.

20   Majano, two pictures.

21        And you will notice on the second one, he writes to

22   Mr. Orellana Montalvo:  That's the dude.  Right?

23        And you will notice that the pictures are of Mr.

24   Majano, distinctive looking gentleman, broad shoulders, shaved

25   head, much as he looks like today.  There is no way to mistake

7

1    Mr. Majano.

2              Below that you will see at 3:17 another message that

3    was sent.  And then below that at 3:30 another message from

4    Kamalion to Mr. Orellana Montalvo.  And that number that he is

5    sending, the 770-374-7042, that's Mr. Majano's phone number.

6    And you will have those phone records with you in evidence in

7    this case today.

8              So now the guy in El Salvador is sending Mr. Orellana

9    Montalvo the phone number of Mr. Majano.  Coordinated activity.

10             And then right below that he says:  Call that

11   number -- call.  That number, then delete the call log.  Delete

12   the call log after that.

13             One of the things I would ask you to remember in this

14   case, ladies and gentlemen, two things as you see the evidence

15   unfold, is that people lie for a reason and that people do

16   things for a certain reason.  There is no such thing as a

17   coincidence in the drug trafficking world.  Right?

18             So we have those messages at 12:41 and then again at

19   3:30.  Right?

20             Moving on.  Now, Mr. Majano, he arrived from El

21   Salvador at Dulles Airport, again on August 10, 2017, dead of

22   summer in Northern Virginia, and he goes, he goes to the

23   baggage claim area.  Now, this baggage claim area still remains

24   in the International Arrivals area.  These are only arriving

25   passengers.  People picking up can't go back there.  This is

8

1    the International -- dedicated to International Arrivals.

2              The person right in the middle there with the shaved

3    head wearing the black shirt and the distinctive white pants,

4    that's Mr. Majano.  He's picking up a bag that he had just

5    received from that conveyor belt behind you.  He will soon put

6    it down, you will see him, he's rolling it.  It's actually too

7    heavy for him to carry.  He ends up picking it is up for just a

8    moment and then rolling it.  That has the 17 pounds of cocaine

9    and heroin.  He transported it through Avianca Airlines into

10   Dulles Airport.

11             Right after this, as he is walking away to leave the

12   International Arrivals area -- Customs and Border Patrol do

13   roving operations within the airport.  They have authority to

14   stop people, to enforce our customs laws, and to look for

15   unlawful contraband.

16             CBP Officer Rhazouani, who you will hear in this

17   case, will be our first witness, stopped Mr. Majano.  And he

18   asked him a couple questions.  What do you have with us -- what

19   do you have with you?

20             And then he asked him to come to the side.  And then

21   he had him fill out a declaration form.  And then he started

22   looking through the bag.  And what he sees inside the bag are

23   these, nine pouches of something called Delisoya Powdered Milk,

24   and two bags of brown coffee.

25             Now, within this black bag, and you will have all

9

1    this in evidence, there was not much else.  There were a couple

2    articles of clothing, some flotsam and jetsam, but

3    substantially it was the 11 pouches of food products, powdered

4    milk and ground coffee, that was in the bag.

5          Officer Rhazouani was curious about that, starts

6    asking him some questions.  Mr. Majano says, well, the powdered

7    milk is for family, and the ground coffee is for me.  And he

8    also says to Officer Rhazouani, I'm here to -- I'm here and I'm

9    going to meet my cousin.

10          Now, at the initial encounter, Mr. Majano and Officer

11   Rhazouani are getting along fine, they are happy with each

12   other, Mr. Majano is in good spirits.

13          Officer Rhazouani, it's not adding up to him.  So he

14   opened -- he begins opening a package.  And immediately Mr.

15   Majano's demeanor changes, he becomes nervous, less

16   communicative.  Right?  And this is visible, this is obvious to

17   Officer Rhazouani.

18          When he opened up the first package, he found another

19   sealed pouch in there that had either cocaine or heroin.  This

20   is after it was collected together.  This is the 17 pounds,

21   eight-plus kilograms of controlled substances after it was

22   removed from all those packages.

23          Drug dogs came in, drug dogs alerted.  At about 3:10

24   Mr. Majano was arrested for importing this contraband.  They

25   had done some preliminary testing, they had probable cause,

10

1    they arrested him.

2           At approximately 3:30 Agent Tarantino and his team

3    are called in to take over the investigation.  Agent Tarantino

4    works for the Department of Homeland Security, Homeland

5    Security Investigations.  They do the longer-term

6    investigations.  They essentially pick up from Customs and

7    Border Protection.  Customs and Border Protection are patrol

8    officers.  They do longer-term investigations.

9           They come and meet with Mr. Majano, apprise him of

10   his Miranda rights.  And Mr. Majano says, well, in fact, I was

11   being paid $500 to bring this contraband into Dulles Airport,

12   and I was here to meet some guy named Steven Gutierrez.

13          Now, to be clear, he said he was coming in to deliver

14   the packages.  He didn't say the cocaine, didn't say the

15   heroin.

16          But I submit to you that when you hear all the

17   evidence in the case, you will have no doubt that Mr. Majano

18   knew what he was bringing in, or at the barest minimum was

19   willfully blind to his activity.  That he sort of ducked his

20   head in the sand and ignored what should have been obvious.

21   Right?

22          And again, ladies and gentlemen, people lie for a

23   reason.  That's not what he told Officer Rhazouani when he

24   first was encountered.

25          Let's move on.  Oh, and by the way, let me move back,

1   you will hardware from Lauren Munoz in this case, who is the

2   DEA analyst.  Homeland Security then transported the drugs to

3   the DEA lab in Greenbelt, Maryland.  It was analyzed.

4   Initially, Homeland Security and CBP, initially thought they

5   had eight kilograms of cocaine.  When it was analyzed, it was

6   actually four kilograms of heroin and 3.85 kilograms of

7   cocaine.

8           All right.  So there was a little bit more heroin

9   than cocaine.  And then they separated it into different

10  packages.  So it's clear which is heroin, which is cocaine.

11          You will hear testimony in this case that heroin,

12  which, unfortunately, is in very high demand these days, has a

13  much higher street wholesale value.  A kilogram of heroin goes

14  for about $75,000.  And again, the total contraband in this

15  case is approximately $400,000, just at the wholesale level.

16          This is where it gets interesting in this case.  And

17  you will hear this evidence unfold over the next day and into

18  tomorrow perhaps.  After Mr. Majano makes some preliminary

19  statements to Agent Tarantino, they say, well, can you see if

20  there is anyone here to pick you up?  Mr. Majano agrees.

21          Then over the course of, oh, approximately the next

22  two to three hours, there is an interesting cat and mouse game

23  that goes on.

24          Now, remember, from 12:41 Mr. Orellana Montalvo knows

25  what Mr. Majano looks like, distinctive looking fellow.  Right?

12

1   They are caught on surveillance camera -- again, HSI allows Mr.

2   Majano to go out there.  They are tailing him because they want

3   to see who is the drug dealer that he was going to deliver it

4   to.

5           And in this photo -- you will see the longer

6   surveillance footage, but this is a snapshot here where Mr.

7   Majano is walking on the upper end of the photograph, sort of

8   going away from you in the paragraph, and Mr. Orellana Montalvo

9   is walking towards you.  And he catches, he sees Mr. Majano.

10          What you are seeing there is he slowly makes a loop

11  and he starts to -- he starts going after him.  He starts

12  following him.

13          This is a picture of Mr. Orellana Montalvo waiting

14  outside the airport.  These agents are now focussing in on him,

15  they have identified him.

16          This is another picture of Mr. Orellana Montalvo.

17          Here we have more communications.  So on this slide

18  Mr. -- and you notice, ladies and gentlemen, those prior

19  pictures, what was Mr. Orellana Montalvo wearing?  A

20  distinctive red shirt and the baggy jeans.  But the red shirt

21  sort of stood out.  Remember that.

22          In this slide, ladies and gentlemen, this is a

23  communication between Orellana, the defendant in this case, and

24  Pops.  There is a lot of communication with Pops.  Remember, it

25  started with Kamalion, now it's Pops.  A lot of communications

13

1    with Pops.

2            You will hear evidence in this case that throughout

3    the course of the day on August 10, there were more than 40

4    communications.  Right?  Now, some were dropped calls or some

5    were calls and no pickups, but there were 40 efforts going back

6    and forth.  A lot of it on WhatsApp, the encrypted

7    communication device.

8            In this photograph -- or in this piece of evidence,

9    ladies and gentlemen, what you have is at 6:40 the defendant

10   Orellana Montalvo sends a communication to Pops and he says:

11   Call me.  Right?

12           Now, it takes about 14 minutes, but at 6:54 you will

13   have phone records that that same phone number calls Mr.

14   Orellana Montalvo and they talk for about 50 seconds.  That's

15   important.

16           And then about 16 minutes after that, Pops sends a

17   message back to Mr. Orellana Montalvo and he says:  Okay, told

18   him to move to the hotel, Marriott, just make sure he has no

19   tail.  Right?  And then he sends a further cautionary chat:  Be

20   on the lookout.

21           But at that time Mr. Majano did not go to the

22   Marriott.  That is because he was being followed by Homeland

23   Security, and he had to do what Homeland Security wanted him to

24   do.

25           So there is an earlier communication where they say,

14

1    go to Pollo Compero.  This communication was in about the

2    5 o'clock hour.  Pollo Compero is a little chicken restaurant

3    on Elden Street in Herndon.  It's about five or ten minutes

4    from Dulles Airport.

5          Mr. Majano goes there.  And at the direction of HSI,

6    you will see the individual there in the red shirt with his

7    back to you in this photograph, that is Agent Culley, he is an

8    HSI agent working on this case.  So he is in the restaurant

9    with Mr. Majano.

10         While those communications were going on -- remember

11   the prior ones that I told you about?  Okay, I told him to go

12   to the Marriott, make sure he has no tail.  Well, he doesn't

13   leave, he stays in Pollo Compero.

14         And Mr. Orellana gets inpatient.  He doesn't

15   understand why he is not picking up this dope.  So he goes into

16   the Pollo Compero and he goes in there at about 7:35.  And he

17   goes to the front counter, he orders some food, and then he

18   comes down.  And what he's doing in this instance, you will

19   hear testimony of this, he's performing a little

20   countersurveillance.  He's checking it out.  Right.

21         The sum of this, you will hear testimony from the

22   agents, he's just driving around that area for a good hour,

23   just driving, you know, suspiciously.  And he goes in there.

24         You will notice in this shot, and you will see this

25   whole video, he walks right past Mr. Majano.  He knows who it

15

1  is, he just doesn't want to encounter him there because he's

2  checking it out.  What did the earlier message say?  Make sure

3  he doesn't have a tail, be on the lookout.

4          So he passes by.  He goes back out.  He eats his food

5  at about 7:41 outside.  Gets back in his car and again starts

6  driving around.

7          Mr. Majano is told to go to the bus stop.  Mr. Majano

8  takes his bag -- the black bag is empty now, they have taken

9  the dope already.  He goes outside and he walks to the bus

10 stop.  And he is standing at the bus stop, and Mr. Orellana

11 Montalvo walks up -- or, excuse me, drives up on Elden Street

12 in his white minivan and opens the door.  And Mr. Majano is

13 supposed to get in.  He doesn't get in.

14         Mr. Orellana Montalvo speeds off.  HSI comes in

15 behind him.  They pull him over at Van Buren Street off of

16 Elden, a few hundred yards away.

17         When he is pulled over, the agents see Mr. Orellana

18 Montalvo banging on his steering wheeling.  And he is

19 exclaiming something.  We're not sure what, but he is

20 exclaiming something.  He is upset.  People act for a reason.

21 Why is he reacting in that way?  He got caught.

22         Now, what's interesting here -- remember, I told you

23 about the red shirt?  What's he wearing here?  A black shirt.

24 He has changed his shirt.  Right?  The red shirt was too

25 obvious.

16

1        What did they find in the white van after it was

2   searched?  The red shirt stuffed in the glove box of the white

3   minivan.  He changed his shirt.  He didn't want to be noticed,

4   the red shirt was too obvious.

5        In addition, ladies and gentlemen, the HSI agents

6   discovered a small scale, it's a scale that has a capacity to

7   weigh out 600 grams, about a pound, I guess.  I guess it is a

8   pound.

9        I will suggest to you that that scale is one of the

10  tools of the drug trafficking trade, its what people use to

11  sort of weigh out drugs for further distribution.

12       And in sum, ladies and gentlemen, that is a part of

13  the Government's evidence in this case.

14       I submit to you when you hear all the evidence in

15  this case, that you will find that these two defendants

16  conspired with each other within a larger organization to

17  fulfill certain goals, which was to move cocaine and heroin

18  into the Northern Virginia area.

19       Each defendant is charged with four counts.  At the

20  conclusion of the case, ladies and gentlemen, my colleague, Mr.

21  Traxler, will have an opportunity to argue it to you.  He will

22  tie it all up together.

23       But I am confident when you hear the evidence unfold

24  in this case, you will find these defendants guilty beyond a

25  reasonable doubt of all four charges that the United States has

17

1    brought against them.

2            Thank you very much.

3            THE COURT:  All right.  Thank you, Mr. Fitzpatrick.

4            Mr. Crawley.

5            MR. CRAWLEY:  May it please the Court, Your Honor.

6            Ladies and gentlemen of the jury, good morning again.

7            My name is Dwight Crawley, and I represent Mr.

8    Rosemberg Majano.

9            Being stupid is not a crime.  Doing something foolish

10   is not a crime.

11           Ladies and gentlemen, despite what the Government has

12   said to you this morning, the evidence will not show that my

13   client knew what was inside of those packages.  In fact, to the

14   contrary, nothing about this case suggests that my client knew

15   what was in those packages.  Those packages were clearly marked

16   soy milk, coffee.

17           The Government, with all of its resources, cannot

18   provide you with one call that suggests that my client knew

19   what was in those packages.  They can't provide you with one

20   witness that will testify that my client knew what was in those

21   packages.  They can't provide with you fingerprint information

22   to suggest -- or scientific information of any sort to suggest

23   that my client touched those packages, opened those packages,

24   put anything in those packages, pulled anything out of those

25   packages.

18

1          And they make a big deal about this notion that, hey,

2   once the agent opens up the packages at the airport, he becomes

3   nervous.  Well, ladies and gentlemen, let me ask you, and you

4   will see from the evidence, think about it, if someone opened a

5   package and you didn't suspect that it had any contraband in

6   it, and then they pulled contraband out, what would your normal

7   reaction be?  You probably would be nervous.

8          But what would your next action be?  Your next action

9   would be, if you didn't do anything wrong, you would do what my

10  client did, you would cooperate with law enforcement.  You

11  would tell them everything you know.

12         And that's what he did on August 10, he told them

13  everything he knew.  But more than that, he assisted them.  He

14  assisted them.  But for his conduct, that gentleman would not

15  be sitting at this table.

16         You see, my client had to engage in this activity

17  with the Government to go after the people who were

18  responsible.  And so, he went along with the Government's

19  statements -- I mean, the agents' directives, and he went along

20  with the calls.  And he did everything that they asked him to

21  do.

22         And what did he get in return?  He got a four-count

23  indictment, and now he sits here an innocent man.  And at the

24  end of this case I believe you will hear all the evidence, and

25  you will make the only reasonable conclusion, which is that

19

1   this man was duped into doing something that he otherwise would

2   not have done.

3           And it's for those reasons I'm going to ask you to

4   return a verdict of not guilty.

5           Thank you.

6           THE COURT:  Thank you, Mr. Crawley.

7           Mr. English.

8           MR. ENGLISH:  Thank you, Your Honor.

9           Good afternoon, ladies and gentlemen.  My name is

10  Greg English.  I represent the gentleman sitting right here,

11  Alex Orellana.

12          And let me explain something about his name to start

13  with.  The name on the indictment is Jose, which is Spanish for

14  Joseph.  Middle name Alejandro, which is Spanish for Alexander.

15  Orellana, it looks like Orellana, it's O-r-e-l-l-a-n-a.   In

16  Spanish, the two Ls are pronounced as a Y.  So it's Orellana.

17  And then the last name, Montalvo.

18          He is an American citizen.  He has been here since he

19  was a child.  He has been Anglicized or Americanized.  He uses

20  the nickname of Alex, that's what his friends and family call

21  him.

22          The custom for many Hispanics is to have your

23  father's name.  Like a former prosecutor who was in the office,

24  he was Jose Rios Torrez.  Rios was his father's name.  We

25  called him George Rios.  Torrez was his mother's name.

20

1          In this case, we call my client the nickname Alex and

2    Orellana, his father's name.  And in his case, the Montalvo is

3    his stepfather's name.

4          So what we call him looks a little different than

5    what is said on the indictment.  It's not like a yuppy

6    hyphenated name where we call him Orellana-Montalvo.  It's

7    simply Orellana.

8          And I would like to point out, I just represent him.

9    I don't represent the co-defendant.  Because these gentlemen

10   were indicted together, they are being tried together.  What

11   you have here is basically two simultaneous trials going on.

12   And the judge will instruct you, you need to judge each

13   defendant separately and each count separately in this case.

14         I also should warn you that in my case, nature has

15   played a bit of a joke.  For a big guy, I have a soft voice.  I

16   am sometimes hard to understand.  So if you ever have trouble

17   hearing me, I would appreciate it if you could signal and I

18   will try to stand closer to the microphone or to speak louder

19   in the case.

20         Now, as Judge O'Grady told you, if you see my client

21   or I in the cafeteria or on the elevator, we won't speak to

22   you.  We might nod, or the most we would ever say is hello.  We

23   are not trying to be snobs or standoffish or anything, but

24   that's because of the rules of the court.

25         Because we're lawyers, we have a fancy name for this,

1    it's called an ex parte contact.  It means without the other

2    party.  Under our rules, we can only talk to you if the

3    opposing party is present and the judge is present to referee.

4             So as much as we would like to talk about some of the

5    problems with leadership in Washington, for example, should

6    Kirk Cousins get a new contract anytime soon, we're not able to

7    because of the rules of the court.  So please don't think we're

8    being rude, we're not.

9             Now, as Judge O'Grady also told you, an indictment is

10   simply an accusation.  An indictment is the formal method by

11   which people are brought to trial.  An indictment informs them

12   of what charge they have to answer.  That's why we're here.

13            Some of the people who are indicted are guilty and

14   some are innocent, and you have to sort out which is which.

15   And you may remember some years ago when members of the Duke

16   lacrosse team were indicted for rape, they were tried by

17   newspaper and found guilty, but when the case was over, the

18   charges against them were dismissed and the prosecutor was

19   disbarred.

20            So what I am saying is, you have to hear all of the

21   evidence in this case before making a decision.  And in that

22   regard, if we were to say to you, ladies and gentlemen, you've

23   heard the opening statements from both sides, how would you

24   vote?  And you would say, gee, Greg, I haven't heard the

25   evidence yet, I don't have an opinion.

22

1           Well, as a matter of law, that's wrong because my

2    client is presumed to be innocent.  That means the scales of

3    justice are tilted like this in his favor.  And that remains

4    that way until the prosecution can prove by evidence,

5    convincing evidence, legal evidence beyond a reasonable doubt

6    that he is guilty.  It then changes and you can say, well, he's

7    guilty because they have proven it.  Which, we submit, won't

8    happen in this case.

9           So if you were to vote right now, the only verdict

10   you could return is not guilty because you've heard no evidence

11   from the Government to prove anything beyond a reasonable

12   doubt.

13          Now, as my client sits here, he has a constitutional

14   right, it's the Fifth Amendment to the Constitution, not to

15   testify in this case.  He will, he will tell you what happened

16   in this case.

17          He will tell you that before August 10, he went to El

18   Salvador where his stepfather and his mother were.  His

19   stepfather had been there for sometime renovating a house that

20   they had.  They had had a tenant for some years, he left, and

21   they wanted to sell it.  And he called his dad and said -- he

22   had a disagreement with his girlfriend and he was upset.  And

23   his dad said, look, I'll get a ticket, I'll pay for you to come

24   here, and you can help me renovate the house.

25          So he went to El Salvador where he was born for a few

1   days.  While he was there, he went to a party.  One of his

2   father's friends had a celebration for the daughter turning --

3   his daughter turning 15.  My client went there with his dad.

4   He met a guy named Kevin.  Excuse me, bad year, bad time for

5   allergies for me, and I apologize for the interruption.

6           Kevin's uncle is also a friend of his dad, he runs a

7   hardware store where he has bought stuff for years.  And during

8   the renovations of the house, he bought numerous things.  Well,

9   to make a long story short, they exchanged numbers while they

10  were there.

11          Now, on August 10, the day of the arrest, my client

12  gets a telephone call from this guy he knows as Kevin.  He asks

13  him, please, pick up a friend at the airport.  He says, the

14  friend doesn't speak English, he just speaks Spanish, and the

15  ride we had for him fell through.  He told my client, and he'll

16  testify, he said, I'll give you $100 for your trouble and I

17  will give $50 for expenses.  The expenses being gas, tolls, and

18  parking.

19          So he agreed to go to Dulles Airport to pick this guy

20  up.  You will see and the evidence will show, my client's a

21  very gullible young man.  And I am trying to think of a

22  politically correct way to say this, he's a little slow.  He

23  was traumatized when he was a child before his family came to

24  America when there was a drive-by shooting and he was shot

25  twice, stray bullets hit him.  He wasn't involved in anything,

1  obviously, he was a child.

2           His parents have babied him because of that.  He had

3  difficulties in school.  He took special ed.  He went to a

4  special school because he was having trouble learning to read

5  and to write.  He spent six months in this military school

6  environment.  And even when that was done, he tried to take the

7  GED, but he didn't pass it.  He is easy to manipulate.  And you

8  will see him testify and you can judge for yourself how

9  sophisticated he is and how quick he is.

10          In any event, Kevin told him to pick this guy up.  He

11  sent him pictures of the person so he would know what he looked

12  like.

13          He didn't have his car anymore.  He had a 20-year-old

14  beater that he had sold for about a thousand dollars.  He had

15  some of the money on him when he went to the airport.  He took

16  his parents' car, he had driven his mother to the airport in

17  their van when she went to join his dad in El Salvador.  And he

18  drove the van, the typical family van to the airport.

19          He went to Dulles, he couldn't find the guy.  He gave

20  up, he started to drive away.  He got to the beltway.  He

21  talked to this Kevin guy.  He said, no, the guy is in a chicken

22  place, told him where it was.  And he drove around looking for

23  the guy.  And when he finally saw him and he drove up to him,

24  he didn't like the looks of the guy, and he was disturbed when

25  he looked at an e-mail and said, this isn't right, so I'm

25

1  leaving.  So he drove away without ever having any contact with

2  the person.

3          Obviously, this guy Kevin is pulling the strings, was

4  getting someone who didn't know there were any drugs being

5  brought by someone, didn't know the other person, had never

6  seen the co-defendant in his life before that day, and was sent

7  to the airport to pick up someone.

8          He never expected anyone would have drugs.  And I

9  submit to you, who would?  We all know after 9/11 what it's

10  like to go through an airport where there are sniffer dogs, and

11  where there is security.  And when you go through it, if

12  someone comes out of Customs coming into America, you would

13  think they wouldn't have any dope on them or any guns on them

14  or any kind of contraband.

15          The same way if someone asked you to pick up someone

16  at this courthouse after what you went through to get in here

17  today, you can be pretty sure that when they walk out and you

18  give them a ride, they're not going to have any guns or any

19  drugs on them either because they have been scanned and

20  x-rayed.

21          So basically what this case is about, someone

22  manipulated my client, who they realized wasn't that swift and

23  was gullible enough to go pick someone at an airport.  They

24  promised to pay him $150 for his efforts for the case.

25          So I ask, when you've heard all of the evidence in

26

1    the case, you will see there is no evidence of any kind of a

2    conspiracy.  My client is simply a victim of a manipulator.

3    And because of that, I would ask you to find him not guilty.

4          Thank you.

5    ------------------------------------------------

          PARTIAL TRANSCRIPT CONCLUDED

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20          I certify that the foregoing is a true and

21    accurate transcription of my stenographic notes.

22

23

                    /s/  Norman B. Linnell

24            Norman B. Linnell, RPR, CM, VCE, FCRR

25